UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| FRANK BRUNCKHORST III, individually and in his capacity as trustee of THE FRANK BRUNCKHORST III 2001 TRUST,<br><br>        Plaintiff,<br><br>        -against-<br><br>ERIC BISCHOFF; SUSAN STRAVITZ KEMP, in her capacity as co-trustee of THE BARBARA BRUNCKHORST 1994 TRUST and executrix of THE ESTATE OF BARBARA BRUNCKHORST, AND RICHARD TODD STRAVITZ, in his capacity as co-trustee of THE BARBARA BRUNCKHORST 1994 TRUST, trustee of THE BARBARA BRUNCKHORST 2010 TRUST, and executor of THE ESTATE OF BARBARA BRUNCKHORST,<br><br>        Defendants. | Case No. 1:21-cv-04362-JPC |
| ERIC BISCHOFF,<br><br>        Counterclaim-Plaintiff,<br><br>        v.<br><br>FRANK BRUNCKHORST III, individually and in his capacity as trustee of THE FRANK BRUNCKHORST III 2001 TRUST,<br><br>        Counterclaim-Defendant. | **ERIC BISCHOFF'S SECOND AMENDED COUNTERCLAIM AND CROSSCLAIM** |

ERIC BISCHOFF,

                Crossclaim-Plaintiff,

            -v.-

SUSAN STRAVITZ KEMP, in her capacity as co-trustee of THE BARBARA BRUNCKHORST 1994 TRUST and executrix of THE ESTATE OF BARBARA BRUNCKHORST, AND RICHARD TODD STRAVITZ, in his capacity as co-trustee of THE BARBARA BRUNCKHORST 1994 TRUST, trustee of THE BARBARA BRUNCKHORST 2010 TRUST, and executor of THE ESTATE OF BARBARA BRUNCKHORST,

                Crossclaim-Defendants.

## SECOND AMENDED COUNTERCLAIMS AND CROSSCLAIMS

Defendant, Counterclaim and Crossclaim Plaintiff Eric Bischoff ("Eric"), by and through his undersigned counsel, brings this (a) Counterclaim against Plaintiff and Counterclaim-Defendant Frank Brunckhorst III, in his individual capacity ("Frank"), and as trustee of the Frank Brunckhorst III 2001 Trust ("Frank's 2001 Trust") and (b) Crossclaim against Susan Stravitz Kemp, as co-trustee of the Barbara Brunckhorst 1994 Trust, and Richard Todd Stravitz, as co-trustee of the Barbara Brunckhorst 1994 Trust and as trustee of the Barbara Brunckhorst 2010 Trust (together, the "Trustees"), and asserts as follows[1]:

## INTRODUCTION

1.      Boar's Head Provisions Co., Inc. ("Boar's Head" or the "Company") is a family-owned, nationally famous, premier manufacturer of delicatessen products that has its roots in

---

[1]      Certain individuals are referenced in this pleading by their first name or initials only for ease of reference, as various family members relevant to issues involved in this matter bear the same surname.

Brooklyn, New York.  For the past 30 years, the Boar's Head Shareholder's Agreement and Irrevocable Trust, dated 1991 (the "Shareholder's Agreement" or the "Agreement"), has been the exclusive agreement governing the ownership and transfer of all Boar's Head stock.  Pursuant to the clear, unambiguous and carefully thought out terms of that Agreement, Eric has the sole and exclusive right to purchase all shares of Boar's Head stock owned by the Barbara Brunckhorst 1994 Trust and the Barbara Brunckhorst 2010 Trust (together, the "Barbara Brunckhorst Trusts") that were deemed offered for sale upon the death of Barbara Brunckhorst ("Barbara") in November 2020 (the "Shares").  This action is made necessary because Frank, having failed to validly exercise his potential right to acquire the Shares, now improperly lays claim to them, and because the Trustees, in contravention of the plain terms of the Shareholder's Agreement, have decided to sell the Shares to Frank.

2.      The Shareholder's Agreement places Boar's Head shareholders ("Shareholders") into one of two groups, Group A and Group B, and governs the disposition of Boar's Head stock in the event of the death of a Shareholder or of the beneficiary of a trust that is a Shareholder (a "Shareholder-Beneficiary").  So that the shares remain under the control of living family members, the Agreement compels the prompt disposition of shares following the death of a Shareholder or a Shareholder-Beneficiary pursuant to a waterfall mechanism (the "Waterfall").  Through the Waterfall, upon the death of a Shareholder-Beneficiary, all Boar's Head shares owned by the related trusts are deemed offered for sale at book value to certain other Shareholders for prescribed periods of time based on a predetermined order of priority.

3.      On November 18, 2020, Eric's cousin Barbara passed away.  Barbara was a beneficiary of the Barbara Brunckhorst Trusts, which held approximately 25% of the Company's

stock at the time of her death.  Thus, as set forth in the Shareholder's Agreement, upon her death, the Shares were deemed offered for sale through the Waterfall.

4.      The Waterfall worked as follows:  For the first 20 days following Barbara's death, the Shares were deemed offered to other Group A Shareholders.  That group included Frank's 2001 Trust (or, alternatively, the Brunckhorst 2020 Investment Trust-A ("Frank's 2020 Trust")).[2] However, no Group A Shareholder accepted the deemed offer to purchase the Shares during those 20 days, and the offer expired pursuant to the terms of the Agreement.

5.      Next in the Waterfall, the Shares were deemed offered to the Company for 20 days.  When the Company did not accept the deemed offer, its offer expired as well.

6.      Last in the Waterfall, the Shares were deemed offered to the Group B Shareholders, which includes Eric, for 10 days.  On January 6, 2021, Eric accepted the deemed offer.  No other Group B Shareholder accepted the deemed offer within the 10 days.  Thus, Eric is the *only* Shareholder who exercised his option to purchase the Shares pursuant to the mandated procedure set forth in the Agreement.

---

[2]      Only Shareholders may participate in the Waterfall.  On information and belief, at the time of Barbara's death, Frank's 2001 Trust or Frank's 2020 Trust was a Shareholder, but Frank was not a Shareholder in his individual capacity.  Throughout this pleading, certain references to Frank's 2001 Trust apply equally to Frank's 2020 Trust in the event that Frank's 2020 Trust was a shareholder at the time of Barbara's death.

**Waterfall of Deemed Offer of Shares Following Barbara's November 18, 2020 Death**

| Priority | Offer Window | First Day to Accept Offer | Last Day to Accept Offer | Offerees | Acceptances |
|---|---|---|---|---|---|
| 1 | 20 Days | November 19, 2020 | December 8, 2020 | Group A Shareholders (including Frank's 2001 Trust (or Frank's 2020 Trust)) | None |
| 2 | 20 Days | December 9, 2020 | December 28, 2020 | The Company | None |
| 3 | 10 Days | December 29, 2020 | January 7, 2021 | Group B Shareholders (including Eric) | Eric accepted the deemed offer on January 6, 2021 |

7.      Having missed his window for accepting the offer to purchase the Shares, Frank scrambled in an attempt to lay claim to them.  First, on January 22, 2021, he sent a belated notice of acceptance on behalf of himself purporting to exercise the right to purchase the Shares.  But that notice, in addition to being deficient for reasons discussed below, was sent over a month after the Group A Shareholder window to accept the deemed offer of the Shares closed.  It was plainly untimely.

8.      Next, Frank launched a campaign against Eric, claiming that Eric's exercise of his contract rights under the Shareholder's Agreement demonstrates "breathtaking greed."  Frank claims that he and Barbara had mutually understood that, if either of them died, the other would inherit their shares and donate a portion of the deceased's economic interest in Boar's Head to charitable organizations.  This purported understanding was allegedly captured in a non-binding and non-enforceable 2010 Memorandum of Understanding ("MOU") entered into by Frank and Barbara.  However, even assuming, for purposes of argument, that Frank and Barbara shared such an "understanding" or that Barbara intended that Frank would purchase the Shares upon her death, any such understanding or intention did not create legal rights where there were none.

9.      Indeed, in the MOU itself, Frank acknowledged that neither he nor his trusts would acquire the Shares if they did not follow the letter of the Shareholder's Agreement. The MOU states that **"[t]he Shareholders' Agreement gives Frank and/or Frank's Trust the right to purchase Barbara's Trust's interest in the Company for its book value on the date of Barbara's death** if Frank survives Barbara and if Frank and/or Frank's Trust is then a Group A Shareholder or a permitted transferee within the meaning of the Shareholders' Agreement" but acknowledges that "[t]he Company and/or **other shareholders of the Company would succeed to the purchase right of the survivor of Barbara and Frank if he or she failed to exercise it**." (MOU, at 1 (emphasis added).) That is precisely what happened here.

10.     Frank or Frank's 2001 Trust had two clear paths under the terms of the Shareholder's Agreement to obtain ownership of the Shares. *First*, Barbara's trust instruments could have expressly provided that any Boar's Head shares she owned would pass to Frank or his trust. *Second*, Frank's 2001 Trust could have purchased the Shares in the Waterfall when it was his turn. Neither of those things happened. Instead, the Shares passed through the Waterfall until they reached Eric, who timely and properly exercised his rights.

11.     Accordingly, the Barbara Brunckhorst Trusts were required under the Shareholder's Agreement to sell the Shares to Eric no later than August 18, 2021, which deadline was extended (on consent) to September 30, 2021. Regrettably, but predictably, on September 30, the Trustees, who are Barbara's children, stated their intention to sell the Shares to Frank, their first cousin, instead of Eric, their second cousin, based on extra-contractual reasons and newly-minted readings of the Shareholder's Agreement that no party, even Frank, had ever raised before. Thus, the Trustees and the Barbara Brunckhorst Trusts are now in breach of the Shareholder's Agreement.

12. With Frank having challenged his rights and the Trustees having decided to sell the Shares to Frank, Eric brings this Counterclaim and Crossclaim seeking a judicial determination that: (i) pursuant to the express terms of the Shareholder's Agreement, Eric timely and properly exercised his option to purchase the Shares; (ii) Eric has the exclusive right to purchase the Shares, consistent with the terms of the Agreement; and (iii) the Trustees and the Barbara Brunckhorst Trusts are required to sell the Shares to Eric.

13. To enforce his exclusive right to purchase the Shares, Eric seeks an injunction prohibiting the Trustees and the Barbara Brunckhorst Trusts from transferring the Shares to Frank, the Frank 2001 Trust, or any other actual or purported Shareholder other than Eric, an order compelling the Trustees and the Barbara Brunckhorst Trusts to sell the Shares to Eric pursuant to the terms and conditions set forth in Paragraphs 4 and 5 of the Shareholder's Agreement, and a judgment that the Trustees and the Barbara Brunckhorst Trusts have breached the Agreement by failing to sell the Shares to Eric.

## PARTIES

14. Counterclaim and Crossclaim Plaintiff Eric Bischoff (*i.e.*, Eric) is an individual residing at 40 Forest Road, North Haven, New York 11963. Eric is a party to the Shareholder's Agreement and an owner of Boar's Head shares.

15. Counterclaim-Defendant Frank Brunckhorst III is an individual residing in Florida. Frank is a trustee and beneficiary of The Frank Brunckhorst III 2001 Trust (*i.e.*, Frank's 2001 Trust).

16. On information and belief, Crossclaim Defendants Susan Stravitz Kemp and Richard Todd Stravitz (*i.e.*, the Trustees) are citizens and residents of Virginia, co-executors of the Estate of Barbara Brunckhorst, and co-trustees of the Barbara Brunckhorst 1994 Trust. In addition, Richard Todd Stravitz is a trustee of the Barbara Brunckhorst 2010 Trust.

## RELEVANT NON-PARTIES

17.     Non-party Barbara Brunckhorst (*i.e.,* Barbara) was, at the time of her death, a beneficiary of the Barbara Brunckhorst Trusts and an individual residing in Virginia.

18.     Non-party Boar's Head Provisions Co., Inc. (*i.e.*, Boar's Head) is an S Corporation duly organized and existing under the laws of the State of Delaware, with its principal place of business at 1819 Main Street, Suite 800, Sarasota, Florida 34236.

## JURISDICTION, VENUE, AND GOVERNING LAW

19.     The Court has subject matter jurisdiction over this Counterclaim and Crossclaim, pursuant to 28 U.S.C. §1332 because Counterclaim and Crossclaim Plaintiff Eric Bischoff is a domiciliary of New York, Counterclaim-Defendant Frank Brunckhorst III is a domiciliary of Florida, and Crossclaim Defendants are domiciliaries of Virginia, and the amount in controversy exceeds $75,000, excluding attorneys' fees and costs.

20.     The Court also has supplemental jurisdiction over this Counterclaim and Crossclaim pursuant to 28 U.S.C. §1367(a) because the Court has original jurisdiction over the action filed by Counterclaim-Defendant, and because Counterclaim-Defendant's Complaint and this Counterclaim and Crossclaim are so related that they form part of the same case or controversy under Article III of the U.S. Constitution.

21.     Venue is proper pursuant to 28 U.S.C. §1391 because Counterclaim-Defendant filed the Complaint in this district.

22.     The Shareholder's Agreement "shall be governed by, construed and enforced in accordance with, the laws of the State of New York without giving effect to conflict of law principles." (Agreement, ¶ 18.)

## STATEMENT OF FACTS

**A.      The Boar's Head Business and Relevant Family Lines.**

23.     In 1905, Frank Brunckhorst founded the Frank Brunckhorst Company ("FB Co."), to distribute delicatessen products from his horse-drawn wagon in Brooklyn, New York. Initially, the meats that FB Co. distributed were manufactured by others.

24.     Two years after Frank Brunckhorst's death in 1931, Boar's Head was founded by Bruno Bischoff ("Bruno") who was Frank Brunckhorst's son-in-law, Frank Brunckhorst Jr. ("Frank, Jr.") and Theodore Weiler, the Company's financial backer, to manufacture deli meats for distribution by FB Co.  The founding members shared an understanding that Mr. Weiler's Boar's Head shares would revert back to the Brunckhorst and Bischoff families upon his death. As intended, Mr. Weiler's Boar's Head equity interests reverted to the families after he died in 1987.

25.     Bruno and Frank Jr. became patriarchs of two family lines, the Bischoffs and the Brunckhorsts.  The founders intended that both family lines have equal rights and access to ownership of the Company.

26.     A diagram depicting the lineal descendants of the two family lines is depicted below.



27.     Although the ownership of the Company was initially divided equally between the two family lines, the shares historically have been transferred in ways that result in unequal ownership between the two.  Thus, while the Brunckhorst and Bischoff family lines have desired equal ownership between the two lineages, that outcome was never guaranteed or required.

28.     By way of example, in the Bischoff family line, Herbert Bischoff (Eric's father) owned 25% of the families' Boar's Head equity.  When Herbert died in 1973, Barbara purchased all of Herbert's Boar's Head shares, increasing the Brunckhorst family shareholding to more than 50%, and resulting in an unequal distribution of shares among the two family lines.

29.     Following his father's death and upon graduating from college, Eric began working as a full-time employee of Boar's Head with the promise and expectation that he would receive the same percentage of family-owned Boar's Head shares that his father held.  While some of those shares were later transferred back to Eric, most went to the Martin side of the Bischoff family line.  Forty-eight years later and after working full-time for Boar's Head for over three decades, including moving to Virginia and supervising the building, start up and successful operation of the Company's first manufacturing plant outside of Brooklyn, the family has not made good on its promise to restore to Eric the percentage of family-owned shares previously held by his father.

**B.     In 1991, All Then-Existing Shareholders Enter Into the Shareholder's Agreement**

30.     In 1991, all Boar's Head shares were held by descendants of Frank Brunckhorst. At that time, the then-existing Shareholders entered into the Shareholder's Agreement, which bifurcated the two family lines into separate Shareholder groups:  The Brunckhorst family Shareholders are referred to as "Group A Shareholders" and the Bischoff family Shareholders are referred to as "Group B Shareholders."

10

31.     At the time the Shareholder's Agreement was executed, Barbara was the only Group A Shareholder, and there were three Group B Shareholders: (i) the Alvina Martin 1988 Trust (a trust established for the benefit of Bruno Bischoff's daughter, Alvina Martin); (ii) Robert S. Martin (Alvina Martin's son); and (iii) Eric.

32.     Paragraph 3(b) of the Agreement provides that any transferee of Boar's Head shares "shall take such Shares subject to, and shall be fully bound by, the terms of this Agreement as if such transferee were a party hereto as a Group A or Group B Shareholder." Pursuant to that provision, upon receiving Boar's Head shares, the Barbara Brunckhorst Trusts and Frank's 2001 Trust became Shareholders fully bound by the terms of the Shareholder's Agreement.

33.     Throughout the years, the Shareholders have sought to adhere to the terms of the Shareholder's Agreement with regard to the transfer and sale of Boar's Head stock.

### C.     The Shareholder's Agreement Strictly Governs the Transfer of Shares Between and Among Shareholders Upon Death

34.     The Shareholder's Agreement sets forth unambiguous, mandatory procedures governing any transfer of Boar's Head shares.  Paragraph 5 of the Shareholder's Agreement specifically addresses the transfer or disposition of Boar's Head shares upon the death of any Shareholder or Shareholder-Beneficiary, including Barbara.

35.     If, prior to his or her passing, a deceased Shareholder-Beneficiary legally committed to transferring their Boar's Head stock through their operative trust instrument, Paragraph 5(a) governs.  Otherwise, Paragraph 5(b) does.

36.     Paragraph 5(a) provides that, in the event of the death of a Shareholder-Beneficiary, "the shares of such Shareholder" may be transferred to a permissible transferee if "the dispositive terms of the applicable trust instrument provide for the transfer of the Shares" in

accordance with the terms and conditions of Paragraph 3(b) of the Agreement. (Agreement, ¶ 5(a).) Paragraph 3(b) states that a Group A Shareholder—as the Barbara Brunckhorst Trusts are—may transfer "any and all" of their Boar's Head stock to "any other Group A Shareholder," any member of Barbara Brunckhorst's "immediate family," who is also an active employee of Boar's Head or other related corporations, or "a trust for the benefit of such Group A Shareholder or such permitted transferee." (Agreement, ¶ 3(b).)

37.    The trust instruments for the Barbara Brunckhorst Trusts did not provide for the transfer of the Shares in accordance with Paragraph 3(b) of the Agreement. Accordingly, Paragraph 5(b) controls the disposition of the Shares.

38.    Paragraph 5(b) provides that "in the event of the death of a beneficiary, on the date of death," the trustees of the relevant Shareholder trust shall "be deemed to have offered for sale all of the Shares owned by such Shareholder at the time of death, in accordance with the provisions of Paragraph 4 hereof, except that no written offers provided therein need be given." (Agreement, ¶ 5(b).)

39.    Thus, on the date of Barbara's death (*i.e.*, November 18, 2020), the Trustees of the Barbara Brunckhorst Trusts were deemed to have offered all the Shares for sale in accordance with the Waterfall provisions of Paragraph 4 of the Shareholder's Agreement.

40.    Paragraph 4 sets forth an elective waterfall distribution mechanism that flows as follows:

A.    *First*, a Shareholder trust must "first offer to sell all of the Shares owned by such Shareholder to the other members of his Group," *i.e.*, Group A or Group B, pursuant to the terms and conditions set forth in the Agreement. (Agreement, ¶ 4(a)-(b).) The other Shareholders in the offering Shareholder's group (if any)

then have 20 days to accept the Shares deemed to have been offered to them.  (*Id.*, ¶ 4(a).)

B.    *Second*, if no Shareholders in the offering Shareholder's group exercise their purchase option, then those shares are deemed offered to the Company, which has 20 days to exercise its option once those shares are deemed offered. (*Id.*, ¶ 4(c).)

C.    *Third*, if the Company does not exercise its option within its 20 day window, the shares are next deemed offered to the Shareholders in the other group for a period of 10 days.  (*Id.*, ¶ 4(d).)

41.    Paragraph 19 of the Agreement requires any and all notices by a Shareholder to exercise the option to purchase any shares, including those for the acceptance of any deemed offer, to be "in writing" and "personally delivered or sent by registered or certified mail, return receipt requested, postage prepaid, addressed to the parties" at their respective addresses. (Agreement, ¶ 19.)

42.    Paragraph 7(a)(i)(A) requires that, "with respect to sales of Shares pursuant to Paragraph 5," the parties shall agree on the date on which the purchase price shall be paid against the delivery of the certificate of shares (the "Sale Date").  The Sale date must fall within nine months of the date of death of the Shareholder-Beneficiary, *i.e.*, in this instance, no later than August 18, 2021 (nine months after Barbara Brunckhorst's death).  (Agreement, ¶ 7(a)(i)(A).)

**D.    Barbara Passes Away on November 18, 2020 and her Trusts' Shares Pass Through the Waterfall**

43.    Barbara, the Shareholder-Beneficiary of the Barbara Brunckhorst Trusts, died on November 18, 2020.  The Shares (defined above) held by the Barbara Brunckhorst Trusts

constituted approximately 25% of the Company.  Pursuant to the plain terms of the Agreement, the Shares then passed through the Waterfall.  (Agreement, ¶ 5(b).)

44.    As the Barbara Brunckhorst Trusts are Group A Shareholders, on November 18, 2020, the Shares were deemed offered by those trusts to the other Group A Shareholders for a period of 20 days, *i.e.*, until December 8, 2020.  On information and belief, the only other Group A Shareholder at that time was Frank's 2001 Trust (or, in the alternative, Frank's 2020 Trust).  No Group A Shareholder exercised its option to purchase the Shares within the allotted 20-day time period.

45.    Next, the Shares were automatically deemed offered to the Company for a period of 20 days, *i.e.*, until December 28, 2020.  Likewise, the Company did not exercise its option to purchase the Shares within its 20-day allotted time period.

46.    When the Company failed to exercise its option to purchase the Shares, the Shares were automatically and immediately deemed offered to the Group B Shareholders for a period of 10 days, *i.e.*, until January 7, 2021.

### E.    When Group B's Turn Comes in the Waterfall, Eric Timely and Properly Exercises His Right to Purchase the Shares by Providing Written Notice Via Certified Mail

47.    On January 6, 2021, Eric, a Group B Shareholder, exercised his option to purchase the Shares and sent written notice to the offering Shareholders, the Barbara Brunckhorst Trusts, pursuant to Paragraph 19 of the Agreement.

48.    In strict compliance with Paragraph 19, Eric sent his exercise notice via certified mail, return receipt requested, postage prepaid, to the Barbara Brunckhorst Trusts at the last known addresses for the Barbara Brunckhorst Trusts and for the Trustees.  Eric has since confirmed that his exercise notice was properly addressed to at least one of the Trustees, Susan Stravitz Kemp, at her home address, and that both of the Trustees received the notice.

49.     Eric's notice constituted a valid and legally-binding acceptance of the deemed offer to purchase the Shares because the notice was timely and strictly complied with the terms and conditions of the Agreement.

50.     On January 6, 2021, both Eric and a trust for which he is a beneficiary, the Eric Bischoff 2012 Trust, were Group B Shareholders.  Accordingly, in his written notice, Eric included notice by the Eric Bischoff 2012 Trust to exercise its right to purchase the Shares. However, the Eric Bischoff 2012 Trust is no longer a Shareholder and no longer seeks to purchase the Shares.[3]  Eric, individually, remains a Group B Shareholder, and he accepted all of the Shares deemed offered in his individual capacity.

51.     At midnight on January 7, 2021, the 10-day period for any other Group B Shareholders to exercise their option to purchase the Shares expired.  (Agreement, ¶ 4(d).)  On information and belief, no other Group B Shareholder sent written notice of an intent to acquire the Shares pursuant to Paragraph 19 of the Agreement prior to that deadline.

52.     Eric is the only Shareholder who timely and properly accepted the deemed offer to purchase the Shares pursuant to the terms of the Shareholder's Agreement.  As such, Eric has the sole and exclusive right to acquire the Shares.

**F.     Only After Eric Exercises His Right in the Waterfall Does Frank Purport to Exercise His Own Right to Purchase the Shares on January 22, 2021**

53.     Eric's notice of his acceptance of the deemed offer to sell the Shares apparently triggered Frank to assert an expired and invalid right to purchase the Shares.

---

[3]     Pursuant to an agreement entered into by Frank's 2001 Trust, Eric and others, the Eric Bischoff 2012 Trust was a Group B Shareholder at the time the Barbara Brunckhorst Trusts were deemed to have offered the Shares to Group B Shareholders.  As required by that same agreement, all of the Boar's Head shares previously owned by the Eric Bischoff 2012 Trust have since reverted back to Eric.

54.     On January 22, 2021, Frank (purportedly in his capacity as a Group A Shareholder) sent a letter to the Barbara Brunckhorst Trusts purporting to give notice that he was accepting an offer to purchase the Shares.  However, Frank's letter was untimely, improper and ineffective.

55.     First, the Group A Shareholders' deadline to exercise the option to purchase the Shares expired 44 days before Frank sent his January 22, 2021 letter.  It was therefore untimely and ineffective under New York law, which strictly construes contractual time limitations on option agreements.

56.     In an effort to justify his delay, Frank has offered a tortured reading of the Shareholder's Agreement which improperly mixes and matches inapplicable provisions.  Frank alleges that the time periods in the Waterfall did not start to run on Barbara's death in November 2021.  Instead, he claims, the Waterfall provisions began to run on January 19, 2021 when the co-executors of Barbara Brunckhorst's estate were appointed, making his January 22, 2021 notice timely.  (Complaint, ¶¶ 39-42.)  But this argument applies the wrong provision from the Shareholder's Agreement.

57.     If Barbara had owned the Shares in her individual capacity at the time of her death, then Frank would be correct that the Waterfall would have begun to run ten days after the appointment of her estate's executors.  But Barbara did not own any of the Shares individually.  Rather, as Frank admits in his pleadings, the Barbara Brunckhorst Trusts owned the Shares and Barbara was a Shareholder-Beneficiary.

58.     As set forth above, in the case of a Shareholder-Beneficiary (*i.e.*, for shares owned by a trust), the Waterfall's clock starts to run upon the death of the Shareholder-

Beneficiary, and not ten days after the appointment of executors of his or her estate. Indeed, Frank admitted as much in the non-binding MOU.

59. In the MOU signed by Frank, Frank acknowledged that "[t]he Shareholders' Agreement gives Frank and/or Frank's Trust **the right to purchase Barbara's Trust's interest in the Company** for its book value **on the date of Barbara's death** if Frank survives Barbara and if Frank and/or Frank's Trust is then a Group A Shareholder or a permitted transferee within the meaning of the Shareholders' Agreement." (MOU, 1 (emphasis added).) Therefore, under the express terms of Paragraph 4 of the Agreement, as acknowledged by Frank, Frank must have sent his notice within 20 days of Barbara's November 18, 2020 death. He plainly did not do so.

60. Frank attempts to obfuscate the indisputable fact that Barbara was not a Shareholder at the time of her death by claiming that because Barbara is defined in the *preamble* to the Shareholder's Agreement as a "Shareholder," she remains one forever and can never become a Shareholder-Beneficiary. But that makes no sense.

61. When Barbara signed the Shareholder's Agreement in 1991, she owned Boar's Head shares in her individual capacity. Thus, she was a Shareholder at that time, which is why she is referred to as a Shareholder in the preamble. However, between 1991 and her death in 2020, Barbara transferred all her shares to her trusts. At that point, she became a Shareholder-Beneficiary and lost her status as a Shareholder because she no longer owned shares; rather, her trusts owned shares and became Shareholders in her place.

62. Further, pursuant to the Shareholder's Agreement, the deemed offer was made to Frank's 2001 Trust, which was a Group A Shareholder with an option to purchase the Shares within 20 days of Barbara's death. However, Frank never provided notice on behalf of that or

any other trust.  Instead, Frank purported to give "notice" in his individual capacity, but he was not a Shareholder at the time of Barbara's death and, as such, no deemed offer was made to him.

63.    Accordingly, even assuming, for purposes of argument, that the January 22, 2021 letter by Frank purporting to accept a deemed offer to purchase the Shares was timely (it was not), it still would have no effect under the Agreement because Frank had no individual right to purchase the Shares.

64.    In addition, pursuant to the logic of Frank's current argument that the Waterfall began to run on the January 19, 2021 appointment of the executors of Barbara's estate, the Barbara Brunckhorst Trusts never made a deemed offer to sell the Shares to Frank's 2001 Trust, which now seeks to acquire them.  That is so because Frank's 2020 Trust was a Shareholder at the time that the executors were appointed, but neither Frank nor Frank's 2001 Trust were.

65.    Subsequent to a February 27, 2020 Interim Settlement Agreement (the "<u>Interim Settlement Agreement</u>") entered into by all the then-Shareholders, Frank's 2001 Trust was permitted to transfer, and did transfer, all of its Boar's Head stock to Frank's 2020 Trust.  Thus, in January 2021, Frank's 2020 Trust was a Shareholder, but Frank's 2001 Trust was not.

66.    As described, a Shareholder must "first offer to sell all of the Shares owned by such Shareholder to the other members of his Group" pursuant to the terms and conditions set forth in the Agreement.  (Agreement, ¶ 4(a)-(b).)  According to the logic of Frank's argument, any deemed offer made on January 19, 2021 would have been made only to Frank's 2020 Trust, which was the only other Group A Shareholder at the time.  No deemed offer would have been made to Frank's 2001 Trust, which now seeks to acquire the Shares, since it was not then a Shareholder.  That is problematic for Frank's argument, given that his 2020 Trust is not now capable of acquiring the Shares, as it is no longer a permitted Shareholder of Boar's Head.

67.     On information and belief, subsequent to Frank's January 22, 2021 notice letter, Frank's 2020 Trust transferred all of its shares back to Frank's 2001 Trust.  Thus, Frank's 2020 Trust is no longer a Shareholder and is ineligible to receive the Shares pursuant to the terms of the Shareholder's Agreement.

68.     Accordingly, as described, if a deemed offer was made in January 2021, it could not have been made to Frank's 2001 Trust, and therefore that trust cannot accept it.  At the end of the day, Frank's attempt to move the date on which the Waterfall commenced gets him nowhere.

### G.     Eric's Attempt To Consummate The Purchase of Shares

69.     The Shareholder's Agreement requires that the Trustees sell the Shares within nine months of Barbara's death, *i.e*., no later than August 18, 2021.

70.     On April 14, 2021, counsel for Eric sent a letter to the attention of Susan Stravitz Kemp, one of the Trustees, confirming Eric's intent to consummate the purchase of the Shares within the nine-month window provided for in the Agreement.

71.     Notwithstanding the unambiguous terms of the Agreement, the Trustees have refused to sell the Shares to Eric.

### H.     Frank Initiates this Action, Claiming That He Had An Understanding with Barbara that the Shares Would Pass to Him

72.     In addition to sending a late and otherwise deficient notice, when Frank realized that he had failed to accept the deemed offer of the Shares and therefore had forfeited any ability to acquire them, he initiated this action against his cousin Eric.  Rather than accept the plain terms of the Shareholder's Agreement to which he is bound, Frank made a series of extra-contractual arguments that seek to supplant the terms of the binding and enforceable contract that has governed the Shareholders' ownership and transfer of shares for the past 30 years.

73.     Frank alleges that Barbara intended that the Shares be transferred to him, and that her intent is expressed in the MOU.  (Complaint, ¶ 45.)  Frank claims that the MOU reflects Frank and Barbara's agreement that if one of them died, the other would acquire the deceased's shares and that the value of those shares in excess of the purchase price would be donated to a charitable organization of the deceased's choice.  That is not correct.

74.      The MOU merely sets forth a nonbinding expression of intent by the parties to make charitable gifts to the predeceased party's favored charities in the event the surviving party realizes an economic benefit from a favorable purchase price of the predeceased party's shares pursuant to the terms of the Shareholder's Agreement.  Nothing in the MOU requires that Barbara or her trusts give or transfer any shares to Frank or Frank's 2001 Trust.

75.     As Frank admits in his Complaint, the MOU, by its express terms, is *non-binding*.  (*Id*., ¶ 46.)  Indeed, the MOU itself states that Frank and Barbara "have no power to amend the Shareholder's Agreement without the consent of the Company and its other shareholders."  (*Id*., ¶ 45 (quoting the MOU).)  Thus, Barbara's purported intentions—as described by Frank—have no bearing on the determination required in this action regarding the parties' respective rights and obligations under the Shareholder's Agreement.

76.     Moreover, the existence of the MOU supports Eric's interpretation of the Agreement.  The MOU was purportedly entered into *after* the Shareholder's Agreement, so Barbara and Frank were well aware of the terms and processes mandated by it.  Barbara could have carried out what Frank purports was her intention had she followed the mandated procedure set forth in the binding Shareholder's Agreement, yet she did not do so.

77.     To create the impression that the transfer of the Shares from Barbara's trusts to Frank was treated as an inevitability, Frank claims that before Barbara died he began obtaining

appraisals and telling third parties that he planned to purchase the Shares.  But even if Frank took those steps, they are irrelevant under the Agreement.  The Shareholder's Agreement requires that the notice of acceptance of a deemed offer be provided within a specified timeframe following the Shareholder-Beneficiary's death in a specified manner.  The Agreement also requires that a notice of acceptance be "in writing" and "personally delivered or sent by registered or certified mail, return receipt requested."  Frank and his trust plainly did not comply with those requirements.

78.     Fundamentally, had Barbara truly wished to bequeath the Shares to Frank or to a trust for Frank's benefit upon her death, she could have done so through the operative trust instruments.  (Agreement ¶ 5(a).)  She chose not to do so.  Accordingly, she left Frank—and all other Shareholders—to seek to purchase the Shares pursuant to the strict and unambiguous terms of the Shareholder's Agreement.  Eric did just that.

**I.     The Trustees Decide to Sell the Shares to Frank, Their First Cousin, In Violation of the Unambiguous Terms of the Shareholder's Agreement**

79.     On August 16, 2021, Eric, Frank and the Trustees executed waivers that extended the deadline by which the Trustees had to sell the Shares from August 18, 2021 to September 30, 2021.

80.     On September 30, 2021, the Trustees announced—predictably—that they intend to sell the Shares to Frank.  Given the faulty reasoning demonstrated in the letter announcing their decision, the Trustees' decision plainly was based on their personal preference to sell the Shares to their first cousin, Frank, rather than their second cousin, Eric, and perhaps their desire to carry out what they perceived to be their mother's wishes.

81.     Contrary to their suggestions, the Trustees are not neutral parties in this litigation.  Rather, the Trustees are relatives of Frank and Eric and, as such, have their own personal

preferences in this matter based on their relationships with one another.  The Trustees are not close to Eric, and except for the exercise of his right to buy the Shares, neither Eric nor the Trustees having seen or communicated with each other (professionally or socially) for twenty five years or more.  In addition, there is a history of strong animosity between Richard Stravitz, the Trustees' father, on the one hand, and Herbert Bischoff, Eric's father, and Eric, on the other.

82.    By contrast, according to Frank's complaint, Barbara and Frank had a "deep bond."  (Complaint, ¶ 11.)  Frank also alleges that he and Barbara entered the MOU "[t]o ensure that their plans [regarding postmortem charitable contributions] were realized."  (*Id.*, ¶ 10.)  To the extent those allegations are true (which Eric does not concede), they would further bias the Trustees, who are Barbara's children, in favor of selling the Shares to Frank.  Moreover, as fiduciaries of her estate, the Trustees apparently felt duty bound to carry out what they perceived to be Barbara's wishes, irrespective of the Trusts' contractual obligations under the Shareholder's Agreement.

83.    The fact that the Trustees are not mere bystanders to this dispute is demonstrated by their conduct.  In order to effectuate their desired, but unlawful, sale of the Shares to Frank, the Trustees engaged counsel who sought to position themselves as neutral arbitrators of the dispute, rather than the paid advocates that they are.  After receiving Eric's notice of acceptance to purchase the Shares, the Trustees advised Eric and Frank that their counsel would conduct an "investigation" into which of them is entitled to purchase the Shares.

84.    Although the Trustees' counsel requested documents from Eric and Frank and met with counsel for each, the purported investigation was a sham, intended to create the false impression that the Trustees' decision to sell the Shares to Frank was made impartially and on the basis of an independent analysis by counsel.

22

85.     The Trustees' bias was made evident in a meeting in Washington, D.C. on June 9, 2021, wherein the Trustees' counsel offered a number of indefensible interpretations of the Shareholder's Agreement and suggested that the explicit terms of the Shareholder's Agreement were a consequence of "sloppy" drafting, such that the terms do not mean what they expressly and unambiguously provide.  They also suggested that Boar's Head did not follow corporate formalities, such that the Agreement might be disregarded in its entirety.  The Trustees have since abandoned those theories and concocted new ones.

86.     The Trustees' attempt to disguise themselves as neutral arbiters of this litigation culminated with their September 30, 2021 letter, in which they notified Eric and Frank of their decision to sell the Shares to Frank (the "Letter").  In an effort to bolster their standing, the Trustees filed the Letter with the Court, even though no one asked them to do so.  (*See* ECF No. 70.)

87.     In the Letter, the Trustees claimed that Frank is entitled to purchase the Shares because Barbara was a "Shareholder" within the meaning of Paragraph 5 of the Shareholder's Agreement, and therefore the Waterfall began to run ten days after the appointment of the Trustees as executors of Barbara's estate, rather than on the date of Barbara's death.

88.     However, in apparent recognition that the claim made by Frank in his Complaint is deficient, the Trustees articulated as "[t]he primary reason" for their conclusion an argument that was not mentioned in the Complaint.  The Trustees' counsel contend that Barbara is the Shareholder, rather than the Trusts that hold the Shares, because "both of Barbara's Trusts were revocable," and, as such, Barbara maintained control over the Trusts' assets during her life. (Letter, 10.)  The feebleness of that reasoning, which completely ignores the plain terms of the Shareholder's Agreement, reveals the Trustees' bias.

89.     The Shareholder's Agreement provides that the Waterfall begins to run based on whether the Shareholder is an individual or a trust.  The Agreement does not mention "revocable trusts" or "irrevocable trusts," let alone distinguish between the two for purposes of the Waterfall.  Accordingly, and quite obviously, the Trustees ignored the express terms of the Shareholder's Agreement to reach their desired result.  Nothing in the Letter or otherwise alters the conclusion that Eric has the sole and exclusive right to purchase the Shares from the Barbara Brunckhorst Trusts.

### FIRST CAUSE OF ACTION

### <u>Declaratory Judgment</u>

(Against all Counterclaim and Crossclaim Defendants)

90.     Eric incorporates by reference and re-alleges the allegations set forth above in Paragraphs 1 through 89 as if fully set forth herein.

91.     Pursuant to 28 USC § 2201, the Court has the authority to declare the rights and other legal relations of any interested party seeking such declaration.

92.     An actual controversy has arisen and now exists between Eric and the Counterclaim and Crossclaim Defendants that is within the jurisdiction of the Court concerning the parties' rights and obligations under the Shareholder's Agreement, which controversy may be determined by a declaratory judgment of the Court.

93.     The Shareholder's Agreement is a valid, enforceable contract, to which Eric, Frank's 2001 Trust, and the Barbara Brunckhorst Trusts are all parties.

94.     Eric has materially complied with the relevant terms and conditions of the Shareholder's Agreement, including but not limited to those set forth in Paragraphs 3, 4, 5, and 19, and the Shares should be transferred to Eric.

95.    Eric's January 6, 2021 written exercise notice of his acceptance of the deemed offer to purchase the Shares, sent by certified mail, return receipt requested, in full compliance with the terms of the Agreement for notices and for the acceptance of offers, constituted valid and timely notice under all relevant provisions of the Shareholder's Agreement.  Eric's Trust does not claim any right to the Shares at this time.

96.    Frank did not provide any notice of intent on behalf of Frank's 2001 Trust or any other trust to purchase the Shares pursuant to the Shareholder's Agreement.  Frank's January 22, 2021 purported exercise notice sent in his individual capacity was both improper and untimely. Even had Frank's 2001 Trust sent a notice at that time, the option for Group A Shareholders to purchase the Shares had expired 45 days earlier on December 9, 2020.  Therefore, neither Frank, his 2001 Trust, nor his 2020 Trust has a right to purchase the Shares.

97.    The Trustees of the Barbara Brunckhorst Trusts have announced their intention to sell the Shares to Frank, and to date have refused to sell the Shares to Eric, in violation of the Shareholder's Agreement.

98.    A judicial determination is necessary and appropriate at this time and under these circumstances for the parties to ascertain their rights and obligations to one another.

99.    The Court should declare that: (i) pursuant to the express terms of the Shareholder's Agreement, Eric timely and properly exercised his option to purchase the Shares; (ii) Eric has the exclusive right to purchase the Shares, consistent with the binding distribution mechanism set forth in Paragraph 4(a) of the Agreement, and (iii) the Trustees and the Barbara Brunckhorst Trusts are required to sell the Shares to Eric immediately on the terms and conditions provided under the Agreement.

100.    To enforce his exclusive right to purchase the Shares, Eric seeks an injunction prohibiting the Trustees and/or the Barbara Brunckhorst Trusts from transferring the Shares to anyone other than Eric, and an order compelling the Trustees and/or the Barbara Brunckhorst Trusts to sell the Shares to Eric per the terms and conditions of the Agreement.

**SECOND CAUSE OF ACTION**

**Breach of Contract**

(Against the Trustees)

101.    Eric incorporates by reference and re-alleges the allegations set forth above in Paragraphs 1 through 100 as if fully set forth herein.

102.    The Shareholder's Agreement is a valid, enforceable contract, to which Eric, Frank's 2001 Trust, and the Barbara Brunckhorst Trusts are all parties.

103.    Eric has materially complied with the relevant terms and conditions of the Shareholder's Agreement, including, but not limited to, those set forth in Paragraphs 3, 4, 5, and 19, and the Shares must be transferred to Eric.

104.    Eric's January 6, 2021 written exercise notice of his acceptance of the deemed offer to purchase the Shares constituted valid and timely notice under all relevant provisions of the Shareholder's Agreement.  Eric's Trust does not claim any right to the Shares at this time.

105.    Frank did not provide written notice of intent on behalf of Frank's 2001 Trust to purchase the Shares pursuant to the Shareholder's Agreement.  Frank's January 22, 2021 purported exercise notice sent in his individual capacity was both improper and untimely.  Even had Frank's 2001 Trust or Frank's 2020 Trust sent a notice at that time, the option for Group A Shareholders to purchase the Shares had expired 45 days earlier on December 9, 2020. Therefore, neither Frank nor his 2001 Trust has a right to purchase the Shares.

106.    The Shareholder's Agreement requires that the Barbara Brunckhorst Trusts sell the Shares to Eric within nine months of Barbara's death, *i.e.*, no later than August 18, 2021. The parties agreed to extend that deadline to September 30, 2021.

107.    The Barbara Brunckhorst Trusts did not sell the Shares to Eric by the extended deadline of September 30, 2021 as mandated by the Shareholder's Agreement.  Instead, the Trustees' counsel announced the Trustees' decision to sell the Shares to Frank.

108.    By failing to sell the Shares to Eric by the extended deadline of September 30, 2021, the Trustees and the Barbara Brunckhorst Trusts are in breach of the Agreement.

109.    In addition, due to the Trustees' announcement of their intention to cause the Barbara Brunckhorst Trusts to sell the Shares to Frank instead of Eric, the Trustees and the Barbara Brunckhorst Trusts are in breach of the Shareholder's Agreement.

110.    To remedy the Trustees and the Barbara Brunckhorst Trusts' breach of contract, Eric seeks an injunction prohibiting the Trustees and/or the Barbara Brunckhorst Trusts from transferring the Shares to anyone other than Eric, and an order compelling the Trustees and/or the Barbara Brunckhorst Trusts to sell the Shares to Eric per the terms and conditions of the Agreement.

111.    Eric's damages include, among other harms, any distributions made to or on account of the Shares after August 18, 2021 which are not paid to Eric.

## **RELIEF REQUESTED**

Wherefore, Counterclaim and Crossclaim Plaintiff Eric Bischoff prays for relief as follows:

A.    Enter a declaratory judgment that Eric Bischoff timely and properly exercised his option to purchase the Shares;

B.    Enter a declaratory judgment that Eric Bischoff has the exclusive right to purchase the Shares;

C.      Enter a declaratory judgment that the Trustees and/or the Barbara Brunckhorst Trusts are required to sell the Shares to Eric Bischoff immediately on the terms and conditions provided under the Shareholder's Agreement;

D.      Enter an injunction prohibiting the Trustees and/or the Barbara Brunckhorst Trusts from transferring the Shares to anyone other than Eric Bischoff;

E.      Enter an injunction compelling the Trustees and/or the Barbara Brunckhorst Trusts to sell the Shares to Eric Bischoff on the terms and conditions provided under the Shareholder's Agreement;

F.      Award damages for any distributions made to or on account of the Shares after August 18, 2021 not paid to Eric Bischoff; and

G.      Grant Eric Bischoff any such other and further relief as the Court deems just and proper.


Dated:  November 16, 2021
        New York, NY

                                        By: _____

                                        SCHULTE ROTH & ZABEL LLP

                                        Michael E. Swartz
                                        Taleah E. Jennings
                                        Randall T. Adams

                                        919 Third Avenue
                                        New York, New York  10022
                                        (p) 212-756-2000
                                        (f) 212-593-5955

                                        *Attorneys for Defendant,*
                                        *Counterclaim-Plaintiff and*
                                        *Crossclaim Plaintiff Eric Bischoff*