# EXHIBIT 3

Page 1

```
 1
 2     UNITED STATES DISTRICT COURT
       FOR THE SOUTHERN DISTRICT OF NEW YORK
 3     Case No. 1:21-cv-04362-JPC
       -----------------------------------------x
 4     FRANK BRUNCKHORST III, individually and
       his capacity as trustee of THE FRANK
 5     BRUNCKHORST III 2001 TRUST,
 6                         Plaintiff,
 7             - against -
 8     ERIC BISCHOFF, SUSAN STRAVITZ KEMP, in her
       capacity as co-trustee of THE BARBARA
 9     BRUNCKHORST 1994 TRUST and executrix of
       THE ESTATE OF BARBARA BRUNCKHORST, AND
10     RICHARD TODD STRAVITZ, in his capacity as
       co-trustee of THE BARBARA BRUNCKHORST 1994
11     TRUST, trustee of THE BARBARA BRUNCKHORST
       2010 TRUST, and executor of THE ESTATE OF
12     BARBARA BRUNCKHORST,
13                         Defendants.
14     -----------------------------------------x
       ERIC BISCHOFF,
15
16                     Counterclaim-Plaintiff,
17             - against -
18     FRANK BRUNCKHORST III, individually and in
       his capacity as trustee of THE FRANK
19     BRUNCKHORST III 2001 TRUST, and in his
       capacity as trustee of THE FRANK
20     BRUNCKHORST 2020 INVESTMENT TRUST-A,
21                     Counterclaim-Defendant.
       -----------------------------------------x
22
                       December 15, 2022
23                     10:05 a.m.
24
25            *CAPTION CONTINUED ON NEXT PAGE*
```

1              ERIC BISCHOFF
2    over to the Bischoff side; right?
3         A        It didn't go to the Bischoff
4    side.
5         Q        Where did it go?
6         A        To the Martin side.
7         Q        But it went to the opposite
8    side of the Brunckhorsts?
9         A        Yes.
10        Q        Now, you know, don't you,
11   that the founders intended that Boar's
12   Head would be equally divided between the
13   two family groups, being the Brunckhorst
14   family on the one side and the
15   Martin-Bischoff family on the other side;
16   right?
17        A        I don't -- they never told
18   me about it.  But that's sort of the
19   lore.  That's kind of the basic
20   understanding.  But I never heard it from
21   them.
22                 (The above-referred-to
23       document was marked as Exhibit 5 for
24       identification, as of this date.)
25        Q        We've marked as Bischoff 5,

1          ERIC BISCHOFF

2

3

4

5

6

7

8

9

10

11

12              MR. REED:  Let's mark the

13      shareholder's agreement.

14              (The above-referred-to

15      document was marked as Exhibit 11 for

16      identification, as of this date.)

17      Q        So we've handed you, Mr.

18      Bischoff, what's been marked Bischoff 11,

19      my tab 12.

20              Do you recognize this as a

21      copy of the 1991 Boar's Head

22      shareholder's agreement?

23      A        Yes.

24      Q        Now, you've signed this

25      agreement in 1991; correct?

                          ERIC BISCHOFF

1

2       A        Yes.

3       Q        And did you own your shares

4    directly at that time or through a trust?

5       A        I don't remember.

6       Q        Now, if you look at the back

7    page of the agreement, the signature

8    page, it's EBNY4554; right?

9       A        Correct.

10      Q        You see the signatories are

11   Barbara Brunckhorst; correct?

12      A        Yes.

13      Q        And she's signing it in her

14   individual capacity, not as indicated as

15   a representative of any trust; right?

16      A        I don't know.

17      Q        There's nothing there that

18   indicates --

19      A        No.

20      Q        -- she is signing as a

21   trustee; right?

22      A        No.  There's nothing in

23   there that shows that.

24      Q        And below, there's the

25   Alvina Martin 1988 trust, and there are

1                    ERIC BISCHOFF
2     again, please?
3          Q        What do you understand to be
4     the purpose of the requirement that a
5     family member to whom shares are
6     transferred must be an active employee?
7          A        The general concept is if
8     someone -- owns shares, they should be
9     involved in the business, active
10    employee.
11         Q        And what's the source of
12    that understanding?
13         A        I think they want people
14    engaged in the business.
15         Q        You testified to what your
16    understanding was.  I'm asking where that
17    understanding came from.
18         A        From conversations I've had
19    many years ago with the people that
20    signed this.
21         Q        And why is it important that
22    somebody to whom shares are transferred
23    is involved in the business?
24         A        Could you ask that again,
25    please?

                         ERIC BISCHOFF

1    what the problems were.  I don't remember

2    what he said specifically about the

3    problems.

4         Q        Do you recall that one of

5    the problems was the lawsuit that was

6    going on between you and the Martins?

7         A        No.

8                  (The above-referred-to

9         document was marked as Exhibit 13 for

10        identification, as of this date.)

11        Q        You could put that down for

12   a second.  Let me sort of set the stage

13   here.

14                 After that discussion that

15   you just testified about with Frank,

16   there came a point when you, Frank and

17   the Martins and your vehicles signed what

18   we've been calling the interim settlement

19   agreement; right?

20        A        Yes.

21        Q        And I'm not going to purport

22   to describe all of it.

23                 But am I right that sort of

24   the gist of that agreement was that there

```
 1                    ERIC BISCHOFF
 2   was going to be a pause in the litigation
 3   while a sale of the company was explored?
 4        A       Yes.
 5        Q       Now, as part of that, you
 6   wanted the ability to do some estate
 7   planning that involved transferring
 8   shares to a trust for the benefit of your
 9   daughters?
10        A       Correct.
11        Q       And do you recall that Frank
12   and RSM were agreeable to that, so long
13   as you agree that if there was no sale,
14   you would take those shares and transfer
15   them back to yourself?
16        A       Correct.
17        Q       And is that the reason why
18   these estate and tax planning provisions
19   are in the agreement?
20                MR. SWARTZ:  Objection.
21        A       I don't know.
22        Q       Do you know any other reason
23   why those are in the agreement?
24                MR. SWARTZ:  Objection.
25        A       I don't know.  I don't -- I
```

```
 1                ERIC BISCHOFF
 2      A       No.  I don't think so, no.
 3      Q       And you didn't discuss them
 4   with RSM because you don't talk to RSM?
 5      A       No.
 6      Q       So is your understanding
 7   something that came from your lawyer or
 8   anywhere else?  And don't tell me what
 9   your lawyer did or didn't tell you.
10      A       Yeah.  It was through my
11   attorneys that all this was laid out.
12      Q       Your position here in this
13   lawsuit is that Frank violated the ISA;
14   right?
15      A       Yes.
16      Q       And how do you believe he
17   violated it?
18      A       In two ways.  One is that --
19   he took shares from his trust, put it in
20   this new trust that was set up during the
21   interim settlement agreement.  And when
22   it went back, it didn't go back to the
23   trust.  It went back to him personally.
24   And it was supposed to go back to the
25   entity that gave those shares during the
```

1               ERIC BISCHOFF
2      interim settlement agreement.  And the
3      other is that when he got those shares
4      back, he wasn't a full-time working
5      member.
6           Q       Now, when did you come to
7      the belief that Frank had violated the
8      ISA?
9                   MR. SWARTZ:  Apart from
10          conversations with counsel.
11                  MR. REED:  I'm just asking
12          when.
13          A       When?  I don't remember.
14          Q       And now my question is, how?
15     How did you come to the belief that Frank
16     had violated the ISA?
17                  MR. SWARTZ:  Again,
18          without -- if you could say from
19          counsel.  But don't reveal any
20          communications with counsel.
21          A       From counsel.
22          Q       And who was the counsel?
23          A       Counsel is my attorneys.
24          Q       The esteemed Mr. Swartz?
25          A       And Ed Saviano.

```
 1                      ERIC BISCHOFF
 2                 MR. SWARTZ:   And the
 3        esteemed Ed Saviano.
 4         Q         Do you believe that Frank
 5      intentionally violated the ISA?
 6         A         No.
 7         Q         Are you aware of any benefit
 8      that Frank would receive by virtue of
 9      holding his shares in his individual
10      name, rather than through his trust?
11         A         No.
12         Q         Are you harmed in any way by
13      Frank holding his shares in his
14      individual name, rather than in a trust?
15         A         No.
16         Q         Can you think of any way
17      that the company is impacted by Frank
18      holding his shares individually or in a
19      trust?
20         A         No.
21         Q         So am I perceiving this
22      right that you were basically trying to
23      take advantage -- is almost a foot fault
24      to get Frank's shares?
25         A         No.
```

```
 1                     ERIC BISCHOFF
 2   market value?
 3         A         I'm not aware.
 4         Q         Did you obtain any sort of
 5   fair market valuation of the shares in
 6   connection with transferring them back to
 7   yourself?
 8         A         I don't remember.
 9         Q         And you don't recall that
10   was required by the agreement?
11         A         I don't.
12         Q         Who would know that?  Who
13   would know whether a valuation was
14   prepared?
15         A         My attorneys.
16         Q         Now, there was an occasion
17   in 2012 when you transferred some of your
18   Boar's Head shares to a trust for the
19   benefit of your daughters; right?
20         A         In 2012?
21         Q         Yes.
22         A         Yes.  I applied -- I suggest
23   that I -- I didn't handle all that, but
24   yes.  Specifically what happened with
25   that, I'm not sure what stages it went
```

```
 1                  ERIC BISCHOFF
 2    through, how far it got and to what
 3    point.
 4         Q       For the sake of trying to be
 5    efficient, you know that in 2012, you
 6    transferred shares to a trust for the
 7    benefit of your daughters, and then you
 8    signed an agreement to rescind that
 9    transfer; right?
10         A       Correct.
11         Q       Now, when Frank and RSM
12    found out that you had transferred shares
13    to the -- strike it.
14                 When Frank and RSM found out
15    that you had transferred shares to a
16    trust for the benefit of your daughters,
17    they objected because your daughters were
18    not working members; right?
19         A       Correct.
20         Q       Now, you previously
21    testified in the Florida case that you
22    knew the shareholder's agreement did not
23    permit you to transfer those shares to
24    your daughters, but you believed you
25    obtained a carve-out in the 2008
```

```
 1              ERIC BISCHOFF
 2    settlement agreement that resolved
 3    the 2005 lawsuit; right?
 4         A        Correct.
 5         Q        But you ultimately came to
 6    understand there was no such carve-out?
 7         A        Correct.
 8         Q        So your transfer to your
 9    daughters violated the shareholder's
10    agreement?
11         A        You know, I -- we didn't
12    fight it because they objected.  If we
13    fought it and we lost, there was a lot at
14    stake because I would get bought out.  So
15    it wasn't worth fighting over, litigating
16    over because the outcome would have been
17    very punitive.
18         Q        Do you have that deposition
19    transcript in front of you from the 2022
20    deposition as Exhibit 6?
21         A        Yup.
22         Q        Turn, if you would, to
23    page 120.
24         A        120?
25         Q        Yes.
```

```
 1                    ERIC BISCHOFF
 2        for a carve-out; right?
 3                    "ANSWER:  Uh-uh.
 4                    "QUESTION:  You know you
 5        violated the 1991 shareholder's
 6        agreement; right?
 7                    "ANSWER:  Correct."
 8        Q       Did you give those answers
 9    to those questions?
10        A       Yes.
11        Q       Now, as we mentioned, you
12    signed an agreement with the other
13    shareholders in which you were permitted
14    to rescind the transfer; right?
15        A       Excuse me.  Say that again?
16        Q       You signed an agreement with
17    RSM and Frank that permitted you to
18    rescind that 2012 transfer to your
19    daughters?
20        A       Correct.
21        Q       You were aware at the time
22    that instead of permitting you to rescind
23    the transfer to your daughters, RSM and
24    Frank could have exercised rights under
25    the shareholder's agreement to purchase
```

Page 270

```
  1                   ERIC BISCHOFF
  2              The first one is by Barbara
  3    Brunckhorst on behalf of the Barbara
  4    Brunckhorst 1994 trust; yes?
  5         A     Yes.
  6         Q     And the second one is by
  7    Barbara Brunckhorst on behalf of the
  8    Barbara Brunckhorst 2010 trust; yes?
  9         A     Yes.
 10         Q     And the third is by Barbara
 11    Brunckhorst individually; right?
 12         A     Yes.
 13         Q     Now, we've established,
 14    haven't we -- and if not, we could
 15    look -- that Barbara Brunckhorst didn't
 16    own any shares in her individual capacity
 17    in 2013; right?
 18         A     Yes.
 19         Q     So if we look back at these
 20    events of 2012 and 2013, is it fair to
 21    say that you mistakenly violated the
 22    Boar's Head shareholder's agreement, and
 23    Frank and the other Boar's Head
 24    shareholders showed grace by not taking
 25    your shares?
```

1              ERIC BISCHOFF
2        A        Yes.
3        Q        Now, you believe that Frank
4   has violated the interim settlement
5   agreement by transferring shares to a
6   trust they're not allowed to be in;
7   right?
8        A        Correct.
9        Q        Why aren't you showing him
10  the same grace he showed you?
11       A        Because I didn't take -- I
12  don't -- I never had shares.  Frank has
13  the full value of his shares.  I never
14  had his shares.  What I'm saying is the
15  conditions are different because I'm
16  looking to get shares that my family had
17  back from the Brunckhorsts.  And he
18  didn't -- you know, it wasn't shares
19  shifted to the Bischoff-Martin side that
20  went to someone else besides Frank.  So
21  it's more of a -- that's the reason.
22       Q        Which shares does Frank have
23  that ever belonged to the Bischoffs?
24       A        No.  The Brunckhorst.
25       Q        Right.

1              ERIC BISCHOFF
2              Which shares does Frank have
3    that ever belonged to the Bischoffs?
4         A        Well, it's the Brunckhorst
5    side that has it, not Frank -- well, who
6    knows what shares are which.  But it's
7    the Brunckhorst side that took advantage
8    of the fact that my father died in '73
9    and took his shares.  So this is the
10   reverse of that.
11        Q        And how did they do that?
12        A        I know they did it.  I don't
13   know how they did it.  Maybe through the
14   same thing.
15        Q        Let's just be clear.
16              What did they do?
17        A        When my father died, my
18   father was bought out by the
19   Brunckhorsts.
20        Q        And was that pursuant to
21   some agreement?
22        A        I don't know.  It was in
23   '73.  I wasn't involved.  I'm sure it
24   was.  I mean I'm sure they did it, yeah.
25   I guess they did it.  I wasn't around.

                        ERIC BISCHOFF
1
2    But it was transferred.
3         Q        And you believe they took
4    advantage of your father in that
5    circumstance?
6         A        I wouldn't put it that way.
7    I don't know what the situation was.
8         Q        Do you know if your father
9    was paid any less than the fair value of
10   his estate?
11        A        Yeah.  I think it was book
12   value.  Pretty sure it was book value.
13        Q        Was it something that was
14   agreed upon?
15        A        Yes.  It was agreed upon, I
16   guess.  Again, I wasn't involved with
17   that.
18        Q        You really have no idea of
19   the circumstances surrounding this
20   transfer of shares from your father's
21   estate to the Brunckhorsts; right?
22        A        Correct.
23        Q        And the fact is today, the
24   Brunckhorsts own 50 percent?
25        A        Correct.

                    ERIC BISCHOFF

1
2      Q        And that's historically what
3   they've always been supposed to own;
4   right?
5      A        Well, supposed to, that's
6   kind of a loose term, but yes.
7      Q        We already talked about
8   this, and we already had your testimony
9   that historically, the families were
10  supposed to own 50-50:  50 on the
11  Brunckhorst side, 50 on the
12  Bischoff-Martin side?
13     A        Yes.  The general intent was
14  that.
15     Q        So there's nothing that
16  contrasts -- contradicts the general
17  historical intent of the Bischoffs
18  owning -- strike it.
19              There's nothing about the
20  Brunckhorsts owning 50 percent that is
21  wrong in terms of the general historical
22  intent of the company; right?
23     A        No.
24     Q        Now, you believe that Frank
25  blew the deadline to exercise his right

1                    ERIC BISCHOFF

2    to buy Barbara's shares?

3          A         Right.  Barbara's trust

4    shares.

5          Q         But you know he wants them?

6          A         I'm sure he does.  It's

7    apparent today.

8          Q         If I were to ask him the

9    same question, why aren't you showing him

10   the same grace he showed you, would you

11   give the same answer that you just gave?

12         A         Yes.

13                   THE WITNESS:  Could we take

14       a short one?

15                   MR. REED:  Yes.

16                   THE VIDEOGRAPHER:  The time

17       on the video monitor is 4:03 p.m.

18       We're off the record.  This ends

19       Media 4.

20                   (A short recess was taken.)

21                   THE VIDEOGRAPHER:  We are

22       back on the record.  The time on the

23       video monitor is 4:18 p.m.  This

24       starts Media 5.

25                   (The above-referred-to