UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---------------------------------------------------------------------X
                                                                     :
FRANK BRUNCKHORST III, individually and in his                       :
capacity as trustee of THE FRANK BRUNCKHORST III                     :
2001 TRUST,                                                          :
                                                                     :
                                    Plaintiff,                        :
                                                                     :
                    -v-                                               :        21 Civ. 4362 (JPC)
                                                                     :
ERIC BISCHOFF *et al.*,                                               :        OPINION AND
                                                                     :        ORDER
                                    Defendants.                       :
                                                                     :
---------------------------------------------------------------------X
                                                                     :
ERIC BISCHOFF,                                                        :
                                                                     :
                                    Counterclaim-Plaintiff,           :
                                                                     :
                    -v-                                               :
                                                                     :
FRANK BRUNCKHORST III, individually and in his                       :
capacity as trustee of THE FRANK BRUNCKHORST III                     :
2001 TRUST,                                                          :
                                                                     :
                                    Counterclaim-Defendant.           :
                                                                     :
---------------------------------------------------------------------X
                                                                     :
ERIC BISCHOFF,                                                        :
                                    Crossclaim-Plaintiff,             :
                                                                     :
                    -v-                                               :
                                                                     :
SUSAN STRAVITZ KEMP, in her capacity as co-trustee                  :
of THE BARBARA BRUNCKHORST 1994 TRUST and                           :
executrix of THE ESTATE OF BARBARA                                   :
BRUNCKHORST *et al.*,                                                 :
                                                                     :
                                    Crossclaim-Defendants.            :
                                                                     :
---------------------------------------------------------------------X

JOHN P. CRONAN, United States District Judge:

Pending before the Court are cross-motions for summary judgment brought by Plaintiff and Counterclaim-Defendant Frank Brunckhorst III ("Frank"), individually and in his capacities as trustee of the Frank Brunckhorst III 2001 Trust ("Frank 2001 Trust") and trustee of the Frank Brunckhorst 2020 Investment Trust-A ("Frank 2020 Trust"); Defendant, Counterclaim-Plaintiff, and Crossclaim-Plaintiff Eric Bischoff ("Eric"); and Defendants and Crossclaim-Defendants Susan Stravitz Kemp, in her capacities as co-trustee of the Barbara Brunckhorst 1994 Trust ("Barbara 1994 Trust") and as executrix of the estate of the late Barbara Brunckhorst ("Barbara"), and Richard Todd Stravitz ("Todd"), in his capacities as co-trustee of the Barbara 1994 Trust, executor of Barbara's estate, and trustee of the Barbara Brunckhorst 2010 Trust ("Barbara 2010 Trust") (collectively, the "Trustees") on the four pending claims in this case. Frank and Eric cross-move for summary judgment on (1) Frank's sole claim for declaratory judgment concerning shares of Boar's Head Provisions Company, Inc. ("Boar's Head" or the "Company") associated with Barbara (the "Barbara Trust Shares"); (2) Eric's first claim for declaratory judgment concerning the same; and (3) Eric's third claim for declaratory judgment concerning Boar's Head shares associated with Frank (the "Frank Trust Shares"). Eric and the Trustees also cross-move for summary judgment on Eric's second claim for breach of contract against the Trustees; this cause of action also concerns the Barbara Trust Shares. The Trustees additionally move for partial summary judgment seeking to limit Eric's damages on his breach of contract claim to those he identified during discovery.

Broadly speaking, the summary judgment motions aim to identify—after several years of uncertainty—the proper recipient of the Barbara Trust Shares. Eric's third claim also aims to clarify the propriety of a transfer Frank arranged for the Frank Trust Shares in May 2021.

Ultimately, the Court determines that Eric is the proper recipient of the shares held by the Barbara 1994 Trust, but that summary judgment is not warranted as to the shares held by the Barbara 2010 Trust. The Court denies without prejudice the Trustees' request to limit Eric's damages as premature. The Court also declines to exercise its discretion to award declaratory relief for Eric's third claim concerning the Frank Trust Shares. The Court thus denies summary judgment on that claim.

## I. Background[1]

The Court summarizes the factual background behind both the Barbara Trust Shares and the Frank Trust Shares in separate sections below and at this juncture only recites the overarching background to and procedural history of this case.

### A. General Background

Frank, Eric, and the Trustees are all members of the Brunckhorst or Bischoff-Martin families, which are the two families that broadly speaking own Boar's Head. *See* Eric 56.1 Stmt. ¶ 3. Boar's Head is a nationally recognized company that, as Frank puts it, "provid[es] high quality delicatessen products to customers." Dkt. 269 ("Frank Motion") at 6. The Company was founded in 1933 by Bruno Bischoff, Frank Brunckhorst, Jr., and an unrelated individual. Eric 56.1 Stmt. ¶ 1. Eric provided the following family tree to illustrate Bruno Bischoff's and Frank Brunkhorst, Jr.'s descendants:

---

[1] The facts throughout this Opinion and Order are mainly drawn from the parties' statements of undisputed material facts under Local Civil Rule 56.1(a), their respective counter-statements under Rule 56.1(b), and the exhibits filed by the parties. *See* Dkts. 263 ("Trustees 56.1 Stmt."), 271 ("Eric 56.1 Stmt."), 276 ("Frank 56.1 Stmt."), 308 ("Eric 56.1 Counter for Trustees Stmt."), 309 ("Eric 56.1 Counter for Frank Stmt."), 415 ("Frank 56.1 Counter Stmt."). Unless otherwise noted, the Court cites only to a party's statement of undisputed material facts when the opposing party does not dispute the fact, has not offered admissible evidence to refute it, or—as is frequently the case here—simply seeks to add his or her own "spin" on the fact or otherwise disputes the inferences drawn from it.



*Id.* ¶ 4. As illustrated by the chart, Frank and the Trustees are first cousins. Barbara, who died on November 18, 2020, was the Trustees' mother and Frank's aunt. Frank 56.1 Stmt. ¶ 80. Bertha Brunckhorst apparently was Frank Brunckhorst, Jr.'s sister. *See* Frank Motion at 6 (noting that Bruno Bischoff is Frank Brunckhorst, Jr.'s brother-in-law). That would make Eric the second cousin of Frank and the Trustees. The relationship between these actors and, more specifically, how and to what extent they own Boar's Head shares is the focal point of this dispute.

## B.     Procedural History

Frank filed the Complaint in this action on May 14, 2021. Dkt. 1 ("Compl."). In the Complaint, Frank asserts a lone claim against Eric and the Trustees for declaratory judgment under the Declaratory Judgment Act ("DJA"), 28 U.S.C. § 2201, seeking in relevant part a declaration that he "is the appropriate recipient of the [Barbara Trust] Shares" for reasons explained in detail below. Compl. ¶¶ 61, 71; *see generally infra* III. The Trustees filed their answer to the Complaint on October 29, 2021. Dkt. 84. Eric filed his original answer to the Complaint on July 30, 2021, and appended a counterclaim and crossclaim. Dkt. 49.

After several amendments, Eric filed the operative Third Amended Counterclaims and Crossclaims on May 23, 2022. Dkt. 150 ("TACC"). The TACC pleads three claims. The first

two concern the Barbara Trust Shares.  Eric's first claim is for a declaratory judgment under the DJA against Frank and the Trustees and seeks a declaration that he, not Frank, "has the exclusive right to purchase the [Barbara Trust] Shares," *id.* ¶ 154, and Eric's second cause of action is for breach of contract against the Trustees and accuses them of violating the Boar's Head Shareholder's Agreement (the "Shareholder's Agreement") by not selling the Barbara Trust Shares to Eric, *id.* ¶ 164.  The TACC also has a third claim under the DJA against Frank relating to the Frank Trust Shares; Eric seeks in relevant part a declaration that Frank violated the Shareholder's Agreement and a separate agreement—the Interim Settlement Agreement ("ISA")—through a May 2021 transfer of shares.  *See id.* ¶ 187; *see generally infra* IV.

With discovery having concluded, the parties filed summary judgment motions on September 8, 2023.  Dkts. 262 ("Trustees Motion"), 269 ("Frank Motion"), 270 ("Eric Motion"). The parties filed their opposition papers on October 19, 2023, although—as explained below—a number of these filings and subsequent ones were later stricken from the record.  Dkts. 299 (Frank and the Trustees' stricken opposition memorandum), 312 ("Eric Opposition").  The parties then filed their reply papers on November 2, 2023.  Dkts. 334 (Frank and the Trustees' stricken reply memorandum), 345 (Eric's stricken reply memorandum).  Frank and Eric each move for summary judgment on (1) Frank's sole claim in the Complaint as to the Barbara Trust Shares; (2) Eric's first claim in the TACC for declaratory judgment concerning the Barbara Trust Shares; and (3) Eric's third claim in the TACC for declaratory judgment concerning the Frank Trust Shares.  Eric and the Trustees also each move for summary judgment on Eric's second claim in the TACC for breach of contract against the Trustees in connection with the Barbara Trust Shares.  The Trustees also move for partial summary judgment to limit Eric's damages on his breach of contract claim.

The parties have filed a slew of sealing requests for their summary judgment materials, most of which will be addressed in a separate order.  On June 3, 2024, the Court held a conference with the parties to address a subset of these sealing requests and to express its tentative concern that the sealing of certain materials would not be warranted under prevailing Second Circuit precedent.  *See* Dkt. 402.  After this conference, the parties withdrew a number of their filings and replaced them with ones that did not refer to the materials in question.  *See* Dkt. 405 (order governing refilings).  Most relevantly for present purposes, Frank and the Trustees refiled their joint opposition and reply memoranda of law; Eric refiled his reply memorandum, as well.  *See* Dkts. 411 ("Frank Opposition"), 424 ("Eric Reply"), 430 ("Frank Reply").[2]

Eric also filed (and then refiled) a combined motion to exclude the opinions of four expert witnesses proffered by Frank and the Trustees.  *See* Dkts. 436 (Eric's refiled motion to exclude), 440 (Frank and the Trustees' refiled opposition to Eric's motion to exclude), 445 (Eric's refiled reply in support of his motion to exclude).  With one exception, the Court does not find it necessary to consider any of these experts' opinions in resolving the summary judgment motions.  *See infra* n.12.  Eric's motion to exclude is thus denied as moot.

The Court also ordered supplemental briefing on certain issues in connection with the pending summary judgment motions.  Dkt. 448.  The parties submitted these briefs on July 18, 2024.  Dkts. 449 (Frank and the Trustees' supplemental brief), 451 (Eric's supplemental brief).  The Court held oral argument on the summary judgment motions on July 23, 2024.  Dkt. 466 ("Oral Arg. Tr.").

---

[2] Although a number of filings were made jointly by Frank and the Trustees, the Court simply refers to them as Frank's filings for the sake of simplicity.

## II.  Legal Standard

### A.    Summary Judgment

The Court will grant summary judgment if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  "Summary judgment is appropriate '[w]here the record taken as a whole could not lead a rational trier of fact to find for the non-moving party.'" *Mhany Mgmt., Inc. v. Cnty. of Nassau*, 819 F.3d 581, 620 (2d Cir. 2016) (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986)).  "A genuine dispute exists where 'the evidence is such that a reasonable jury could return a verdict for the nonmoving party,' while a fact is material if it 'might affect the outcome of the suit under the governing law.'" *Chen v. 2425 Broadway Chao Rest., LLC*, No. 16 Civ. 5735 (GHW), 2019 WL 1244291, at *4 (S.D.N.Y. Mar. 18, 2019) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)).  In conducting this review, the Court "resolve[s] all ambiguities and draw[s] all reasonable inferences in favor of the nonmoving party." *Mhany Mgmt.*, 819 F.3d at 620.

"The movant bears the initial burden of demonstrating 'the absence of a genuine issue of material fact,' and, if satisfied, the burden then shifts to the non-movant to present 'evidence sufficient to satisfy every element of the claim.'" *Chen*, 2019 WL 1244291, at *4 (quoting *Holcomb v. Iona Coll.*, 521 F.3d 130, 137 (2d Cir. 2008)).  The non-movant "may not rely on conclusory allegations or unsubstantiated speculation," and "must offer some hard evidence showing that its version of the events is not wholly fanciful." *Jeffreys v. City of New York*, 426 F.3d 549, 554 (2d Cir. 2005) (internal quotation marks omitted).  The non-movant must present more than a "scintilla of evidence" to survive summary judgment. *Anderson*, 477 U.S. at 252. "Where no rational finder of fact 'could find in favor of the nonmoving party because the evidence

to support its case is so slight,' summary judgment must be granted." *Brown v. Eli Lilly & Co.*, 654 F.3d 347, 358 (2d Cir. 2011) (quoting *Matsushita Elec. Indus. Co.*, 475 U.S. at 586).

As noted above, the parties have cross-moved for summary judgment in this matter. The Court "need not enter judgment for either party" when cross-motions for summary judgment are filed. *Morales v. Quintel Ent., Inc.*, 249 F.3d 115, 121 (2d Cir. 2001). Generally, the Court evaluates each cross-motion independently of the other, considering the facts in the light most favorable to the non-moving party. *Id.* "But where, as here, the motion and cross-motion seek a determination of the same issues, the Court may consider them together." *ExteNet Sys., Inc. v. Vill. of Pelham*, 377 F. Supp. 3d 217, 223 (S.D.N.Y. 2019).

## B.    Contract Interpretation

Both the Shareholder's Agreement and the ISA—which govern the disputes over the Barbara Trust Shares and the Frank Trust Shares, respectively—are themselves governed by New York law. *See* Dkt. 277-1 ("Shareholder's Agreement") ¶ 18; Dkt. 278-2 ("ISA") ¶ 15. "It is axiomatic under New York law . . . that the fundamental objective of contract interpretation is to give effect to the expressed intentions of the parties." *Lockheed Martin Corp. v. Retail Holdings, N.V.*, 639 F.3d 63, 69 (2d Cir. 2011) (cleaned up). "In a dispute over the meaning of a contract, the threshold question is whether the contract is ambiguous." *Id.* "The matter of whether the contract is ambiguous is a question of law for the court." *L. Debenture Tr. Co. of N.Y. v. Maverick Tube Corp.*, 595 F.3d 458, 465 (2d Cir. 2010). "Contract language is ambiguous if it is capable of more than one meaning when viewed objectively by a reasonably intelligent person who has examined the context of the entire integrated agreement." *Cervecería Modelo de México, S. de R.L. de C.V. v. CB Brand Strategies, LLC*, No. 23-810, 2024 WL 1253593, at *1 (2d Cir. Mar. 25, 2024) (internal quotation marks omitted).

"Generally, a motion for summary judgment may be granted in a contract dispute only when the contractual language on which the moving party's case rests is found to be wholly unambiguous and to convey a definite meaning." *Id.* (internal quotation marks omitted). "[W]here contract language is ambiguous, interpretation of the language's meaning, and hence, determination of the parties' intent, is a question for the jury." *Id.* at *2 (internal quotation marks omitted).

As discussed, the two primary disputes in this matter concern the Barbara Trust Shares and the Frank Trust Shares. The Court will discuss each in turn.

### III. Barbara Trust Shares

**A.    Background**

Frank's claim for declaratory relief, as well as Eric's first claim for declaratory judgment and his claim for breach of contract, center on the disposition of Barbara's shares in the aftermath of her death. *See* Compl. ¶¶ 60-71; TACC ¶¶ 144-155 (claim for declaratory relief), ¶¶ 156-167 (claim for breach of contract). The Shareholder's Agreement governs that disposition.

As discussed above, Boar's Head is a company that is—broadly speaking—privately owned by the Brunckhorst and Bischoff-Martin families. Eric 56.1 Stmt. ¶ 3. Barbara, the Alvina Martin 1988 Trust, Robert S. Martin ("RSM"), and Eric—the "four descendants of Bruno [Bischoff] and Frank [Brunckhorst,] Jr., either individually or in trust," Eric 56.1 Stmt. ¶¶ 20, 22— signed the Shareholder's Agreement in 1991 "for the purpose of insuring continuity of management among themselves and to provide for the orderly disposition of the [Company's] shares of capital stock." Shareholder's Agreement at 2. The Shareholder's Agreement "classified the Brunckhorst line as 'Group A Shareholders,' and the Bischoff-Martin line as 'Group B Shareholders.'" Eric 56.1 Stmt. ¶ 21; *see* Shareholder's Agreement at 1.

9

As Eric summarized, "Paragraph 3(a) of the Shareholder's Agreement prohibits shareholders from 'either directly or indirectly' disposing of their shares other than to certain permitted transferees." Eric Motion at 6 (quoting Shareholder's Agreement ¶ 3(a)). One form of permitted transfer is detailed in Paragraph 3(b); this provision allows for Group A or B Shareholders to make certain intra-group transfers "at any time." Shareholder's Agreement ¶ 3(b). Paragraph 3(a) also broadly provides that "[a]ny attempted disposition of Shares . . . prohibited by this Agreement shall be void"; the shares in question would then be offered for sale pursuant to Paragraph 4 of the Agreement. *Id.* ¶ 3(a).

Paragraph 4, in turn, sets forth what the parties term the "waterfall" through which shares are generally offered for sale if they are not subject to the aforementioned intra-group transfer mechanism described in Paragraph 3(b). *See* Frank Motion at 9; Eric Motion at 7-8. The waterfall proceeds in three steps. As Frank summarized in relevant part:

> First, other Shareholders within the same group have 20 days to accept the offer. If the group members do not offer to purchase the shares pursuant to Paragraph 4(a) or 4(b), then the shares are deemed offered to the Company, which has another 20 days to accept the offer. If the Company fails to do so, then the offer is extended to Shareholders in the other group, who have 10 days to accept the offer.

Frank Motion at 9. Or as Eric graphically depicted in his briefing:



Eric Motion at 8.

Paragraph 5 sets forth specific procedures for the transfer of shares after the death of a Shareholder or the beneficiary of a trust that is a Shareholder. Paragraph 5(a) provides that these shares can pass through the Paragraph 3(b) intra-group transfer mechanism under certain conditions. Shareholder's Agreement ¶ 5(a). The parties agree that this provision does not apply to the Barbara Trust Shares. *See* Eric 56.1 Stmt. ¶ 91. The crucial clause for this dispute is found in Paragraph 5(b). That provision generally mandates that the shares will be offered up for sale under the waterfall detailed in Paragraph 4, with the waterfall beginning on one of two dates: either (1) "on the tenth (10th) day after appointment of [an] executor or administrator [of the deceased Shareholder's estate] by a court of competent jurisdiction" in the event that the deceased was a Shareholder, or (2) "in the event of the death of a beneficiary [of a trust which is a Shareholder], on the date of death." Shareholder's Agreement ¶ 5(b).

This timing discrepancy fuels the instant dispute. As Eric and Frank both acknowledge, whether Barbara was "a Shareholder" of Boar's Head or a "beneficiary of a trust which is a

Shareholder" of Boar's Head (a "Shareholder-Beneficiary") at the time of her death is the crux of the case. Frank Motion at 19; Eric Motion at 2. That distinction affects when the parties had to provide notice to purchase Barbara's shares under the waterfall provision. If Barbara was a Shareholder, the clock did not run until the appointment of the executors; if she was a Shareholder-Beneficiary, the timeline began upon her death.

At the time of Barbara's death, the Barbara Trusts held a ████████████ Boar's Head shares, or a ██████ stake in the Company. Eric 56.1 Stmt. ¶¶ 74-75. The revocable Barbara 1994 Trust held ████████████████ stake in the Company. *See* Eric 56.1 Stmt. ¶ 78; Frank Motion at 11-12. The remaining ██ shares, representing ████████ of the Company, was held by the irrevocable Barbara 2010 Trust. *See* Eric 56.1 Stmt. ¶ 78; Frank Opposition at 25. Frank and Eric agree that Barbara did not hold any shares individually (*i.e.*, not through an associated trust) at the time of her passing. *See* Bischoff 56.1 Stmt. ¶ 78.

Barbara died on November 18, 2020. Frank 56.1 Stmt. ¶ 80. On January 6, 2021, Eric and the Eric Bischoff 2012 Trust sent a letter to the Barbara Trusts, Barbara's estate, and "any other Barbara Brunckhorst Trust" that purported to notify these entities of Eric's acceptance of their "deemed offer to sell" the Barbara Trust Shares pursuant to the waterfall. Dkt. 278 ("Reed Decl."), Exh. 32 ("Eric Notice of Acceptance") at 1-2. On January 22, 2021, Frank essentially purported to do the same by sending a notice to the Trustees, who had been appointed as co-executors of Barbara's estate just three days prior on January 19, 2021. *See* Reed Decl., Exh. 33 ("Frank Notice of Acceptance") at 1; Frank 56.1 Stmt. ¶ 81.

It bears recalling at this juncture that Frank—as well as any associated trusts—is a Group A Shareholder as a member of the Brunckhorst line, that Barbara also was a member of the Brunckhorst line, and that Eric is a Group B Shareholder as a member of the Bischoff-Martin line.

*See* Eric 56.1 Stmt. ¶¶ 21, 92.  Eric argues that Barbara was a Shareholder-Beneficiary and thus the waterfall began upon her death on November 18, 2020.  Under his theory, the waterfall's timeline worked as follows:

| Priority | Offer Window | First Day to Accept Offer | Deadline to Accept Offer | Offerees |
|---|---|---|---|---|
| First | 20 days | November 19, 2020 | December 8, 2020 | Frank 2001 Trust |
| Second | 20 days | December 9, 2020 | December 28, 2020 | The Company |
| Third | 10 days | December 29, 2020 | January 7, 2021 | Eric<br>Eric 2012 Trust<br>RSM Trust<br>RPM Trust |

Eric Motion at 22.[3]  Frank does not dispute that neither he, nor his 2001 Trust, nor the Company had sent a notice accepting the shares by the deadlines imposed by Eric's version of the waterfall timeline.  Eric 56.1 Stmt. ¶¶ 99-100; Frank 56.1 Counter Stmt. ¶¶ 99-100.  The parties also do not appear to dispute the fact that no other Group B Shareholder had sent such a notice by January 7, 2021.  Eric 56.1 Stmt. ¶ 103; Frank 56.1 Counter Stmt. ¶ 103.  Therefore, as Eric puts it, he "is the only Shareholder who timely accepted the deemed offer to purchase the [Barbara Trust] Shares as they passed through the [w]aterfall" under his version of events.  Eric Motion at 23.

By contrast, Frank contends that Barbara was a Shareholder (and not a Shareholder-Beneficiary)—at least with respect to the shares held by the Barbara 1994 Trust—and that the waterfall thus only began ten days after the Trustees were appointed as co-executors of her estate, *i.e.*, on January 29, 2021.  *See* Frank Motion at 20.  Frank's January 22, 2021 notice was thus sent

---

[3] Frank disputes some aspects of this chart, but the general timeline for Eric's theory of the waterfall still stands.  *See* Frank 56.1 Counter Stmt. ¶ 98.

well before the February 18, 2021 deadline for Group A Shareholders to accept the Barbara Trust Shares under this timeline. *See id.*[4]

**B.      The Barbara 1994 Trust Shares**

Starting with the Barbara 1994 Trust, the Court grapples in the first instance with—and ultimately ends with—whether Barbara was unambiguously a Shareholder or a Shareholder-Beneficiary under the Shareholder's Agreement at the time of her passing.  Frank's position essentially asks the Court to include settlors of revocable trusts within the definition of Shareholder, with an eye toward Barbara's status with respect to the Barbara 1994 Trust, and exclude them from the scope of the Shareholder-Beneficiary category. *See, e.g.*, Frank Motion at 22 ("[T]he Shareholder's Agreement, read as a whole and with due regard to the context in which it was executed, unambiguously provides that, for purposes of Paragraph 5(b), a settlor of a revocable trust such as the Barbara 1994 Trust is treated as the Shareholder of shares titled in that trust, not as a 'beneficiary of a trust that is a Shareholder.'").  By contrast, Eric's position is comparatively simple: a trust is a trust, and the fact that Barbara owned her shares through trusts before she passed rendered her a Shareholder-Beneficiary for purposes of Paragraph 5(b).

Both arguments require a brief overview of the differences between revocable and irrevocable trusts.  "Revocation is the resumption by the settlor of possession and title to the trust property, free of any obligation to the beneficiaries."  Bogert's The Law of Trusts & Trustees ("Bogert's") § 998 (July 2024).  Of note here, the Barbara 1994 Trust granted Barbara as the "Settlor" the right to "alter[], amend[], modif[y], revoke[], or terminate[] [the Trust Agreement] in

---

[4] Eric also contends that Frank's sending the notice in his own name—as opposed to that of either his 2001 Trust or his 2020 Trust—rendered his notice defective even under Frank's suggested timeline, but the Court need not reach this dispute given its conclusions that Eric should be awarded the shares held by the Barbara 1994 Trust, *see infra* III.B, and that issues of material fact remain as to whether Barbara was a beneficiary of the Barbara 2010 Trust, *see infra* III.C.

whole or in part, at any time when [Barbara] is alive." Reed Decl., Exh. 19 ("Barbara 1994 Trust Agreement") § XV(A); *see id.* at 1 (defining Barbara as the "Settlor"); *see also Gelber v. Glock*, 800 S.E.2d 800, 806 (Va. 2017) ("A grantor who retains the sole discretionary power to revoke the trust owns the right to eliminate the trust and thereby own the trust property outright any time she chooses to do so." (cleaned up)); Barbara 1994 Trust Agreement § XX(C) (generally mandating that the Barbara 1994 Trust Agreement is governed by Virginia law). By contrast, and as is implied in the name, a settlor lacks the same powers in an irrevocable trust. *See* Bogert's § 1091; *Trust*, Black's Law Dictionary (12th ed. 2024) (defining an "irrevocable trust" as "[a] trust that cannot be terminated by the settlor once it is created"). For instance, the Barbara 2010 Trust was amended to become irrevocable and provides that "[t]his Trust Agreement and the Trusts may not be altered, amended, revoked or terminated by the Settlor, in whole or in part." Dkt. 277 ("Swartz Decl."), Exh. 46 (Amendment to the Barbara 2010 Trust Agreement, dated December 24, 2010) § VI(A).

With that background established, the Court considers the parties' positions below, ultimately concluding that Eric has the better of the argument.

### 1. The Plain Language of the Shareholder's Agreement

Eric's position is simple: trust means trust and shareholder means shareholder. Because there is no dispute that, at the time of her death, Barbara (1) owned all her Boar's Head shares through trusts and (2) was a beneficiary of the Barbara 1994 Trust, Barbara was unambiguously a Shareholder-Beneficiary of that trust for purposes of Paragraph 5(b). *See* Eric 56.1 Stmt. ¶ 86; Frank 56.1 Counter Stmt. ¶ 86 (Frank and the Trustees admitting that "Barbara was a beneficiary of the 1994 Trust immediately prior to her death"). The language of the Shareholder's Agreement fully supports Eric's reading.

The Court starts with the plain language used in Paragraph 5(b).  Under New York law, courts "cannot disregard 'the plain meaning of the [contract]'s language . . . in order to find an ambiguity where none exists.'"  *Fed. Ins. Co. v. Am. Home Assur. Co.*, 639 F.3d 557, 567 (2d Cir. 2011) (quoting, in turn, *Empire Fire & Marine Ins. Co. v. Eveready Ins. Co.*, 851 N.Y.S.2d 647, 648 (2d Dep't 2008)).  The Shareholder's Agreement does not define "trust" in a particular manner or otherwise restrict its scope to only certain types of trusts.  As would be expected, the dictionary definition of "trust" encompasses revocable and irrevocable trusts.  Per one definition in *Black's Law Dictionary*, for instance, "Trust" is defined as "[a] fiduciary relationship regarding property and charging the person with title to the property with equitable duties to deal with it for another's benefit."  *Trust*, Black's Law Dictionary (12th ed. 2024); *see Valtus Cap. Grp., LLC v. Parq Equity L.P.*, No. 21-184, 2022 WL 190755, at *3 (2d Cir. Jan. 21, 2022) ("New York courts regularly refer to the dictionary to determine the plain and ordinary meaning of words to a contract." (internal quotation marks omitted)).  Limiting the word "trust" in Paragraph 5(b) to reach only "irrevocable trusts" would be impermissible under New York law, where "courts may not by construction add or excise terms, nor distort the meaning of those used and thereby make a new contract for the parties under the guise of interpreting the writing."  *Spanski Enters., Inc. v. Telewizja Polska, S.A.*, 581 F. App'x 72, 73 (2d Cir. 2014) (quoting *Reiss v. Fin. Performance Corp.*, 764 N.E.2d 958, 961 (N.Y. 2001)).

The analysis arguably could end there:  the Shareholder's Agreement's unrestricted use of the word "trust" in Paragraph 5(b) plainly reaches both revocable and irrevocable trusts.  But, as Eric points out, various other provisions of the Shareholder's Agreement confirm that its drafters unambiguously intended to include revocable trusts within the scope of "trust."  *See* Eric Opposition at 17-18.  First, the title of the Shareholder's Agreement—namely, "Shareholder's

Agreement *and Irrevocable Trust*," Shareholder's Agreement at 1 (emphasis added)—and Paragraph 8(b) of the Agreement, which mandates certain requirements before shares can be transferred under Paragraphs 3, 4, or 5 of the Agreement to a "Qualified Subchapter S Trust," Shareholder's Agreement ¶ 8(b), both show that the Agreement's drafters knew how to specify a particular type of trust when they wished to do so. *See Thomas & Betts Corp. v. Trinity Meyer Util. Structures, LLC*, Nos. 20-2904, 20-3109, 2021 WL 4302739, at *3 (2d Cir. Sept. 22, 2021) ("Where the contracting parties are sophisticated actors represented by counsel, as they are here, we must presume that they understand how to use different words and construction to establish distinctions in meaning." (internal quotation marks omitted)); *cf. Prophet Mortg. Opps., LP v. Christiana Tr.*, No. 22 Civ. 9771 (JPC), 2024 WL 708774, at *12 (S.D.N.Y. Feb. 21, 2024) ("These are sophisticated parties that plainly knew how to be specific and impose limitations in other provisions. Their failure to impose such a limitation or obligation in [the relevant provision] is strong evidence that the omission was intentional." (internal quotation marks omitted)). Employing similar reasoning, Eric highlights three instances where the Shareholder's Agreement specifies "irrevocable" powers of attorney or voting proxies. *See* Eric Opposition at 19 (citing Shareholder's Agreement ¶ 9(c) ("Each Shareholder hereby grants to . . . other Shareholders an irrevocable proxy to vote . . . ."); *id.* ¶ 12(a) ("[T]he Shareholders grant to . . . each other . . . an irrevocable proxy to vote . . . ."); *id.* ¶ 12(b) ("[T]he Shareholders grant to . . . each other . . . an irrevocable power of attorney . . . .")).

Frank counters that these examples of the Agreement's use of "irrevocable" are inapposite because "the relevant principle is that where parties employed express language to mark a specific distinction in one part of a contract, courts should not imply that same distinction in another part of the contract in the absence of that language (or similar language)." Frank Reply at 6. Accepting

the premise of Frank's argument, that rationale might explain away the uses of "irrevocable" with reference to voting proxies and powers of attorney, given that those provisions do not serve to distinguish among types of trusts.   But it remains harder to square with the Shareholder's Agreement's express reference to a Qualified Subchapter S Trust in Paragraph 8(b), given that the relevant modifier describes a trust and is used in the context of a transfer under Paragraphs 3, 4, or 5 of the Agreement.   Frank does not explain how the legal maxim he identifies applies to this language, instead asserting *ipse dixit* that the principle "has no application here."   Frank Reply at 7; *cf. Tolbert v. Queens Coll.*, 242 F.3d 58, 75 (2d Cir. 2001) ("[I]ssues adverted to in a perfunctory manner, unaccompanied by some effort at developed argumentation, are deemed waived." (internal quotation marks omitted)).

Rather, Frank argues that the reference to "'Qualified Subchapter S Trusts' serves to specify which irrevocable trusts" are contemplated in Paragraph 8(b) of the Shareholder's Agreement.   Frank Reply at 7.   In short, and as reflected in Paragraph 8(a), "Boar's Head has elected to be treated as an 'S corporation' for federal and state tax purposes."   Frank Opposition at 24.   Under Section 1361 of the Internal Revenue Code, a small business corporation that elects to be treated as an "S corporation" is only permitted to have certain types of shareholders.   *See* 26 U.S.C. § 1361(b)(1).   These include grantor trusts—that is, any trust that meets the definition of Sections 671 through 679 of the Internal Revenue Code—pursuant to Section 1361(c)(2)(A)(i), "[a] common example [of which] is a revocable *inter vivos* trust."   1 Richard D. Blau, Bruce N. Lemons & Thomas P. Rohman, S Corporations: Federal Taxation § 3:21.   Another type of trust permitted to hold shares of an S corporation is a Qualified Subchapter S Trust.   *See* S Corporations: Federal Taxation § 3:24 (citing 26 U.S.C. § 1361(c)(2)(A)(i), (d)).   Under Paragraph 8(b) of the Shareholder's Agreement, with respect to a proposed transfer of shares to "a 'Qualified Subchapter

S Trust' within the meaning of Section 1361(d)(3) of the Code, the proposed transfer shall not be effective unless and until the beneficiary of such trust files the election required by Section 1361(d)(2)[5] of the Code."  Shareholder's Agreement ¶ 8(b).

Observing that all revocable trusts are necessarily grantor trusts, Frank contends that revocable trusts already qualify as permissible shareholders under Section 1361's grantor trust provision.  Frank Reply at 7.  He therefore reasons that the Qualified Subchapter S Trust language in Paragraph 8(a) must refer to a subset of irrevocable trusts.  *Id.*  As the Internal Revenue Service has observed, while "[a]ll 'revocable trusts' are by definition grantor trusts[; a]n 'irrevocable trust' can [also] be treated as a grantor trust if any of the grantor trust definitions contained in Internal [Revenue] Code §§ 671, 673, 674, 675, 676, or 677 are met."  IRS, *Abusive Trust Tax Evasion Schemes—Questions and Answers*, https://www.irs.gov/businesses/small-businesses-self-employed/abusive-trust-tax-evasion-schemes-questions-and-answers (last visited August 29, 2024).  It is unclear, however, how far these observations advance Frank's position.  At most, this suggests that certain irrevocable trusts could be permissible shareholders for an S corporation like Boar's Head as either a grantor trust or as a Qualified Subchapter S Trust.  But even if a Qualified Subchapter S Trust constitutes a subset of other irrevocable trusts, that alone sheds little light on the revocability of the trusts contemplated in the Shareholder's Agreement.  The logical conclusion to draw from the mention of a Qualified Subchapter S Trust in Paragraph 8(b) is that the drafters simply specified the particular type of trust that must file the election under 26 U.S.C. § 1361(d)(2).

That conclusion reinforces the merits of Eric's argument, as it allows for a broader takeaway beyond just within the S corporation context: the drafters of the Shareholder's

---

[5] Title 26, United States Code, Section 1361(d)(2) provides for how "[a] beneficiary of a qualified subchapter S trust (or his legal representative) may elect to have" Section 1361(d) apply.

Agreement knew very well "how to use different words and construction to establish distinctions in meaning," including among different types of trusts. *Thomas & Betts Corp.*, 2021 WL 4302739, at *3 (internal quotation marks omitted). And the Agreement's title only reinforces that conclusion: the drafters there specified that the Agreement included an *irrevocable* trust. So if the parties really "intended that the only trusts with shareholder status under the agreement w[ould be] irrevocable trusts," Frank Motion at 3, why did they not then bother to specify so in Paragraph 5 and instead just used the word "trust"?[6]

Other language in the Shareholder's Agreement reinforces this reading that "trust" as used in Paragraph 5(b) reaches both irrevocable and revocable trusts. Paragraph 5(b) also identifies the party that is obligated to offer a deceased shareholder's shares up for sale. The provision specifies that either the "executor or administrator or the trustees of such trust" will do so, with this language paralleling the provision's distinction between "a Shareholder or the beneficiary of a trust which is a Shareholder hereunder"—namely, that the executor or administrator language applies to Shareholders, whereas the trustee language applies to Shareholder-Beneficiaries. Shareholder's Agreement ¶ 5(b). It would make little sense to apply the executor or administrator language to those who have Boar's Head shares owned by a revocable trust, since, after the settlor's death, the trustee of a revocable *inter vivos* trust disposes of the trust corpus as opposed to the executor of the deceased settlor's estate. *See* Eve Preminger *et al.*, New York Practice Series: Trusts & Estate Practice in New York § 2:153 (Dec. 2023) ("The decedent's interest in [a] funded revocable trust [post-death] enters a period of administration similar to the conduct of a probate estate. The trustee

---

[6] The Court thus need not address Eric's argument about Paragraph 3(a); namely, that the provision's broad, prohibitory language about share transfers—including "plac[ing shares] in trust"—means that the word "trust" as used in the Shareholder's Agreement must be similarly broad and encompass both revocable and irrevocable trusts. *See* Eric Opposition at 17-18.

is charged with collection of assets, payment of debts and transfer tax, and the fiduciary management of assets pending distribution.").

Frank does not appear to dispute this point but provides several unconvincing retorts, including his telling statement at oral argument that (at least under his reading of the Shareholder's Agreement) this provision "is messy."   Oral Arg. Tr. at 28:24.   Frank argues that the executor/trustee distinction is "immaterial" because, even if Paragraph 5(b) requires either the executor/administrator or trustee to offer the relevant shares up for sale, "there is no language in the Agreement that would require the executor (as opposed to the trustee) to *consummate* any sale."  Frank Reply at 13 (emphasis added).  Frank similarly argues that the distinction does not matter in practice because "upon the death of the settlor of a revocable trust, the trustees must coordinate closely with the settlor's executors" and "in many cases the trustees and executors will be the same individuals."  *Id.*  But both of these points beg the question: why would the drafters of the Shareholder's Agreement specify someone—namely, the executor—to offer up shares for sale only to have that same person be unable to consummate that sale?  Even accepting Frank's point that the executor of a settlor's estate is often the same person as the trustee of the settlor's revocable trust, that fundamental question still remains, given the Shareholder's Agreement's specific use of "executor or administrator" as the relevant party for deceased Shareholders. Shareholder's Agreement ¶ 5(b); *cf. LaSalle Bank Nat'l Ass'n v. Nomura Asset Cap. Corp.*, 424 F.3d 195, 206 (2d Cir. 2005) ("An interpretation of a contract that has the effect of rendering at least one clause superfluous or meaningless is not preferred and will be avoided if possible." (cleaned up)).[7]

---

[7] Frank also notes that "pursuant to the Shareholder's Agreement, all notices of acceptance are sent to the same address for the deceased Shareholder, regardless of whether the deceased's

### 2. Frank's Other Primary Arguments

The Court thus turns to Frank's other primary arguments in support of his reading of Paragraph 5(b).  To his credit, Frank does not appear to contest that his definition of "Shareholder" departs from the dictionary definition of the term, nor does he argue "that the term 'trust' carries a specialized meaning of 'irrevocable trust' in family buy-sell agreements as a matter of custom and practice" with respect to the corollary question of what qualifies as a trust for purposes of the Shareholder-Beneficiary definition.  Frank Reply at 1.  Rather, Frank sets forth three primary rationales for his position that settlors of revocable trusts are unambiguously included within the term "Shareholder" under the Agreement.  None of them ultimately prove availing.

### i. Shareholder Status

Frank's strongest argument for his interpretation of the Shareholder's Agreement concerns the contracting parties' status at the time they entered the Agreement in 1991.  *See* Eric 56.1 Stmt. ¶ 21.  As noted above, the preamble to the Agreement lists the following individuals and entity as Shareholders: Barbara, the Alvina Martin 1988 Trust, RSM, and Eric.  *See* Shareholder's Agreement at 1.  Frank argues that "Shareholder" must include settlors of revocable trusts because RSM held his shares through the Robert S. Martin 1988 Trust ("RSM 1988 Trust"), which according to Frank was a revocable trust, yet RSM was named individually as a Shareholder, whereas Alvina Martin held her shares at the time through her irrevocable 1988 Trust (*i.e.*, the Alvina 1988 Trust) and was *not* named individually as a Shareholder.  *See* Frank Motion at 22-23.

Eric brings several challenges to this theory.  At the outset, Eric claims that the Court cannot consider the RSM shares' ownership status at the time of the Agreement—at least in

---

shares remain in trust or are part of the deceased's estate," Frank Reply at 13, but the import of this argument for the executor/trustee distinction remains unclear.

determining whether the Agreement is ambiguous—because "[i]t is pure extrinsic evidence offered to demonstrate the meaning of the contract's provisions." Eric Opposition at 30. Frank retorts that whether RSM or a trust affiliated with him owned the relevant shares forms part of the surrounding circumstances of the contract, appropriately gesturing to the maxim that "in deciding whether an agreement is ambiguous[,] courts should examine the entire contract and consider the relation of the parties and the circumstances under which it was executed." *Kass v. Kass*, 696 N.E.2d 174, 180 (N.Y. 1998) (internal quotation marks omitted); *see generally* Williston on Contracts § 32:7 (May 2024) (noting that the "surrounding circumstances" that a court can take into account in determining ambiguity include "the nature and length of [the contracting parties'] relationship").[8]

Ultimately, even if Frank can muster sufficient evidentiary support for his argument, it fails because RSM's status does not suffice to create an ambiguity as to Barbara's for purposes of

---

[8] In a footnote to his reply brief, Frank belatedly asserted that the Court could also consider RSM's status under the doctrine of latent ambiguity. *See* Frank Reply at 3 n.4. "Latent ambiguities occur when, although the words of the contract appear on their face to have a clear meaning, the evidence shows that they could apply to different facts, objects, or circumstances." *Ezrasons, Inc. v. Travelers Indem. Co.*, 89 F.4th 388, 395 (2d Cir. 2023). "Latent ambiguities present an exception to the rule that courts must look within the four corners of a document to determine ambiguity." *Id.* While Eric has had limited opportunities to respond to this argument in a letter and at oral argument, *see* Dkt. 455; Oral Arg. Tr. at 60:15-61:14, the Court will decline to exercise its discretion to consider this argument, given that Frank made it for the first time in a reply brief. *See Nobel Ins. Co. v. City of New York*, No. 00 Civ. 1328 (KMK), 2006 WL 2848121, at *16 (S.D.N.Y. Sept. 29, 2006) ("Normally, the Court will not consider arguments raised for the first time in a reply brief . . . ." (cleaned up)). Frank is represented by sophisticated counsel who purposefully made the RSM status-related argument the focal point of his summary judgment briefing as to the Barbara Trust Shares. *Cf. United States v. Sineneng-Smith*, 590 U.S. 371, 375-76 (2020) ("Our system is designed around the premise that parties represented by competent counsel know what is best for them, and are responsible for advancing the facts and argument entitling them to relief." (cleaned up)). And on the merits, Frank also appears to take the wrong framing for any latent ambiguity question: while he claims that RSM's status shows a latent ambiguity as to "the term 'trust,'" Frank Reply at 3 n.4, one would think that RSM's status, if anything, would show a latent ambiguity as to the term "Shareholder."

Paragraph 5(b).  The Court will thus assume *arguendo* that RSM's status is admissible at the initial ambiguity phase of contract interpretation to flesh out this point, while first pausing to note some of the evidentiary issues with Frank's proffer as to RSM's status.  Federal Rule of Civil Procedure 56(c) requires in relevant part that "[a] party asserting that a fact cannot be or is genuinely disputed . . . support the assertion by . . . citing to particular parts of materials in the record."  Fed. R. Civ. P. 56(c)(1)(A).  Of note here, "[a]n affidavit or declaration used to support or oppose a motion must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant or declarant is competent to testify on the matters stated."  Fed. R. Civ. P. 56(c)(4).  At this juncture, Frank bears the burden of supporting two propositions under Rule 56(c)(1)(A): (1) that RSM held his Boar's Head shares through the RSM 1988 Trust at the time of the signing of the Shareholder's Agreement and (2) that the RSM 1988 Trust was revocable.

Frank, in turn, relies on three pieces of evidence to support these propositions, but the Court will home in on one:[9] the declaration of RSM dated September 8, 2023—the same day that Frank filed his motion for summary judgment.  Dkt. 273 ("RSM Declaration") at 4; *see* Frank Motion at 44.  In his Local Rule 56.1 statement, Frank uses this declaration as the sole support for the proposition that the RSM 1988 Trust is revocable, pointing to RSM's statement that "[i]n 1991, at the time the Shareholder's Agreement was executed, I held all of my Boar's Head shares in . . . the 'RSM 1988 Trust' . . . a revocable trust that I settled in 1988."  RSM Declaration ¶ 4; *see* Frank

---

[9] For the sake of completeness, the other two pieces of evidence in the record that Frank uses to attempt to illustrate RSM's status at the time of the signing of the Shareholder's Agreement—even disregarding Eric's objection to one piece and the fact that the other was apparently not produced in discovery—only show that that the RSM 1988 Trust held Boar's Head shares in 1991, not that the RSM 1988 Trust is revocable.  *See* Dkt. 338 at 8 (excerpt of Boar's Head 1991 Schedule K-1 showing that the RSM 1988 Trust owned ███ ███ of the Company in 1991, cited at Frank Reply at 5); Reed Decl., Exh. 14 at 2 (summary table showing the same, cited at Frank 56.1 Stmt. ¶ 22); *see also* Eric 56.1 Counter for Frank Stmt. ¶ 22 (objecting to the summary table and noting that the Boar's Head Schedule K-1s were not produced in discovery).

56.1 Stmt. ¶¶ 21-25.  The RSM Declaration goes on to detail the key provision of the RSM 1988 Trust instrument that illustrates the Trust's revocability.  *See* RSM Declaration ¶ 5 ("The RSM 1988 Trust specifies that the trust may be 'be altered, amended, revoked, or terminated by [RSM], in whole or in part . . . .'").

As Eric accurately points out, there are a host of evidentiary problems with the RSM Declaration for purposes of Rule 56(c)(4).  *See* Eric Opposition at 40-42.  First, at no point does RSM swear that he made the statements in the Declaration based on his personal knowledge.  *See* Fed. R. Civ. P. 56(c)(4) ("An affidavit or declaration used to support or oppose a motion must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant or declarant is competent to testify on the matters stated.").  There is at least a reasonable question over whether this was merely an oversight; RSM has made various filings through experienced and competent counsel in this matter, *see* Dkts. 281, 316, 353, 373, 387, 395, 457, and Frank never bothers to explain this omission in the RSM Declaration, *see* Frank Reply at 4-5.  Nevertheless, Frank is correct that this omission is not fatal.  *See id.*; *Giallanzo v. City of New York*, 630 F. Supp. 3d 439, 458 (S.D.N.Y. 2022) (collecting cases).  Rather, "[t]he test for admissibility is whether a reasonable trier of fact could believe the witness had personal knowledge."  *Id.* (internal quotation marks omitted); *accord Folio Impressions, Inc. v. Byer Cal.*, 937 F.2d 759, 764 (2d Cir. 1991) (applying this rule in the context of Federal Rule of Evidence 602).  "The lack of certain specific details or arguably vague statements will not render the affidavit inadmissible, but affect the weight and credibility of the testimony, which have to be determined by the trier of fact at trial."  *Han v. Shang Noodle House, Inc.*, No. 20 Civ. 2266 (PKC), 2023 WL 5755213, at *6 n.8 (E.D.N.Y. Sept. 5, 2023) (internal quotation marks omitted).  To that end, the Court is loath to determine that *no* factfinder could determine that RSM made these statements

with personal knowledge, given that he was a signatory to the Shareholder's Agreement and, after all, he does "own" the shares in question in the colloquial sense of the term.  *See* RSM Declaration ¶ 3.

The RSM Declaration is also eyebrow-raising in several respects.  It was submitted by Frank on the same day that the parties filed for summary judgment, authorized by RSM, someone with an admittedly acrimonious relationship with Eric, and centered on an issue—whether RSM held his shares in a revocable trust at the time of the Shareholder's Agreement—that features prominently in Frank's briefing.  *See* Dkt. 156 ¶¶ 6, 13 (RSM detailing his previous legal disputes with Eric and his attempt to stop Eric from acquiring the Barbara Trust Shares).  RSM had testified just *eight months earlier* at his deposition that he could not recall whether he owned his shares in 1991 individually or through a revocable trust.  *See* Reed Decl., Exh. 7 (RSM deposition transcript) at 252:9-14.  Yet, neither Frank nor RSM offer any explanation for how RSM has suddenly acquired personal knowledge of the status of these shares back in 1991 during the intervening months since his deposition, other than RSM's memory having been "refreshed . . . [through] the Company's records and the K-1s issued by the Company to [his] trust."  Oral Arg. Tr. at 12:20-22.  All in all, the situation has some of the classic features that counsel for application of the sham issue of fact doctrine.  *See In re Fosamax Prods. Liab. Litig.*, 707 F.3d 189, 194 (2d Cir. 2013) (per curiam) ("[T]he [sham issue of fact] doctrine applies to stop [a party] from manufacturing a factual dispute by submitting testimony . . . where the relevant contradictions . . . are unequivocal and inescapable, unexplained, arose after the motion for summary judgment was filed, and are central to the claim at issue."); *Moll v. Telesector Res. Grp., Inc.*, 760 F.3d 198, 205 (2d Cir. 2014) (implying that a non-party with "a familial or other close relationship with [a party] that suggests [that the party] could influence [the non-party's] testimony" warrants application of the sham issue

of fact doctrine to non-party testimony). Frank also somewhat inexplicably provides no explanation as to why the RSM 1988 Trust instrument itself is not in the record other than RSM being "unwilling to provide the document to [Frank]." Oral Arg. Tr. at 11:19-21. As Eric's counsel pointed out at oral argument, one would have thought that Frank would have prioritized obtaining this trust agreement during discovery given how crucial it is to his primary argument on summary judgment. *See id.* at 65:13-16. Nevertheless, despite the above analysis, the Court is similarly loath to disregard Frank's counsel's statement at oral argument that there were limits to RSM's willingness to cooperate with Frank in this matter, which in turn counsels against applying the sham issue of fact doctrine. The Court nevertheless recognizes that this is a close call.

Eric also raises valid and thorny questions as to Frank's ability to use the RSM Declaration as proof of the RSM 1988 Trust's revocability. As detailed above, the RSM Declaration contains two statements that constitute the sole evidence thereof: (1) RSM's statement that, at the time of the signing of the Shareholder's Agreement, he held all of his Boar's Head shares in the RSM 1988 Trust, which he describes as "a revocable trust that [he] settled in 1988," and (2) the quoted excerpt of the trust instrument's revocability clause. RSM Decl. ¶¶ 4-5. Eric contends that these statements are both hearsay and violate the best evidence rule. *See* Eric Opposition at 41-42; Frank Reply at 4-5. To be sure, "material relied on at summary judgment need not be admissible in the form presented to the district court . . . so long as the evidence in question will be presented in admissible form at trial." *Smith v. City of New York*, 697 F. App'x 88, 89 (2d Cir. 2017) (internal quotation marks omitted). By that logic, the hearsay concern identified by Eric does not automatically mean that the Court cannot consider the two relevant paragraphs of the RSM Declaration at this juncture. However, the question of whether RSM's testimony alone could prove the revocability of the RSM 1988 Trust at trial remains. As Eric points out, *see* Eric

Opposition at 41, Federal Rule of Evidence 1002—also known as the "best evidence rule"—mandates that "[a]n original writing . . . is required in order to prove its content unless these rules or a federal statute provides otherwise." Fed. R. Evid. 1002. And while Federal Rule of Evidence 1004 lists several exceptions to this rule, including if "all the originals are lost or destroyed, and not by the proponent acting in bad faith," "an original cannot be obtained by any available judicial process," or "the writing . . . is not closely related to a controlling issue," none of those exceptions appears to apply here, nor has Frank so argued. Fed. R. Evid. 1004(a)-(b), (d). Frank counters that RSM could simply testify "from personal knowledge as to the character of a trust that he is the settlor of," Oral Arg. Tr at 14:23-25, but the line between RSM testifying as to his personal knowledge and him trying to prove the contents of the RSM 1988 Trust instrument remains fine and the Court lacks fully developed briefing on the subject.

In the end, these evidentiary problems are academic: even crediting Frank's argument that RSM held his shares through a revocable trust at the time the Shareholder's Agreement was signed, that fact still fails to raise an ambiguity as to Barbara's status for purposes of Paragraph 5(b). "[A] contract may be ambiguous when applied to one set of facts but not another[;] . . . ambiguity is detected claim by claim." *Morgan Stanley Grp. Inc. v. New England Ins. Co.*, 225 F.3d 270, 278 (2d Cir. 2000). Even if RSM's form of ownership creates an ambiguity as to his own status in 1991 or some other use of the term Shareholder in the Agreement, the other facets of the Agreement canvassed above show that the same ambiguity does not transfer to Paragraph 5(b) as applied to the Barbara 1994 Trust shares. Framed slightly differently, the ambiguity phase of contract interpretation under New York law is fundamentally a holistic endeavor under which, as noted above, "courts should examine the entire contract and consider the relation of the parties and the circumstances under which it is executed." *Kass*, 696 N.E.2d at 180 (internal quotation marks

omitted).  The sum total of the Court's previous analysis, particularly that the parties knew how to distinguish between types of trusts and included the executor/trustee parallelism in Paragraph 5(b), illustrates that Frank's arguments simply seek to introduce extrinsic evidence to create an ambiguity in Paragraph 5(b) as to the Barbara Trust Shares where none legitimately exists.

Frank's remaining arguments fall flat on the same basis.  For instance, Frank uses examples from both trust and estate and tax law to show that RSM's designation as a Shareholder while being the settlor of a revocable trust "accords with well-established law holding that revocable trusts, in contrast to irrevocable trusts, are equivalent to their settlors."  Frank Motion at 23; *see id.* at 24-25 (examples provided by Frank).  Yet the import of this argument is also reliant on RSM's status taking oversized importance in this matter.  As Frank acknowledges in his reply brief, he "is [not] arguing that the term 'trust' carries a specialized meaning of 'irrevocable trust' in family buy-sell agreements as a matter of custom and practice," but rather is "asking the Court to interpret the term 'trust' in the context of the Agreement as a whole and the relevant facts concerning its execution," including the parties' shareholder status in 1991 and RSM's in particular.  Frank Reply at 1-2.  In other words, Frank offers no genuine custom and practice argument, at least as those arguments apply to the ambiguity phase of contract interpretation.  Rather, his custom and practice argument merely serves to support his primary argument about RSM's status.  As the Second Circuit summarized:

> Consideration of trade practice may be a useful interpretation aid where there is a term in the contract that has an accepted industry meaning different from its ordinary meaning or where there is a term with an accepted industry meaning that was omitted from the contract.  But [appellant] does not claim that there is such a term of art included or omitted here.  Trade practice is therefore irrelevant in this case [at this phase], and the contract's unambiguous terms govern.

*Sompo Japan Ins. Co. of Am. v. Norfolk S. Ry. Co.*, 762 F.3d 165, 181 (2d Cir. 2014) (quoting *Hunt Constr. Grp., Inc. v. United States*, 281 F.3d 1369, 1373 (Fed. Cir. 2002)) (first alteration in original).[10]

### ii.    Absurdities and Purpose

The Court next turns to two of Frank's other rationales for his preferred interpretation of Paragraph 5(b) of the Shareholder's Agreement: that deeming settlors of revocable trusts to be Shareholder-Beneficiaries under the Shareholder's Agreement produces absurd results and serves no purpose.  Neither of these arguments is availing, either.

Frank's argument regarding absurdities gestures to the maxim that "[i]n interpreting contracts, 'words should be given the meanings ordinarily ascribed to them and absurd results should be avoided.'"  *Trez Cap. (Fla.) Corp. v. Noroton Heights & Co., LLC*, No. 20 Civ. 9622 (DLC), 2022 WL 16833701, at *11 (S.D.N.Y. Nov. 8, 2022) (quoting *Mastrovincenzo v. City of New York*, 435 F.3d 78, 104 (2d Cir. 2006)).  However, "[t]he [New York] Court of Appeals has set a high bar for declaring a contract absurd" and the fact that a contractual provision might create an "unwise" outcome from the vantagepoint of the contracting parties does not suffice to make such a showing.  *Cottam v. Glob. Emerging Cap. Grp., LLC*, No. 16 Civ. 4584 (LGS), 2020 WL 1528526, at *6 (S.D.N.Y. Mar. 30, 2020) (first quoting *Warberg Opportunistic Trading Fund, L.P. v. GeoResources, Inc.*, 973 N.Y.S.2d 187, 192 (1st Dep't 2013)); *see also Jade Realty LLC v.*

---

[10] The Court can also discern no argument that the term "Shareholder" has a specialized meaning in this context; as Frank conceded at oral argument, "[t]o the extent custom and practice is relevant here, it would be in the event that the Court deems the contract ambiguous."  Oral Arg. Tr. at 29:18-20.  Frank argues that, in light of the examples he provides, "it may be presumed that the parties were well aware of [these] principles and norms the[n] and would have understood and intended that a 'Shareholder' under the Shareholder's Agreement would not lose that status by virtue of placing his shares into a revocable trust."  Frank Motion at 33.  But this argument also runs afoul of the Second Circuit's reasoning in *Sompo Japan*.

*Citigroup Com. Mortg. Tr. 2005-EMG*, 980 N.E.2d 945, 947 (N.Y. 2012) ("[I]t is not a court's function to imply a term to save a defendant from the consequences of an agreement that it drafted." (internal quotation marks omitted)).

As relevant here, Frank raises a hypothetical of Barbara placing her shares in a revocable trust for the benefit of her niece, in an attempt to illustrate the supposedly absurd consequences of treating settlors of revocable trusts as Shareholder-Beneficiaries.  Frank argues that "[i]t would be nonsensical to interpret the Shareholder's Agreement such that, if the niece predeceases [Barbara], the shares are immediately offered for sale instead of allowing [Barbara] to simply take them back."  Frank Motion at 26.  This scenario does not rise to the level of absurdity.

First of all, as Eric points out, Frank explicitly includes the fact that Barbara's niece would be a permitted transferee under Paragraph 3(b) of the Shareholder's Agreement in his hypothetical. In the trust that Frank envisions, Barbara could have simply chosen to include a provision in the trust instrument that would have provided that the shares intended to benefit her niece simply pass to another permitted transferee under Paragraph 3(b)'s intra-group transfer mechanism upon her niece's death, as envisioned by Paragraph 5(a).  *See* Eric Opposition at 36 (citing Shareholder's Agreement ¶ 5(a)).  Barbara also could have exercised her power of revocation before the niece passed away were she concerned about not being able to take the shares back.

Moreover, even if Barbara had exercised neither of these options by the time of her niece's death, New York law makes clear that the mere fact that Barbara would have lost out on the shares upon her niece's passing is not a reason to disregard contractual terms based on absurdity, even if Barbara would have been unhappy with the result.  Courts in this District have summarized New York law as holding that "only contracts that very nearly produce the opposite effect of what the parties likely desired will be held to be absurd."  *Wiseman v. ING Groep, N.V.*, No. 16 Civ. 7587

(AJN), 2017 WL 4712417, at *6 (S.D.N.Y. Sept. 28, 2017) (collecting cases); *see also AAR Allen Servs. Inc. v. Feil 747 Zeckendorf Blvd LLC*, No. 13 Civ. 3241 (JMF), 2014 WL 1807098, at *4 (S.D.N.Y. May 6, 2014) ("[T]he meaning of particular language found in [a contract] should be examined in light of the business purposes sought to be achieved by the parties and the plain meaning of the words chosen by them to effect those purposes." (quoting *Newmont Mines Ltd. v. Hanover Ins. Co.*, 784 F.2d 127, 135 (2d Cir. 1986))), *aff'd*, 599 F. App'x 23 (2d Cir. 2015). The logic underpinning Frank's hypothetical appears to be that Barbara would want the shares to revert to her if her niece predeceased her. But it is far from apparent that Barbara retaining this right was a contractual purpose of the Shareholder's Agreement. The recitals of the Agreement specify that the Shareholders at the time—including Barbara, by definition—broadly desired to achieve two goals through the Agreement: (1) "to maintain ownership and control of the Corporations among themselves for the purpose of insuring continuity of management among themselves" and (2) "to provide for the orderly disposition of the shares of capital stock of the Corporations . . . now owned or hereafter acquired by each of them upon the occurrence of certain events." Shareholder's Agreement at 2. Given the second goal and the Agreement explicitly allowing Barbara to transfer shares to her nieces (so long as they are active employees) "at any time," *id.* ¶ 3(b)(i), Barbara choosing to risk "losing" those shares if her niece predeceased her as a result of the hypothetical arrangement Frank identifies thus would not obviously contradict the goals of the Shareholder's Agreement.[11]

---

[11] The same principles apply to the other hypotheticals raised by Frank, each of which broadly concerns Barbara or other family members losing out on shares that they transfer to a revocable trust because of the Shareholder's Agreement's transfer limitations. *See* Frank Opposition at 19. As Eric points out, there are mechanisms to avoid such scenarios, and the risk of these outcomes does not appear to so severely undercut the Agreement's objectives so as to make Eric's interpretation of "Shareholder" absurd. *See* Eric Reply at 5-6.

As for a lack of purpose, Frank argues that the potential for a settlor of a revocable trust to exercise a testamentary power of appointment undercuts Eric's position that including beneficiaries of such trusts within the ambit of a Shareholder-Beneficiary helps "ensur[e] a prompt transfer of shares following the death of a Shareholder-Beneficiary." Frank Motion at 26 (internal quotation marks omitted). For context, Frank characterizes this feature of a trust instrument as "the power to appoint any or all of the trust assets remaining at death through a provision in the settlor's will," Frank Motion at 28; he contends that, if a trust instrument contains this type of provision, "a prudent trustee [is required] to wait until the [decedent settlor's] will is probated before transferring [any] shares," *id.* at 27.

The legal import of this line of reasoning for Frank's argument is somewhat unclear. As detailed above, the Court's task at this juncture is to determine whether the meaning of "Shareholder" is ambiguous, not whether Paragraph 5(b) furthers an objective proffered by Eric. Frank's argument here also relies on the expert report of Professor Robert H. Sitkoff of Harvard Law School, *see* Frank Motion at 28-30, yet Frank also concedes that "Professor Sitkoff does not offer any opinion on the meaning of 'Shareholder' and 'trust' under the [Shareholder's Agreement]," Dkt. 440 at 10, including, by extension, a custom and practice-based argument about the meanings of these words.[12] The soundness of any objectives proffered by Eric does not impact whether the relevant language of the Shareholder's Agreement is ambiguous. After all, "[w]hen the terms of a written contract are clear and unambiguous, the intent of the parties must be found

---

[12] For purposes of resolving the pending summary judgment motions, the Court assumes the admissibility of Professor Sitkoff's report at trial, considers the report's findings, and concludes that those findings fail to overcome the defects in Frank and the Trustees' position. *See In re Mylan N.V. Sec. Litig.*, 666 F. Supp. 3d 266, 292 n.3 (S.D.N.Y. 2023), *aff'd sub nom. Menorah Mivtachim Ins. Ltd. v. Sheehan*, No. 23-720, 2024 WL 1613907 (2d Cir. Apr. 15, 2024). Eric's motion to exclude Professor Sitkoff's report is therefore denied as moot. *See id.*

within the four corners of the contract." *Chesapeake Energy Corp. v. Bank of New York Mellon Tr. Co.*, 773 F.3d 110, 114 (2d Cir. 2014) (quoting *Howard v. Howard*, 740 N.Y.S.2d 71, 71 (2d Dep't 2002)); *see also JA Apparel Corp. v. Abboud*, 568 F.3d 390, 397 (2d Cir. 2009) ("In interpreting an unambiguous contract, the court is to consider its '[p]articular words' not in isolation 'but in the light of the obligation as a whole and the intention of the parties *as manifested thereby* . . . .'" (emphasis added) (quoting *Kass*, 696 N.E.2d at 180-81)).

In any case, the notion that *no* purpose is served by beginning the waterfall immediately after the death of a settlor of a revocable trust that is a Boar's Head Shareholder does not withstand scrutiny. After all, "[a]voidance of probate perhaps is the most publicized advantage of the revocable living trust." Edward F. Koren, Estate, Tax & Personal Financial Planning § 19:15 (Mar. 2024). The Trustees themselves recognized this fact in their October 5, 2021 letter—in which they took the view that Barbara's shares should be awarded to Frank—writing that "revocable trusts are will substitutes[;] [t]hey allow the settler to create a coordinated plan for the distribution of trust assets upon their death—*bypassing probate*." Swartz Decl., Exh. 4 ("Trustees' Letter") at 2 (emphasis added). As Eric convincingly stated, "[t]here is, at most, only a *possibility* that any trust agreement may contain a testamentary power of appointment. This mere possibility does not and cannot negate the entire purpose for having two different start dates for the [w]aterfall or reflect an intent by the parties with respect to whether revocable trusts can be Shareholders." Eric Opposition at 37-38. In essence, given this recognized advantage of revocable trusts, it is not apparent to the Court that it would have been completely nonsensical—or, as Frank puts it, that there would have been *no* purpose—for the drafters of the Shareholder's Agreement to have assumed that shares held by a revocable trust could be transferred before a decedent's will was probated, at least in the abstract. In addition, as Frank concedes, an irrevocable trust can also

contain a testamentary power of appointment.  *See* Frank Reply at 10.  And the parties do not dispute that the beneficiary of an irrevocable trust is a Shareholder-Beneficiary under Paragraph 5(b).  Frank argues that this fact should be of little import in the context of the Shareholder's Agreement because "[t]he possibility that an irrevocable trust would include a testamentary power of appointment in the settlor is virtually nonexistent because of the attendant adverse tax consequences," *id.*, but, by this point, Frank's ostensibly unambiguous interpretation of "Shareholder" relies on a feature that is only true of a subset of the type of trusts to which he contends the word does apply but could also at least hypothetically apply to the type of trusts to which he contends it does not.  Whatever the merits of Frank's argument, an unambiguous term it does not make.

To be sure, Frank also attempts to link this argument to RSM's status,[13] arguing in relevant part that "[b]y designating [RSM] individually as [a] Shareholder, the parties ensured that any deemed offer to sell the shares held by [RSM]'s revocable trust would occur on the tenth day after the appointment of his executor—a result that makes perfect sense given [RSM]'s testamentary power of appointment over the shares."  Frank Motion at 30.  But this argument fails as it also depends on the notion that RSM's status creates an ambiguity with respect to the Barbara Trust Shares.[14]

---

[13] In support of this argument, Frank also urges the Court to consider the Barbara 1994 Trust's provision that grants a testamentary power of appointment as part of the "context" of the Shareholder's Agreement, Frank Reply at 11-12, but how exactly a contract that was entered some three years after the signing of the Shareholder's Agreement could fit the bill remains unclear to the Court.  *See* 11 Williston on Contracts § 32:7 ("'[S]urrounding circumstances' do not embrace either the prior or contemporaneous collateral agreements of the parties or their understanding of what particular terms in their agreement mean.").

[14] While Eric devotes much of his briefing refuting the Trustees' assertion at prior phases of this dispute that Barbara was a Shareholder because the Shareholder's Agreement "expressly identifies her as such," neither Frank nor the Trustees appear to advance such an argument in any

* * *

The Court has not canvassed herein each and every one of the arguments the parties mustered in support of their preferred interpretation of Paragraph 5(b), but it has thoroughly considered them. *See Dreni v. PrinterOn Am. Corp.*, No. 18 Civ. 12017 (MKV), 2021 WL 4066635, at *3 (S.D.N.Y. Sept. 3, 2021).  The upshot is this: Frank has failed to proffer a reasonable reading of Paragraph 5(b) where "trust" would carry anything other than its plain and ordinary meaning, whereas Eric has provided a number of convincing reasons to conclude that "trust" just means trust.  In sum, "[l]anguage whose meaning is otherwise plain does not become ambiguous merely because the parties urge different interpretations in the litigation," and Frank's arguments simply "strain the contract language beyond its reasonable and ordinary meaning." *L. Debenture Tr. Co. of N.Y.*, 595 F.3d at 467 (cleaned up).

The Court thus holds that Barbara was unambiguously a Shareholder-Beneficiary pursuant to Paragraph 5(b) with respect to any Boar's Head shares held in a trust for which she was a beneficiary, irrespective of whether that trust was revocable or irrevocable.  Given that Frank and the Trustees do not meaningfully dispute that Barbara was a beneficiary of the Barbara 1994 Trust on the date of her death nor the timeline detailed at *supra* III.A as applied to this scenario,[15] Eric, not Frank, timely accepted the shares held by the Barbara 1994 Trust.

---

detail on summary judgment.  Eric Motion at 19-21 (quoting Trustees Letter at 10); *see* Trustees' Letter at 2.

[15] As discussed, Barbara died on November 18, 2020.  Assuming Barbara's status as a Shareholder-Beneficiary of the Barbara 1994 Trust, the timeline under the waterfall at Paragraph 4 of the Shareholder's Agreement meant that the Frank 2001 Trust had from November 19, 2020, to December 8, 2020, to accept the offer of the Barbara 1994 Trust shares.  After that, Boar's Head had from December 9, 2020, to December 28, 2020, to accept the offer of those shares.  And then Eric, the Eric 2012 Trust, the RSM Trust, and the RPM Trust had from December 29, 2020, to January 7, 2021, to accept the offer of the shares.  Eric and the Eric Bischoff 2012 Trust sent a letter accepting the offer on January 6, 2021, Eric Notice of Acceptance at 1-2, while Frank did not do so until January 22, 2021, Frank Notice of Acceptance at 1.

C.    **The Barbara 2010 Trust Shares**

The Court's conclusion as to the Barbara 1994 Trust shares does not end the matter with respect to the Barbara Trust Shares. The three claims that concern the Barbara Trust Shares ask the Court to enter relief as to *both* the 1994 Barbara Trust shares and the Barbara 2010 Trust shares and largely do not distinguish between these two tranches of shares. *See* Compl. at 24-25 (requesting relief as the "Barbara Brunckhorst Shares"); *id.* ¶ 13 (defining the "Barbara Brunckhorst Shares" as those held in both the Barbara 1994 Trust and the Barbara 2010 Trust); TACC at 43-44 (same for Eric's declaratory judgment and breach of contract actions related to the "BB Trusts' Shares"); *id.* ¶ 2 (defining the "BB Trusts' Shares" as those held in both the Barbara 1994 Trust and the Barbara 2010 Trust).

Frank claims that, even if the Court adopts Eric's position that Barbara was a Shareholder-Beneficiary—as it has done—summary judgment in favor of Eric should be denied as to the shares held by the Barbara 2010 Trust because Barbara was not a beneficiary of that Trust. *See* Frank Opposition at 25. In asserting so, Frank relies on three amendments to the Barbara 2010 Trust—all executed the same day that trust was settled—that the parties agree collectively "had the intended effect of amending the 2010 Trust Agreement to name ███████████ the beneficiary of the 2010 Trust." Eric 56.1 Stmt. ¶ 70; *see* Frank Opposition at 25-26.

In maintaining that Barbara was a beneficiary of the Barbara 2010 Trust at the time of her death, Eric relies on the Trustees' and Frank's admissions in their respective answers that Barbara was a beneficiary of both the Barbara 1994 Trust and the Barbara 2010 Trust. *See* Eric 56.1 Stmt. ¶ 87 (citing Dkt. 161 ¶¶ 4, 28 (the Trustees admitting to relevant TACC allegations in their answer to TACC)); Eric Motion at 18 n.13 (citing to Dkt. 162 ¶ 28 (same with Frank, albeit in his case admitting so "on information and belief")). Eric accurately points out that "[f]acts admitted in an

answer, as in any pleading, are judicial admissions that bind the defendant throughout th[e] litigation." *Crawford v. Franklin Credit Mgmt. Corp.*, 758 F.3d 473, 491 (2d Cir. 2014) (internal quotation marks omitted).  While Frank failed to address the Trustees' admission in his briefing, instead arguing that the Court should overlook his own earlier admission because he made it "on information and belief," *see* Frank Opposition at 22-23 (citing *Diarama Trading Co. v. J. Walter Thompson U.S.A., Inc.*, No. 01 Civ. 2950 (DAB), 2005 WL 2148925, at *9 (S.D.N.Y. Sept. 6, 2005) (declining to give conclusive effect to an admission made in an amended complaint because they had only been made "upon information and belief" and the relevant defendants "uniquely controlled" the facts in question), *aff'd*, 194 F. App'x 81 (2d Cir. 2006)), both Frank and the Trustees conceded at oral argument that they, as Frank's counsel put it, simply "got it wrong" in their answers, Oral Arg. Tr. at 33:5-6 (Frank); *accord id.* at 41:9-42:11 (the Trustees); *see also Diarama Trading Co.*, 2005 WL 2148925, at *9 ("[J]udicial admissions generally pertain to matters that a party is uniquely positioned to know and concede, as opposed to facts uniquely known or controlled by an adverse party." (internal quotation marks omitted)).  However, and somewhat puzzlingly, neither the Trustees nor Frank sought leave to amend or withdraw their answers to the TACC until oral argument.  *See* Oral Arg. Tr. at 42:8-11.

Eric also does not make any arguments disputing that the three aforementioned amendments made ███████████████ the beneficiary of the Barbara 2010 Trust, *see* Eric Reply at 7-9, and the Court can discern no evidence in the record that would show that these amendments were not operative at the time of Barbara's death.  Eric also conceded at oral argument that "███████████████████████" of the Barbara 2010 Trust on Barbara's death. Oral Arg. Tr. at 72:16-17.

This contradictory record proves difficult to parse. Eric cannot be faulted for failing to support his original stance with anything other than Frank's and the Trustees' answers, since he is not "uniquely positioned to know" the workings of the Barbara 2010 Trust and presumably Eric would have mustered up record support for his argument had it existed. *Diarama Trading Co.*, 2005 WL 2148925, at *9 (internal quotation marks omitted). At the same time, all parties now appear to agree that ███████████████████ became the beneficiary of the Barbara 2010 Trust at the latest upon Barbara's death; Frank and Eric also both agree that any transfer to ██ ███████ would run afoul of the Shareholder's Agreement. Eric Reply at 9; Oral Arg. Tr. at 31:13-16 (counsel for Frank positing that "the [Barbara 2010 Trust] is prohibited, under the terms of the [Shareholder's] [A]greement, from transferring [shares] to ███████████ because ███████████████ is not a permitted transferee").

Ultimately, the Court retains some "discretion to avoid the consequence of conclusiveness of an admission and [an obligation to ensure] that '[p]leadings . . . be construed so as to do justice.'" *Moll v. Telesector Res. Grp.*, 94 F.4th 218, 251 (2d Cir. 2024) (cleaned up) (quoting Fed. R. Civ. P. 8(e)). The Court will do so here and afford both Frank and the Trustees an opportunity to amend their answers to reflect their new positions. To be sure, the Court does so with some reluctance, since judicial admissions are particularly apt for facts "peculiarly within [a party's] knowledge or control." *Hausler v. JP Morgan Chase Bank, N.A.*, 127 F. Supp. 3d 17, 37 (S.D.N.Y. 2015) (internal quotation marks omitted). That is certainly the case here, at least with respect to Todd, given his position as trustee of the Barbara 2010 Trust. There is also a reasonable, albeit somewhat less compelling, argument that the same logic should apply to Frank, given that he signed one of the three 2010 amendments ███████████████████████, *see* Swartz Decl., Exh. 48 at 2, and appears to have been substantially involved in the estate planning for

Barbara's shares, *see, e.g.*, Swartz Decl., Exh. 39 (█████████████████████████████

███████████████████████████).   Moreover (and as mentioned above), neither

Frank nor the Trustees sought to amend or withdraw their answers throughout discovery or even

over the course of the briefing on the instant motions, despite the issue having crystallized by that

point.  *See* Frank Opposition at 26 (citing to Eric Motion at 18-19).  Nevertheless, the parties'

belated unanimity on the beneficiary upon Barbara's death leads the Court to conclude that justice

simply would not be served by litigating this case as if the situation were otherwise.

That conclusion opens another Pandora's box, however.  Eric asserted in his reply brief

and again at oral argument that, in the scenario in which ████████████████ was the

beneficiary of the Barbara 2010 Trust, that ██████ shares still went through the waterfall starting

on the date of Barbara's death under Paragraph 3(a) of the Shareholder's Agreement.  *See* Eric

Reply at 9.  That arguments rests on Paragraph 3(a)'s language that "[a]ny attempted disposition

of [s]hares, either voluntary, involuntary or by operation of law, [that is] prohibited by this

Agreement shall be void and shall immediately" result in those shares being put up for sale through

the waterfall.  Shareholder's Agreement ¶ 3(a).  But it remains unclear to the Court if and when

the Trustees attempted to dispose of the Barbara 2010 Trust shares. As Frank pointed out, the

Court is without briefing on this issue, although there would appear to be several distinct

possibilities, as discussed at oral argument.  Frank may be correct in arguing that the waterfall has

not yet begun to run because "there will be no violation of the [S]hareholder's [A]greement unless

and until this [T]rust tries to actually transfer the shares to ████████████████."  Oral

Arg. Tr. at 90:14-16. On the other hand, Eric makes a compelling point that Barbara's appointment

of "the entire trust fund of the [Barbara 2010] Trust remaining at [her] death to ███████████

███████" meant that her death triggered an attempted transfer at that point.  Swartz Decl., Exh.

47 at 2; *see* Oral Arg. Tr. at 87:6-10.   There also remains the possibility that the attempted

"disposition" of shares actually occurred when the amendments were executed in 2010, although

no party appears to have taken that position.   *See* Oral Arg. Tr. at 89:2-3.

All in all, what becomes clear from the convoluted course of the parties' briefing and

statements at oral argument is that summary judgment is not in order as to the Barbara 2010 Trust

shares.   Fundamentally, the primary issue that remains is a dispute over the meaning of "attempted

disposition" under Paragraph 3(a) of the Shareholder's Agreement that the parties do not address

in their briefing.   While both Frank and Eric advanced at least facially plausible constructions of

the Agreement at oral argument, the Court will not purport to pass on this question without further

aid from the parties.   In other words, no party has met their burden of showing that they are entitled

to summary judgment as a matter of law as to the Barbara 2010 Trust shares.   Summary judgment

is thus denied as to these shares.   Given Frank and Eric's agreement that any sale of shares to ▮

▮▮▮▮▮▮▮▮▮▮   would run afoul of the Shareholder's Agreement and the relatively small

stake of the Company at issue (at least when compared to the Barbara 1994 Trust shares), the Court

notes that the parties may request a referral to the Honorable Robert W. Lehrburger for a settlement

conference or to the Court-annexed mediation program at this juncture.

## D.     Eric's Damages

As discussed at *supra* III.B, the Court determines that Eric is the proper recipient of the

shares held by the Barbara 1994 Trust.   While the Trustees in their moving brief generally defended

the breach of contract claim against them on the same bases as Frank—on the theory that they

breached no duty to sell the shares to Eric because Barbara was a Shareholder—they also argue,

in the event that Eric prevails on the merits of the dispute, that Eric should be precluded from

offering evidence of damages other than Boar's Head distributions made since August 18, 2021

and pre- and post-judgment interest.  *See* Trustee Motion at 7-8.  The Trustees' request comes in response to Eric's assertion in the TACC with respect to this breach of contract claim that his "damages include, *among other harms*, any distributions made to or on account of [the Barbara] Trust[] Shares after August 18, 2021 which are not paid to Eric," TACC ¶ 167 (emphasis added), in addition to similar interrogatory responses by Eric, *see* Trustees 56.1 Stmt. ¶¶ 31-32.  Eric does not dispute that he "never supplemented, clarified, corrected, or otherwise amended his response to [the relevant interrogatory], nor did he disclose any expert witness to quantify or otherwise detail his claimed damages corresponding with his contract claim against the Trustees."  *Id.* ¶ 33; *see* Eric 56.1 Counter for Trustees Stmt. ¶ 33 (Eric's admission).

The Trustees urge the Court to preclude evidence of theories of damages other than one based on the distributions plus interest, arguing any new damages theories would violate Federal Rule of Civil Procedure 26(a)(1)(A)(iii), which requires disclosure of "a computation of each category of damages claimed," and Rule 26(e), which broadly mandates a continuing obligation to supplement these disclosures.  *See* Trustees Motion at 7-8.  Eric, in turn, both contends that "he is only seeking distributions and applicable statutory interest thereon" but then somewhat puzzlingly leaves the door open for "additional damages flowing from the intersection between the Court's remedy [in Eric's favor] and the [Shareholder's] Agreement's payment provisions," all without explaining his apparent failure to disclose this theory of damages (even if only hypothetical) during discovery.  Eric Opposition at 48-49.

The Court denies without prejudice this aspect of the Trustees' motion.  Given Eric's representation that "he is only seeking distributions and applicable statutory interest thereon," there does not appear to be a live dispute on this issue.  But in any event, resolving this damages issue is premature at this stage because Eric's breach of contract claim is not being resolved on summary

judgment to the extent it concerns the Barbara 2010 Trust and given the Trustees' pending motion to amend their answer. *Cf. DiFolco v. MSNBC Cable L.L.C.*, 831 F. Supp. 2d 634, 644 (S.D.N.Y. 2011) (denying the defendants' motion for partial summary judgment as to damages as premature because the court determined that a breach of contract claim should go to the jury and therefore "the issue of whether to limit damages will depend, *inter alia*, on the jury's determinations as to Plaintiff's purported repudiation, Defendants' purported breach of the Contract, and the timing of any such breach").

## E.    Declaratory Judgment vs. Breach of Contract

As noted above, the Barbara Trust Shares are implicated in three claims: (1) Frank's sole claim for declaratory relief, for which he seeks a Court declaration that, among other things, he "is the appropriate recipient of the Barbara [Trust] Shares," *see* Compl. ¶ 71; (2) Eric's first claim for declaratory relief that conversely asks the Court to declare that he "has the exclusive right to purchase the [Barbara] Trust[] Shares," TACC ¶ 154; and (3) Eric's second cause of action for breach of contract against the Trustees, for which he seeks, among other items, "an order compelling the Trustees and/or the Barbara [] Trusts to sell the [Barbara] Trust[] Shares to Eric per the terms and conditions of the [Shareholder's] Agreement," *id.* ¶ 166.

Although the Court ultimately determines that summary judgment is only in order as to the Barbara 1994 Trust shares, there still remains a question of whether to grant summary judgment in Eric's favor on his declaratory judgment claim or his breach of contract claim.  As will be explored in more detail below, *see infra* IV.B, "[t]he decision on whether to grant declaratory relief is subject to the court's discretion, which turns on the following considerations: '(1) whether the judgment will serve a useful purpose in clarifying or settling the legal issues involved; and (2) whether a judgment would finalize the controversy and offer relief from uncertainty.'" *Premier*

*Med. Sys., LLC v. NeuroLogica Corp.*, No. 21 Civ. 1337 (GHW), 2022 WL 603999, at *9 (S.D.N.Y. Feb. 28, 2022) (quoting *Duane Reade, Inc. v. St. Paul Fire & Marine Ins. Co.*, 411 F.3d 384, 389 (2d Cir. 2005)).  "Courts reject declaratory judgment claims when other claims in the suit will resolve the same issues, because, under such circumstances, a declaratory judgment will not serve any useful purpose."  *Id.* (internal quotation marks omitted).  "Courts in this Circuit [thus] 'routinely dismiss requests for declaratory judgment when the parties' rights will be adjudicated through a breach of contract claim in the same action.'"  *StandardAero Aviation Holdings, Inc. v. Signature Aviation Ltd.*, No. 22 Civ. 7515 (AT), 2024 WL 125574, at *5 (S.D.N.Y. Jan. 11, 2024) (quoting *Com. Lubricants, LLC v. Safety-Kleen Sys., Inc.*, No. 14 Civ. 7483 (MKB), 2017 WL 3432073, at *17 (E.D.N.Y. Aug. 8, 2017) (collecting cases)).

Here, Eric acknowledges in his moving brief that his "counterclaim . . . seek[ing a] declaration[] as to who has the right to purchase the Barbara Trust Shares under the Shareholder's Agreement . . . [is] coextensive with Eric's second counterclaim for breach of contract against the Trustees," Eric Motion at 2 n.1; indeed, both claims seek an order compelling the Trustees to sell the Barbara Trust Shares to Eric and an injunction prohibiting them from transferring these shares to anyone else.  *See* TACC ¶¶ 155 (declaratory judgment), 166 (breach of contract).  Given the case law surveyed above, the Court denies summary judgment on Eric's first claim for declaratory relief.

That leaves Eric's breach of contract claim.  Under New York law—which both Eric and the Trustees agree applies to this claim, *see* Trustees Motion at 6-7; Eric Motion at 16— "the elements of a breach of contract claim are (1) the existence of a contract, (2) performance by the party seeking recovery, (3) breach by the other party, and (4) damages suffered as a result of the breach."  *Zam & Zam Super Mkt., LLC v. Ignite Payments, LLC*, 736 F. App'x 274, 276 (2d Cir.

2018). As noted above, the Trustees' only defense on the merits of this claim is that they breached no duty under the Shareholder's Agreement because Barbara was a Shareholder and thus Frank was the rightful recipient of the Barbara Trust Shares. *See* Trustees Motion at 7. This defense proved unavailing as to the Barbara 1994 Trust shares. Nor do the Trustees appear to advance any arguments under Eric's reading of the Shareholder's Agreement related to Eric's performance through his January 6, 2021 notice of acceptance of the Barbara Trust Shares or his claim of damages for distributions. *Cf. id.* ("Although [Eric's breach of contract claim] is due to be dismissed in its entirety, the Court, alternatively, should enter partial summary judgment in favor of the Trustees and against Eric for all monetary damages other than distributions and potentially applicable statutory interest."). The Court therefore grants summary judgment in Eric's favor on his breach of contract claim to the extent it concerns the Barbara 1994 Trust shares. But final resolution of this claim will have to await resolution as to the Barbara 2010 Trust shares. Therefore, summary judgment is denied on this claim to the extent it concerns the Barbara 2010 Trust shares.

## IV. Frank Trust Shares

Eric and Frank also cross-move for summary judgment on Eric's third claim, which seeks a declaration that Frank, as trustee of the Frank 2001 Trust and the Frank 2020 Trust, violated the Shareholder's Agreement and the ISA through a May 2021 transfer of shares (the "Disputed Transfer"). *See* TACC ¶¶ 181, 187; Reed Decl., Exh. 2 ("ISA"). The Court ultimately determines that it should not exercise its discretion to award the requested declaratory relief.

### A. Background

By way of background, RSM and Eric had a dispute over RSM's transfers of Boar's Head shares between 2011 and 2016 to his son, Robert P. Martin ("RPM"). *See* Frank 56.1 Stmt. ¶¶ 66-

67; Eric 56.1 Stmt. ¶ 136.[16]    Eric contended that these transfers violated the Shareholder's Agreement and instituted an arbitration proceeding against RSM in October 2019.  *See* Eric 56.1 Stmt. ¶ 136.  RSM then filed a lawsuit against Eric in the United States District Court for the Middle District of Florida the same month.  *See id.*  While these proceedings were pending, Frank suggested to both RSM and Eric that they "agree[] to a standstill while a possible sale of Boar's Head was contemplated."  Frank 56.1 Stmt. ¶ 69.  This resulted in RSM and Eric entering into the ISA on February 27, 2020; the Barbara Trusts, Frank 2001 Trust, and a trust associated with RPM all consented to this agreement.  Eric 56.1 Stmt. ¶ 139.  "Pursuant to the ISA, Eric and RSM withdrew their respective proceedings and agreed to not refile until after April 30, 2021, which gave Boar's Head approximately 14 months to negotiate a sale [of the Company]."  *Id.* ¶ 140.  During this window—referred to as the "Standstill Period" in the ISA, *see* ISA § 4—the Shareholder's Agreement's limitations on transfers of Boar's Head shares were "temporarily suspended and Shareholders were permitted to transfer their Boar's Head shares to certain trusts."  Eric 56.1 Stmt. ¶ 141; *see* ISA § 3(a).  The parties do not dispute that the rationale behind this suspension was that "such transfers would provide estate planning benefits in the event of a sale."  Frank 56.1 Stmt. ¶ 71.

The crux of the party's disagreement concerns the ISA's provisions for these transfers in the event that the Company was not sold before the end of the Standstill Period and, more specifically, whether Frank complied with these provisions.  In the end, Boar's Head was not sold before April 30, 2021.  *See* Frank 56.1 Stmt. ¶¶ 76-77.  Section 3(h) of the ISA provides in relevant part that "each shareholder or member who transferred shares to such a Permitted Trust in

---

[16] Eric and Frank dispute whether these transfers of shares were done directly from RSM to his son or through their various trusts, but this discrepancy is of no moment for instant purposes.  *See* Frank 56.1 Stmt. ¶ 66; Eric 56.1 Counter for Frank Stmt. ¶ 66.

accordance with this Agreement shall be required to exchange, transfer, purchase or otherwise reacquire (including by substitution) from the Permitted Trust(s), at their then fair market value, the shares he transferred to it (them)." ISA § 3(h). In addition, Section 3(h) mandates—again in relevant part—that if any such shares are not transferred back as required "within thirty (30) days after receiving notice of the expiration of the Standstill Period," these shares will pass through the waterfall under Paragraph 4 of the Shareholder's Agreement. *Id.*

At the time the ISA was signed, the Frank 2001 Trust held ███ Boar's Head shares. *See* Eric 56.1 Stmt. ¶ 155. Eric and Frank provide different versions of the events in play—which, given the Court's holding below, are ultimately immaterial—but the bottom line is that Frank arranged for the shares held in the Frank 2001 Trust to be transferred to the Frank 2020 Trust on December 30, 2020. *See* Frank 56.1 Stmt. ¶ 75; Eric 56.1 Stmt. ¶ 156; Reed Decl., Exh. 26. The Frank 2020 Trust is a grantor retained annuity trust, *see* Frank 56.1 Stmt. ¶ 48, which is a type of trust to which the ISA permitted transfers, *see* ISA § 3(a). Eric's objection is essentially that, after the expiration of the Standstill Period, Frank arranged for these shares to be transferred to himself personally through a transfer on May 20, 2021, as opposed to having the Frank 2001 Trust reacquire them (*i.e.*, the Disputed Transfer). *See* Eric Opposition at 53 (citing Eric 56.1 Stmt. ¶¶ 161-162).[17] Eric essentially contends that the Frank 2001 Trust—as opposed to Frank himself—was obligated to reacquire the shares to comply with the ISA, given the requirement in Section 3(h) that the "shareholder or member who transferred the shares" be the party to reacquire said shares. *See* Eric Opposition at 53-54.

---

[17] The parties do not dispute that "Frank's counsel sent revised transfer documents to Boar's Head, which backdated the Disputed Transfer to be effective as of May 5, 2021," Eric 56.1 Stmt. ¶ 162, but, as with the other technicalities of the transfer, this fact is also immaterial to the Court's analysis.

Eric further contends that, because the transfer was outside the bounds of the ISA—which, it bears recalling, temporarily suspended the Shareholder's Agreement transfer restrictions—the Shareholder's Agreement restrictions applied to that transfer. *See* Eric Opposition at 65. Eric then argues that this transfer also did not pass muster under the Shareholder's Agreement, either, because Frank was not a permitted transferee under Paragraph 3(b) at the time of the Disputed Transfer. *See* Eric Opposition at 65-66. As detailed above, Section 3(b) of the Shareholder's Agreement broadly speaking permits Group A Shareholders to sell their shares "at any time" to "any other Group A Shareholder" or "any other member of Barbara Brunckhorst's immediate family (including nieces and nephews . . . ) who is an Active Employee." Shareholder's Agreement ¶ 3(b)(i). Eric contends that Frank fit neither of these categories. He argues that Frank was not a Group A Shareholder because he "did not hold any shares in his personal capacity" at the time of the Disputed Transfer. Eric Opposition at 66. Eric also asserts that, for purposes of the immediate family provision, Frank at the time of the Disputed Transfer could not meet the definition of an Active Employee, which the Shareholder's Agreement defines as "a person who is a full time employee of [Boar's Head, Specsal Realty Corp., or Frank Brunckhorst Co.], devoting substantially all of his or her business time to the affairs of one of such companies." Shareholder's Agreement ¶ 3(c); *see* Eric Opposition at 66.[18]

Per Eric, the upshot of all these arguments is that the Disputed Transfer—having violated both the ISA and the Shareholder's Agreement—triggered the waterfall under the latter and,

---

[18] Frank unsurprisingly disagrees with Eric's arguments concerning both the ISA and Shareholder's Agreement, but his arguments are of no moment, given the Court's resolution of this claim. *See generally* Frank Motion at 34 ("[T]he ISA permitted Frank to take direct possession of his shares and did not require that he deposit them in his 2001 Revocable Trust . . . ."); *id.* at 39-40 (arguing that Frank was a Shareholder for purposes of the Shareholder's Agreement); Frank Opposition at 32-42 (positing that, even if Frank was required to be an Active Employee to receive the shares in question, he meets the definition thereof).

consequently, that the Frank Trust Shares should be put up for sale. *See* Eric Motion at 35 ("[T]he Court should enter a declaratory judgment that the Disputed Transfer triggered the [w]aterfall under the ISA."); *id.* at 45 ("Eric respectfully requests that the Court declare that the Disputed Transfer is void, and that it triggered the [w]aterfall under the Shareholder's Agreement."). To that end, Eric notes that Boar's Head, Eric, RSM, and RPM all sent notices over the course of July 2021 generally purporting to accept any deemed offer to sell the Frank Trust Shares after the end of the Standstill Period. *See* Eric 56.1 Stmt. ¶¶ 163-166. Boar's Head sent the first notice of this group on July 7, 2021; Eric sent a notice two days later on July 9, 2021. *See id.* ¶¶ 163-164.

## B.   Declaratory Judgment

Eric's claim related to the Frank Trust Shares arises under the DJA. *See* TACC ¶ 169. "The DJA provides that '[i]n a case of actual controversy within its jurisdiction, . . . any court of the United States . . . may declare the rights and other legal relations of any interested party seeking such declaration, whether or not further relief is or could be sought." *Admiral Ins. Co. v. Niagara Transformer Corp.*, 57 F.4th 85, 92 (2d Cir. 2023) (quoting 28 U.S.C. § 2201(a)). Given its permissive language that a court *may* declare rights under its auspices, the DJA "confers a discretion on the courts rather than an absolute right upon the litigant." *Frontier Airlines, Inc. v. AMCK Aviation Holdings Ireland Ltd.*, 676 F. Supp. 3d 233, 254 (S.D.N.Y. 2023) (quoting *Pub. Serv. Comm'n of Utah v. Wycoff Co., Inc.*, 344 U.S. 237, 241 (1952)). Consequently, the Second Circuit "ha[s] consistently interpreted this permissive language as a broad grant of discretion to district courts to refuse to exercise jurisdiction over a declaratory action that they would otherwise be empowered to hear." *Admiral Ins. Co.*, 57 F.4th at 96 (internal quotation marks omitted). The Supreme Court has similarly "acknowledg[ed] . . . the unique breadth of [a federal court's]

discretion to decline to enter a declaratory judgment." *Wilton v. Seven Falls Co.*, 515 U.S. 277, 287 (1995).

"[T]he two principal criteria guiding the policy in favor of rendering declaratory judgments are (1) when the judgment will serve a useful purpose in clarifying and settling the legal relations in issue, and (2) when it will terminate and afford relief from the uncertainty, insecurity, and controversy giving rise to the proceeding." *Admiral Ins. Co.*, 57 F.4th at 96 (internal quotation marks omitted). Nevertheless, and after some uncertainty in the case law, the Second Circuit clarified last year in *Admiral Insurance Company* that "even in circumstances [that meet the two aforementioned criteria], district courts retain broad discretion to decline jurisdiction under the DJA." *Id.* at 99 (internal quotation marks omitted). The Circuit advised that district courts should consider the following criteria "to the extent they are relevant in a particular case," *id.* (internal quotation marks omitted):

> (1) whether the declaratory judgment sought will serve a useful purpose in clarifying or settling the legal issues involved; (2) whether such a judgment would finalize the controversy and offer relief from uncertainty; (3) whether the proposed remedy is being used merely for procedural fencing or a race to res judicata; (4) whether the use of a declaratory judgment would increase friction between sovereign legal systems or improperly encroach on the domain of a state or foreign court; (5) whether there is a better or more effective remedy; and (6) whether concerns for judicial efficiency and judicial economy favor declining to exercise jurisdiction.

*Id.* at 99-100 (cleaned up). And "inherent in district courts' broad discretion to decline jurisdiction under the DJA is a similarly broad discretion to weigh the factors [the Second Circuit] ha[s] enumerated . . . . Thus, no one factor is sufficient, by itself, to mandate that a district court exercise—or decline to exercise—its jurisdiction to issue a declaratory judgment." *Id.* at 100 (cleaned up). "These factors are non-exhaustive, with district courts retaining wide latitude to address other factors as relevant to the ultimate question of whether the normal principle that

federal courts should adjudicate claims over which they have jurisdiction should yield to considerations of practicality and wise judicial administration in a particular case." *Id.* (internal quotation marks omitted).

The Court readily concludes that it should decline to exercise its discretion to render declaratory relief as to the Frank Trust Shares.[19] Eric's briefing makes it clear that, even if he were granted his requested relief, this remedy would not "offer relief from uncertainty" as to the Frank Trust Shares. *Id.* at 100 (internal quotation marks omitted). Rather, Eric is fairly clearly raring to file another lawsuit to determine the proper recipient of the Frank Trust Shares should the Court declare the Disputed Transfer invalid. In Eric's own words, after the Court issues his desired declaration, "[r]esolution of who has the superior right to acquire the [Frank Trust Shares] can then be determined in another proceeding, where a court has jurisdiction over all necessary parties." Eric Motion at 45. Or as he wrote in his opposition brief, "[a]ny determination as to the issue of priority would require the inclusion of certain necessary part[ies] who are not parties to this litigation and who the Court does not have jurisdiction over." Eric Opposition at 70 n.44.

While he never quite spells it out, Eric is in all likelihood referring at the very minimum to Boar's Head. After Frank noted in his moving brief that any declaratory judgment invalidating the Disputed Transfer "would not result in Eric receiving the shares, because the Company has a priority over Eric in the waterfall," Frank Motion at 4, Eric refused to accept this contention, asserting that "[t]he issue of priority is irrelevant as it is not before the Court" and—in the footnote

---

[19] In its Order of July 9, 2024, in advance of oral argument, the Court requested supplemental briefing from the parties on, *inter alia*: "Should the Court decline to exercise its discretionary jurisdiction over Eric's third counterclaim seeking declaratory judgment under the factors articulated by the Second Circuit in *Admiral Insurance Co. v. Niagara Transformer Corp.*, 57 F.4th 85 (2d Cir. 2023)?" Dkt. 448 at 2. As noted, the parties submitted their supplemental briefing in response to that Order on July 18, 2024. Dkts. 449 (Frank and the Trustees' supplemental brief), 451 (Eric's supplemental brief).

quoted above—postulating that separate litigation would need to be commenced to determine the ultimate recipient of the shares in another forum, *see* Eric Opposition at 70 & n.44.

Thus, declaring the Disputed Transfer invalid would appear to only spawn more litigation and uncertainty over the workings of the waterfall as applied to this scenario; it would not "afford relief from the uncertainty, insecurity, and controversy giving rise to the proceeding." *Admiral Ins. Co.*, 57 F.4th at 99 (internal quotation marks omitted).  It is well established that "courts look with disfavor on piecemeal litigation of the matters in controversy and may refuse declaratory relief on those grounds."  Wright & Miller, Federal Practice & Procedure § 2759 (June 2024); *see Lumbermens Mut. Cas. Co. v. Connecticut Bank & Tr. Co*., 806 F.2d 411, 414 (2d Cir. 1986) ("[T]he avoidance of piecemeal litigation should be given great weight in the context of declaratory judgment actions because such litigation would complicate and fragment the trial of cases . . . ."), *abrogated on unrelated grounds by Wilton*, 515 U.S. at 281-82.

Eric tries to circumvent this issue by framing the actual controversy before the Court as "concern[ing] only the validity of the [Disputed] Transfer, and [by noting that he] does not seek to resolve the priority of rights to the [Frank Trust] Shares between and among Eric, the Company and the other Shareholders."  TACC ¶ 185.  Eric's clever framing notwithstanding, the Court remains concerned that a declaration in this matter would only serve to tie the hands of a court or arbitrator in a future case and relatedly does not believe that it would serve judicial efficiency or economy to enter the declaration Eric seeks as to the Disputed Transfer.  And a better remedy does exist to resolve all related questions about the Frank Trust Shares; namely, a separate case concerning the Frank Trust Shares in which all necessary parties can be joined and where the judge or arbitrator can resolve at once *both* the question of whether the Disputed Transfer was valid *and*, if not, to whom the Frank Trust Shares should be awarded.

Therefore, the balance of the factors identified in *Admiral Insurance Company* militates toward the conclusion that the Court should decline to exercise its discretion to issue a declaration as to the Frank Trust Shares.  The Court thus denies summary judgment as to Eric's third claim.[20]

## V.  Conclusion

For the foregoing reasons, the Court: (1) denies Frank's motion for summary judgment in its entirety; (2) grants Eric's motion for summary judgment as to the lone claim in the Complaint for declaratory judgment to the extent it involves the Barbara 1994 Trust shares and denies it otherwise, denies Eric's motion for summary judgment on the first claim in the Third Amended Counterclaims and Crossclaims, grants Eric's motion for summary judgment on the second cause of action in the Third Amended Counterclaims and Crossclaims for breach of contract against the Trustees to the extent it concerns the Barbara 1994 Trust shares and denies it otherwise, and denies

---

[20] In his supplemental briefing, Eric reiterates a concern that he originally brought up in discussions over his motion to amend his claims; namely, that Frank or other parties in future litigation over the Frank Trust Shares may take the position that his claims were compulsory counterclaims in this action under Federal Rule of Civil Procedure 13(a)(1). *See* Dkt. 451 at 10 (supplemental briefing); Dkt. 117 (transcript from conference on January 19, 2022) at 5:2-6:13. It is not entirely clear to the Court that there is a live controversy over this question, since Frank at oral argument declined to take a position on the matter, at least at that moment.  Oral Arg. Tr. at 95:1-16.  Nevertheless, the Court seriously doubts the proposition that the Frank Trust Share claims were compulsory counterclaims in this action.  Rule 13(a)(1)(A) mandates in relevant part that a counterclaim is compulsory if it "arises out of the transaction or occurrence that is the subject matter of the opposing party's claim."  The Second Circuit has "considered this standard met when there is a 'logical relationship' between the counterclaim and the main claim[,] . . . [*i.e.*,] the essential facts of the claims must be so logically connected that considerations of judicial economy and fairness dictate that all the issues be resolved in one lawsuit." *Jones v. Ford Motor Credit Co.*, 358 F.3d 205, 209 (2d Cir. 2004).  The Court struggles to see how that would be the case here: the claims concerning the Barbara Trust Shares and the Frank Trust Shares involve two different parties, two different attempted dispositions of shares at two different times, and two different contracts.  Even if the Court were to reach Eric's argument about the Shareholder's Agreement— which would also require an interpretation of the ISA as a threshold matter—any interpretation would center on Paragraph 3(b) and not Paragraph 5(b).  In sum, the "essential facts" of each claim are far apart and, in addition to all the reasons discussed above, the Court also finds that judicial economy is not served by opining on the Frank Trust Shares in this matter.

Eric's motion for summary judgment on the third claim in the Third Amended Counterclaims and Crossclaims; and (3) denies the Trustees' motion for summary judgment in its entirety.

The Court will rule on the remaining sealing motions in a separate order. In advance of that order, the parties shall file a proposed joint order with a table of the remaining sealing requests by September 5, 2024. This table shall include columns with the following information: (1) the ECF docket number of the document sought to be sealed, (2) a short description of the relevant document, (3) the party requesting the document's sealing, and (4) a short description of the basis for sealing. The parties shall file this proposed order on ECF and also email both PDF and Microsoft Word versions thereof to the Court's chambers inbox.

This Opinion and Order shall also initially be filed under seal. The parties shall have until September 5, 2024, to file any proposed redactions to this Opinion and Order, as well as a letter addressing why these redactions are justified under *Lugosch v. Pyramid Company of Onondaga*, 435 F.3d 110 (2d Cir. 2006). The parties shall submit a single set of proposed redactions, but may explain any disagreements in their joint letter.

As detailed at *supra* III.C, the Court will also permit Frank and the Trustees to amend their answers solely with regard to their positions as to the beneficiary of the Barbara 2010 Trust. Those amended pleadings are also due September 5, 2024. Given that the Trustees did not move for summary judgment in their favor on Frank's claim for declaratory judgment, the Court will also provide Frank and the Trustees an opportunity to show cause why summary judgment should not similarly be granted *sua sponte* on this claim under Rule 56(f) in favor of the Trustees as for the Barbara 1994 Trust shares but denied as for the Barbara 2010 Trust shares. Frank and the Trustees may file a letter of no longer than five pages addressing this issue by September 5, 2024. In the

absence of any letter, the Court will grant summary judgment in favor of the Trustees along these lines.

Finally, the Court will hold an in-person status conference for this matter on October 9, 2024, at 3:00 p.m., in Courtroom 12D of the Daniel Patrick Moynihan U.S. Courthouse, 500 Pearl Street, New York, New York 10007. The parties should be prepared to discuss trial dates in early 2025 as to the remaining claims, in addition to the Trustees' request to amend their answer, Dkt. 453. The Clerk of Court is respectfully directed to close Docket Numbers 261, 266, and 268.

SO ORDERED.

Dated: August 29, 2024
New York, New York

_____
JOHN P. CRONAN
United States District Judge