# EXHIBIT 9

ASPEN CASEBOOK SERIES



# WILLS, TRUSTS, AND ESTATES

ELEVENTH EDITION

**ROBERT H. SITKOFF**

Austin Wakeman Scott Professor of Law
John L. Gray Professor of Law
Harvard University

**JESSE DUKEMINIER**

Late Maxwell Professor of Law
University of California, Los Angeles



will, nothing passes to a devisee until the testator's death. While the testator is alive, the devisee has only an expectancy (see page 70). Upon creation of the trust, by contrast, Williams took a future interest that, subject to a variety of conditions, would become possessory at the death of Farkas.

The court emphasized that Farkas owed fiduciary duties to Williams. True, Farkas had the power "to vote, sell, redeem, or otherwise deal in the stock." But Farkas held this power as trustee, and "as trustee he must so conduct himself in accordance with the standards applicable to trustees generally." Accordingly, "if, without having revoked the trust, Farkas as trustee had given the stock away without receiving any consideration therefor," or if Farkas "had pledged the stock improperly for his own personal debt," then "Williams would have had an enforceable claim against Farkas' estate for whatever damage had been suffered." The court contrasted the rights of a testator, who "could waste the property or do anything with it he wished during his lifetime without incurring any liability to those designated by the will to inherit the property."

But does this reasoning come to grips with Farkas's retained power to revoke the trust and take back the trust property at any time and for any reason? In light of Farkas's unconditional power of revocation, what could he do that would give rise to a successful lawsuit by Williams for breach of duty? The court acknowledged that a suit by Williams might not be "feasible," because if Williams sued "Farkas could then revoke the trust." Moreover, the "controlling consideration" in interpreting a donative instrument is the donor's intent.[13] If without first formally revoking the trust Farkas took an action that abridged Williams's (entirely defeasible) remainder interest, would not the more sensible interpretation — that is, the interpretation more in accord with Farkas's intent — be that the action constituted an implied revocation to that extent?[14]

## 2.  Abandoning the Present Transfer Fiction

Legal formalisms aside, the policy question at issue in *Farkas* was whether a revocable trust should be effective to pass property at death without Wills Act formalities. After many years of benign experience with deathtime transfer by revocable trusts and other will substitutes lacking the formalities of a will, an alternative explanation for their validity emerged. The Restatement (Third) of Property explains:

> [W]ill substitutes need not be characterized as effecting a present transfer to escape characterization as a will. Rather, the donor is free to transfer wealth on death either in the probate system or in the nonprobate system or in both. When using the nonprobate system, the donor uses its forms, which typically arise from the commercial practice of financial intermediaries. When using the state-operated transfer

---

13. Restatement (Third) of Property: Wills and Other Donative Transfers § 10.1 (Am. Law Inst. 2003).

14. *See* John H. Langbein, The Nonprobate Revolution and the Future of the Law of Succession, 97 Harv. L. Rev. 1108, 1127-28 (1984).

system of probate administration, the donor uses the forms appropriate to that system (for testation) or allows that system to operate by default (in the case of intestacy). The statute of wills does not require wealth transfers on death to occur by probate; the statute merely requires that probate transfers comply with the statute's formalities. Because the statute of wills does not govern nonprobate transfers, wealth holders may use these alternative wealth-transfer systems on death by means of will substitutes.[15]

Under this reasoning, a revocable trust can be openly acknowledged as a will substitute—in effect, a nonprobate will. Even if a "settlor serves as sole trustee or co-trustee, or reserves the right to veto, direct, or otherwise control the acts of another trustee in the administration or distribution of the trust estate," the trust is valid and may transfer property to a remainder beneficiary at the death of the settlor without Wills Act formalities.[16]

Acknowledging that a revocable trust is a will substitute shifts the focus from finding a present transfer to effectuating the settlor's intent. In *Farkas*, given the settlor's unconditional power to revoke the trust and take back the trust property, the more sensible interpretation of the settlor's intent is that any action by Farkas that impaired Williams's interest in the trust was an implied revocation to that extent. On this view, Farkas owed no duties to Williams while the trust was revocable. Modern law, including Uniform Trust Code (UTC) § 603, excerpted below, and the Restatement (Third) of Trusts,[17] has embraced this view.

### Uniform Trust Code (Unif. Law Comm'n 2000, as amended 2018)

#### § 603.  Settlor's Powers; Powers of Withdrawal

(a) To the extent a trust is revocable by a settlor, a trustee may follow a direction of the settlor that is contrary to the terms of the trust. To the extent a trust is revocable by a settlor in conjunction with a person other than a trustee or person holding an adverse interest, the trustee may follow a direction from the settlor and the other person holding the power to revoke even if the direction is contrary to the terms of the trust.

(b) To the extent a trust is revocable [and the settlor has capacity to revoke the trust], rights of the beneficiaries are subject to the control of, and the duties of the trustee are owed exclusively to, the settlor. . . .

### *Fulp v. Gilliland*
998 N.E.2d 204 (Ind. 2013)

Rush, J. Revocable trusts are popular substitutes for wills, intended to provide non-probate distribution of people's estates after their deaths, allowing them to

---

15.  Restatement (Third) of Property: Wills and Other Donative Transfers § 7.1 cmt. a (Am. Law Inst. 2003).

16.  Restatement (Third) of Trusts § 25 cmt. b (Am. Law Inst. 2003).

17.  *See* id. § 74(1).

458        Chapter 7.  Nonprobate Transfers and Planning for Incapacity



Justice Loretta Rush, first appointed to the Indiana Supreme Court in 2012, became the first woman to be named Chief Justice of that court in 2014.

retain control and use of their assets during their lifetimes. . . . We . . . address an issue of first impression in Indiana: while a revocable trust is revocable, whom does the trustee serve? . . .

### FACTS

Soon after Ruth and Harold Fulp Sr. married, they moved to the family farm, where they raised their three children — Harold Jr., Nancy, and Terry. Harold Sr. farmed the land; Junior later joined him, then took over after Senior's death. A few years later, Ruth placed the farm into the Ruth E. Fulp Revocable Trust. As the Trust's primary beneficiary, Ruth could use its assets; as trustee, she could sell them; and as settlor, she could "alter, amend or revoke" the Trust "in any respect." In addition, the Trust required the trustee — unless another term of the trust provided otherwise — to "administer the trust solely in the interest of the beneficiaries," "treat multiple beneficiaries impartially," and "preserve the trust property." Upon Ruth's death, the trust would become irrevocable, and the successor trustee would distribute any remaining assets to the children.

As Ruth got older, she moved to the Indiana Masonic Home and decided to sell the farm to pay for her living expenses there. But she wanted to keep the farm in the family, so she approached Harold Jr., who was interested in buying it. He offered her a discounted price per acre — the same price Nancy's daughter had previously paid Ruth for another portion of the farm. Ruth agreed and said "what I did for one I can do for the other." But Harold Jr. cautioned her that the farm was worth more than the $450,252 he was offering. Indeed, an appraisal later showed it was worth more than $1 million.

Harold Jr.'s lender, Farm Credit, drew up the purchase agreement, and Ruth signed it. When Nancy found out, she objected because she "wanted her share." . . .

After a bench trial, the trial court found that Ruth was competent to sell the farm, the price paid for the farm was adequate, and Harold Jr. exerted no undue influence. Still, the court . . . found that Ruth breached her fiduciary duty to the children by selling the farm at a low price. . . .

Harold Jr. appealed. The Court of Appeals agreed with the trial court that if Ruth had sold the farm as *trustee*, she would have breached a fiduciary duty to her children. But it also recognized that if Ruth had such a duty, her conflicting rights and duties as trustee would essentially render the Trust irrevocable. To avoid that untenable result, the court instead concluded that Ruth sold the farm as *settlor*, so that the purchase agreement "in effect" amended the Trust. . . .

Nancy [appealed] . . . , asking us to decide whether the trustee of a revocable trust owes a duty to the settlor alone or also to the remainder beneficiaries. We granted [the appeal] to address that issue, and we conclude that while a revocable trust is