UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---------------------------------------------------------------------X
                                               :

FRANK BRUNCKHORST III, individually and in his  :
capacity as trustee of THE FRANK BRUNCKHORST III  :
2001 TRUST,  :
  :
                           Plaintiff,  :
  :
                    -v-  :        21 Civ. 4362 (JPC)
  :
ERIC BISCHOFF *et al.*,  :        <u>OPINION AND</u>
  :          <u>ORDER</u>
                      Defendants.  :
  :
---------------------------------------------------------------------X
  :
ERIC BISCHOFF,  :
  :
                    Counterclaim-Plaintiff,  :
  :
                    -v-  :
  :
FRANK BRUNCKHORST III, individually and in his  :
capacity as trustee of THE FRANK BRUNCKHORST III  :
2001 TRUST,  :
  :
                    Counterclaim-Defendant.  :
  :
---------------------------------------------------------------------X
  :
ERIC BISCHOFF,  :
                    Crossclaim-Plaintiff,  :
  :
                    -v-  :
  :
SUSAN STRAVITZ KEMP, in her capacity as co-trustee  :
of THE BARBARA BRUNCKHORST 1994 TRUST and  :
executrix of THE ESTATE OF BARBARA  :
BRUNCKHORST, *et al.*,  :
  :
                    Crossclaim-Defendants.  :
  :
---------------------------------------------------------------------X

JOHN P. CRONAN, United States District Judge:

For several years, the parties have litigated the proper ownership of certain shares of Boar's Head Provisions Company, Inc. ("Boar's Head" or the "Company") that were associated with Barbara Brunckhorst ("Barbara") before her death on November 18, 2020 (the "Barbara Trust Shares"). Most of this dispute was resolved in the Court's summary judgment decision on August 29, 2024, which was publicly filed with redactions about one month later. *See* Dkt. 467 ("Opinion"); *Brunckhorst v. Bischoff*, No. 21 Civ. 4362 (JPC), 2024 WL 4277788 (S.D.N.Y. Sept. 24, 2024).[1] But that ruling did not answer who is the proper recipient of the ███████ shares (the "2010 Trust Shares")—representing ██ of all Boar's Head stock—held by the Barbara Brunckhorst 2010 Trust (the "Barbara 2010 Trust"). Defendant, Counterclaim-Plaintiff, and Crossclaim-Plaintiff Eric Bischoff ("Eric"), on the one hand, and Plaintiff and Counterclaim-Defendant Frank Brunckhorst III ("Frank") and Defendant and Crossclaim-Defendant Richard Todd Stravitz ("Todd"),[2] on the other, now cross-move for summary judgment as to these remaining shares. For the following reasons, the Court concludes that Eric is the proper recipient of the 2010 Trust Shares. Eric's motion for partial summary judgment is therefore granted and Frank and Todd's cross-motion is denied.

---

[1] This Opinion and Order assumes familiarity with the Court's prior decision.

[2] Defendant and Crossclaim-Defendant Susan Stravitz Kemp is not a trustee of the Barbara 2010 Trust and thus did not participate in the parties' supplemental briefing as to the disposition of the 2010 Trust Shares. *See* Dkt. 517 ("Frank & Todd SJ Brief") at 1 n.1.

## I. Background[3]

### A.    The Shareholder's Agreement

The Court set forth a detailed background of this dispute in its August 29, 2024 summary judgment decision. *See* Opinion at 3-6, 9-14, 37-41. A few points bear refreshing for purposes of the instant motions.

In 1991, the four shareholders of Boar's Head at the time—Barbara, the trustees of the Alvina Martin 1988 Trust, Robert S. Martin ("RSM"), and Eric—entered into the Shareholder's Agreement. Frank & Todd 56.1 Stmt. ¶ 1; Eric 56.1 Stmt. ¶¶ 1-2; *see* Dkt. 520 ("Swartz Decl."), Exh. 1 ("Shareholder's Agreement"). The Shareholder's Agreement was signed "for the purpose of insuring continuity of management among [the four shareholders] and to provide for the orderly disposition of [Boar's Head's] shares of capital stock." Shareholder's Agreement at 2. Under the Shareholder's Agreement, Barbara was designated a "Group A" shareholder, while the Alvina Martin 1988 Trust, RSM, and Eric were designated as "Group B" shareholders. Frank & Todd 56.1 Stmt. ¶¶ 3-4; Eric 56.1 Stmt. ¶ 2. Each Group represents a different line of descendants of the founders of Boar's Head, Frank Brunkhorst, Jr. and Bruno Bischoff. *See* Opinion at 9.

Paragraph 3 of the Shareholder's Agreement is entitled "Restrictions on Sale or Other Disposition of Shares by Shareholders." Shareholder's Agreement at 3. Paragraph 3(a) provides that:

---

[3] The facts throughout this Opinion and Order are drawn from the parties' statements of undisputed material facts under Local Civil Rule 56.1(a), their respective counter-statements under Rule 56.1(b), and the exhibits filed by the parties. *See* Dkts. 519 ("Frank & Todd 56.1 Stmt."), 522 ("Eric 56.1 Stmt."), 543 (Counterstatement to Eric 56.1 Stmt.), 547 (Counterstatement to Frank & Todd 56.1 Stmt.). Unless otherwise noted, the Court cites only to a statement of undisputed material facts when the opposing party does not dispute the fact, has not offered admissible evidence to refute it, simply seeks to add his own "spin" on the fact, or otherwise merely disputes the inferences drawn from it.

During the term of this Agreement, no Shareholder, either directly or indirectly, shall sell, assign, mortgage, hypothecate, transfer, pledge, create a security interest in or lien upon, encumber, give, place in trust, or otherwise voluntarily or involuntarily dispose of any of the Shares now owned or hereafter acquired by said Shareholder, except as hereinafter provided.  Any attempted disposition of shares, either voluntary, involuntary or by operation of law, prohibited by this Agreement shall be void and shall immediately give [Boar's Head] and the Shareholders the option to purchase the Shares which were the subject of the attempted disposition, such option to be on the terms set forth in Paragraph 4 [of the Shareholder's Agreement], except that no written offers as provided therein need be given.

*Id.* ¶ 3(a).  Paragraph 3(b) sets forth that:

Notwithstanding the foregoing, (i) a Group A shareholder may at any time sell or otherwise transfer any or all of his Shares to any other Group A Shareholder, any other member of Barbara Brunckhorst's immediate family (including nieces and nephews but excluding Richard Stravitz) who is an Active Employee (as defined below) or a trust for the benefit of such Group A Shareholder or such permitted transferee, (ii) a Group B Shareholder may at any time sell or otherwise transfer any or all of its or his Shares to any other Group B Shareholder, any other member of Alvina Martin's immediate family (including nieces and nephews but excluding Robert A. Martin) who is an Active Employee, a trust for the benefit of such Group B Shareholder or such permitted transferee, or . . . a beneficiary of the Alvina Martin 1988 Trust to whom Shares are permitted to be transferred under the terms of the Trust Agreement creating such Trust as in effect on the date hereof; provided, however, that the transferee shall take such Shares subject to, and shall be fully bound by, the terms of this Agreement as if such transferee were a party hereto as a Group A or Group B Shareholder, as the case may be (based upon the Group of which the transferring Shareholder was a member), and shall execute and deliver an appropriate instrument confirming that such Shares are so held, and provided further that any person (a) who is presently a Shareholder or who is otherwise a permitted transferee pursuant to the provisions of this Section 3(b) and (b) who marries after the date of execution of this Agreement (each individually a "Prenuptial Shareholder") must satisfy the Prenuptial Requirement (as hereinafter defined).

*Id.* ¶ 3(b).  As the Court has previously characterized these two provisions, "Paragraph 3(a) of the Shareholder's Agreement prohibits shareholders from either directly or indirectly disposing of their shares other than to certain permitted transferees."  Opinion at 10 (internal quotation marks omitted).  "One form of permitted transfer is detailed in Paragraph 3(b); this provision allows for Group A or B Shareholders to make certain intra-group transfers 'at any time.'"  *Id.*  "Paragraph 3(a) also broadly provides that '[a]ny attempted disposition of Shares . . . prohibited by this

Agreement shall be void'; the shares in question would then be offered for sale pursuant to Paragraph 4 of the Agreement." *Id.*

"Paragraph 4, in turn, sets forth . . . the 'waterfall' through which shares are generally offered for sale if they are not subject to the aforementioned intra-group transfer mechanism described in Paragraph 3(b)." *Id.* "The waterfall proceeds in three steps":

> First, other Shareholders within the same group have 20 days to accept the offer. If the group members do not offer to purchase the shares pursuant to Paragraph 4(a) or 4(b), then the shares are deemed offered to the Company, which has another 20 days to accept the offer. If the Company fails to do so, then the offer is extended to Shareholders in the other group, who have 10 days to accept the offer.

*Id.* (citation omitted); *see* Shareholder's Agreement ¶ 4(a)-(h).

The Shareholder's Agreement also provides that "[i]n the event that there is no election to purchase all the Shares offered for sale pursuant to the provisions of this Paragraph 4, the offering Shareholder shall have the right to sell or exchange any or all of such Shares in a bona fide transaction, for a period of six (6) months from the date that the last offer expires hereunder[.]" Shareholder's Agreement ¶ 4(i). Any transferee who purchases shares pursuant to a bona fide transaction "takes such Shares pursuant to the terms of [the Shareholder's Agreement] and as a member of the Group of the transferring Shareholder," and "[a]t the end of such six-month period, the offering Shareholder shall notify the other parties hereto in writing of any Shares which he then owns and the number of Shares which have during such period been sold in bona fide transactions. All of such Shares then owned by such offering Shareholder shall again become subject to all of the restrictions and provisions of [the Shareholder's] Agreement." *Id.* Or, as Eric graphically depicted in his briefing:



Dkt. 546 ("Opp. to Frank & Todd SJ Brief") at 23.

In addition to any disposition or attempted disposition outlined in Paragraph 3, the waterfall is also triggered "after the death of a Shareholder or the beneficiary of a trust that is a Shareholder," and the procedures for such transfer are set forth in Paragraph 5 of the Shareholder's Agreement. Opinion at 11. "The crucial clause for this dispute is found in Paragraph 5(b). That provision generally mandates that the shares will be offered up for sale under the waterfall detailed in Paragraph 4, with the waterfall beginning on one of two dates: either (1) 'on the tenth (10th) day after appointment of [an] executor or administrator [of the deceased Shareholder's estate] by a court of competent jurisdiction' in the event that the deceased was a Shareholder, or (2) 'in the event of the death of a beneficiary [of a trust which is a Shareholder], on the date of death.'" *Id.* (quoting Shareholder's Agreement ¶ 5(b)).[4] As the Court has previously explained, "[t]his timing discrepancy fuels the instant dispute" because "whether Barbara was 'a Shareholder' of Boar's

---

[4] Paragraph 5(a) also "provides that these shares can pass through the Paragraph 3(b) intra-group transfer mechanism under certain conditions," but "[t]he parties agree that this provision does not apply to the Barbara Trust Shares." Opinion at 11.

Head or a 'beneficiary of a trust which is a Shareholder' of Boar's Head (a 'Shareholder-Beneficiary') at the time of her death . . . affects when the parties had to provide notice to purchase Barbara's shares under the waterfall provision.  If Barbara was a Shareholder, the clock did not run until the appointment of the executors; if she was a Shareholder-Beneficiary, the timeline began upon her death."  *Id.* at 11-12.

## B.    The Barbara 2010 Trust

In 2009, a law firm provided a memorandum to Barbara and Frank addressing estate planning issues (the "Firm Memo").  Frank & Todd 56.1 Stmt. ¶ 15; Eric 56.1 Stmt. ¶ 15; *see* Swartz Decl., Exh. 6 ("Firm Memo").  At the time, Barbara's shares were held by the trustees of the Barbara 1994 Trust.  Firm Memo at FB_0010399.  The Firm Memo explained that, due to the mechanics of the Shareholder's Agreement, upon the death of either Barbara or Frank, the survivor would have "the right to make a bargain purchase of the shares owned" by the decedent.  *Id.* at FB_0010400.  The Firm Memo advised that it might be possible to mitigate any gift tax obligations by "entering into an agreement under the terms of which the survivor of [Barbara or Frank] would agree to give to the chosen charity of the one of [Barbara or Frank] who dies first (the 'Decedent') an amount equal to the excess of the fair market value of the Company shares over the book value of the Company shares held by the Decedent's trust."  *Id.* at FB_0010401.

But because Frank was treated as a member of Barbara's family under the Internal Revenue Code and together they "own[ed] 50% of" Boar's Head's stock, in the event Barbara predeceased Frank and Frank received all her shares, Frank would need to pay estate taxes on the spread between the fair market value of the shares and their book value.  *Id.* at FB_0010400.  The Firm Memo observed that the estate tax "problem applies . . . only if at Barbara's death she and members of her family own 50% or more of the shares of the Company.  Barbara could reduce her family's

ownership of the shares of the Company to less than 50% by arranging for the transfer of 1 of her shares to a trust for the benefit of someone other than herself." *Id.* at FB_0010401-0010402. The Firm Memo stated that Barbara's "ultimate charitable beneficiary, ███████████████████, would be a likely candidate" to serve as the trust beneficiary. *Id.* at FB_0010402.

The Firm Memo suggested that "[a] direct transfer would trigger the purchase rights of the Shareholders' Agreement, but a two part, indirect transfer . . . should not." *Id.* As the first step in this process, "Barbara would direct the transfer of 1 share of her shares of the Company's stock to a separate trust for her benefit. An individual she trusts . . . would be the trustee with the power to vote the share. The terms of the trust would require that Barbara receive all of the income for life and that, on her death, the trust property would pass to a person or persons selected by her." *Id.* The Firm Memo took the view that "[t]his transfer would be a permitted transfer" under the Shareholder's Agreement. *Id.*

At the second step, "Barbara would transfer her right to receive trust income to the ██████████████████████ or such one or more of the public charities generally supported by the ██████████████████████ as the trustee of the trust selects. Simultaneously, she would irrevocably exercise her power of appointment over the trust remainder to the ██████████████████ or to one or more of such public charities." *Id.* The Firm Memo opined that "[b]ecause no transfer of shares has occurred in the second step, it should not trigger the purchase rights under the Shareholders' Agreement. Because the transfer that occurred in the first step was permitted only because Barbara was the primary beneficiary of the purchasing trust, the fact that she is no longer the beneficiary of the trust at the time of her death will likely result in the trust not being protected from the purchase rights of the Shareholders' Agreement that arise on the death of a shareholder." *Id.* The Firm Memo said that, as a result of these two steps, "Barbara and members of her family

will own less than a 50% interest in the Company at her death.  As a result, the estate tax should not be imposed on the spread between the fair market value of her Company shares and the book value of such shares."  *Id.*

On January 7, 2010, Frank and Barbara, individually and in their capacities as trustees of the Barbara 1994 Trust and Frank 2001 Trust, entered a Memorandum of Understanding.  Frank & Todd 56.1 Stmt. ¶ 16; Eric 56.1 Stmt. ¶ 29; *see* Dkt. 278-36 ("MOU").  "The MOU reflected a nonbinding understanding between Barbara and Frank that the survivor of the two of them will make charitable contributions to the predeceased party's favored charities based on the excess value they would obtain if they purchased the other's shares in the Waterfall at book value."  Eric 56.1 Stmt. ¶ 30.

On December 24, 2010, Barbara settled the Barbara 2010 Trust.  *Id.* ¶ 35; *see* Swartz Decl., Exh. 2 ("Barbara 2010 Trust Agreement").  The Barbara 2010 Trust was funded with ▆▆▆▆▆ shares of Boar's Head, which amounted to ▆▆ of Boar's Head stock.  Frank & Todd 56.1 Stmt. ¶ 25; Eric 56.1 Stmt. ¶ 35; *see* Barbara 2010 Trust Agreement Art. I.  Todd was made the Trustee of the Barbara 2010 Trust.  Frank & Todd 56.1 Stmt. ¶ 26.  At its inception, the Barbara 2010 Trust was revocable, *see* Barbara 2010 Trust Agreement Art. VI(A); Todd as the Trustee was required to pay Barbara or apply for her benefit the "entire net income in quarter-annual installments or more frequent installments as may be convenient to the Trustee[]," *id.* Art. II(A); and Barbara was granted a general power of appointment over the entire trust corpus, *id.* Art. II(C).  *See also* Frank & Todd 56.1 Stmt. ¶ 27; Eric 56.1 Stmt. ¶ 36.  The Barbara 2010 Trust Agreement also provided that it would terminate upon Barbara's death and that upon that termination, the Trustee would

pay the Trust Fund[5] to whomever Barbara designated pursuant to her power of appointment. Barbara 2010 Trust Agreement Art. II(D); *see* Eric 56.1 Stmt. ¶ 37.

Barbara executed three other documents (the "Ancillary Documents") later on the same day the Barbara 2010 Trust was created.  Eric 56.1 Stmt. ¶ 38.  One document made the Barbara 2010 Trust irrevocable.  Swartz Decl., Exh. 3 ("Irrevocability Amendment").  A second document irrevocably exercised Barbara's power of appointment by appointing the entire Trust Fund remaining at Barbara's death to the ███████████████ and releasing her right to make any other appointments during her lifetime.  Swartz Decl., Exh. 4 ("Death Appointment").  A third document assigned Barbara's right to receive income during her lifetime to the ██████████ ████████.  Swartz Decl., Exh. 5 ("Income Assignment"); *see also* Frank & Todd 56.1 Stmt. ¶¶ 28-30 (describing the operation of the Ancillary Documents); Eric 56.1 Stmt. ¶¶ 38-41 (same). By their terms, the Irrevocability Amendment and Death Appointment took effect on January 1, 2011; the Income Assignment took place effective immediately upon Barbara's signing on December 24, 2010.  *See* Irrevocability Amendment; Death Appointment; Income Assignment.

Barbara died on November 18, 2020.  Frank & Todd 56.1 Stmt. ¶ 32; Eric 56.1 Stmt. ¶ 44. At that time, the Barbara 2010 Trust still held ██████████ of Boar's Head's stock, and those shares remain in trust to this day.  Frank & Todd 56.1 Stmt. ¶¶ 34-35; Eric 56.1 Stmt. ¶¶ 45, 53. Following Barbara's death, both Eric and Frank sent notices to the trustees of Barbara's trusts, including the Barbara 2010 Trust, purporting to accept shares offered through the waterfall.  *See* Opinion at 12-13.

---

[5] The Barbara 2010 Trust Agreement defines the "Trust Fund" as "all property (principal plus accrued, accumulated and undistributed income) that, at any particular time, belongs to the Trust."  Barbara 2010 Trust Agreement Art. XI(A)(16).

**C.      Procedural History**

The procedural history of this litigation is set forth in detail in the Court's prior summary judgment decision.  *See* Opinion at 4-6.  In that Opinion and Order, the Court determined that Eric was the proper recipient of the Boar's Head shares held by the Barbara Brunckhorst 1994 Trust ("Barbara 1994 Trust") but held that no party had established entitlement to summary judgment as to the 2010 Trust Shares.  *Id.* at 41.  With respect to those remaining shares, the Court indicated that the parties should prepare for trial in early 2025.  *Id.* at 55.

The Court held a conference with the parties on October 9, 2024.  *See* Dkt. 499 (transcript of October 9, 2024 conference).  At that conference, the parties indicated that they did not believe a trial as to the 2010 Trust Shares was necessary and instead proposed that they engage in simultaneous supplemental briefing and submit the remaining issues for a decision by the Court. *Id.* at 6:16-10:18.  The Court agreed to this proposal and set deadlines for supplemental and responsive briefs.  *Id.* at 10:19-12:9.  The Court subsequently authorized the parties to cross-move for summary judgment in connection with their supplemental briefing.  Dkt. 515.

The parties filed their summary judgment motions with supplemental briefs on November 22, 2024.  Dkts. 516-523.  Responses were filed on December 23, 2024.  Dkts. 542-544, 546-547. The Court held oral argument on the parties' cross-motions for summary judgment on September 8, 2025.  Dkt. 573 ("9/8/25 Oral Arg. Tr.").

## II.  Legal Standard

**A.      Summary Judgment**

The Court will grant summary judgment if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  "Summary judgment is appropriate '[w]here the record taken as a whole could not

lead a rational trier of fact to find for the non-moving party.'"  *Mhany Mgmt., Inc. v. Cnty. of Nassau*, 819 F.3d 581, 620 (2d Cir. 2016) (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986)).  "A genuine dispute exists where 'the evidence is such that a reasonable jury could return a verdict for the nonmoving party,' while a fact is material if it 'might affect the outcome of the suit under the governing law.'"  *Chen v. 2425 Broadway Chao Rest., LLC*, No. 16 Civ. 5735 (GHW), 2019 WL 1244291, at *4 (S.D.N.Y. Mar. 18, 2019) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)).  In conducting this review, the Court "resolve[s] all ambiguities and draw[s] all reasonable inferences in favor of the nonmoving party."  *Mhany Mgmt.*, 819 F.3d at 620.

"The movant bears the initial burden of demonstrating 'the absence of a genuine issue of material fact,' and, if satisfied, the burden then shifts to the non-movant to present 'evidence sufficient to satisfy every element of the claim.'"  *Chen*, 2019 WL 1244291, at *4 (quoting *Holcomb v. Iona Coll.*, 521 F.3d 130, 137 (2d Cir. 2008)).  The non-movant "may not rely on conclusory allegations or unsubstantiated speculation," and "must offer some hard evidence showing that its version of the events is not wholly fanciful."  *Jeffreys v. City of New York*, 426 F.3d 549, 554 (2d Cir. 2005) (internal quotation marks omitted).  The non-movant must present more than a "scintilla of evidence" to survive summary judgment.  *Anderson*, 477 U.S. at 252. "Where no rational finder of fact 'could find in favor of the nonmoving party because the evidence to support its case is so slight,' summary judgment must be granted."  *Brown v. Eli Lilly & Co.*, 654 F.3d 347, 358 (2d Cir. 2011) (quoting *Matsushita Elec. Indus. Co.*, 475 U.S. at 586).

As noted above, the parties have cross-moved for summary judgment in this matter.  The Court "need not enter judgment for either party" when cross-motions for summary judgment are filed.  *Morales v. Quintel Ent., Inc.*, 249 F.3d 115, 121 (2d Cir. 2001).  Generally, the Court

evaluates each cross-motion independently of the other, considering the facts in the light most favorable to the non-moving party. *Id.* "But where, as here, the motion and cross-motion seek a determination of the same issues, the Court may consider them together." *ExteNet Sys., Inc. v. Vill. of Pelham*, 377 F. Supp. 3d 217, 223 (S.D.N.Y. 2019).

## B. Contract and Trust Interpretation

The Shareholder's Agreement is governed by New York law. *See* Shareholder's Agreement ¶ 18. "It is axiomatic under New York law . . . that the fundamental objective of contract interpretation is to give effect to the expressed intentions of the parties." *Lockheed Martin Corp. v. Retail Holdings, N.V.*, 639 F.3d 63, 69 (2d Cir. 2011) (cleaned up). "In a dispute over the meaning of a contract, the threshold question is whether the contract is ambiguous." *Id.* "The matter of whether the contract is ambiguous is a question of law for the court." *L. Debenture Tr. Co. of N.Y. v. Maverick Tube Corp.*, 595 F.3d 458, 465 (2d Cir. 2010). "Contract language is ambiguous if it is capable of more than one meaning when viewed objectively by a reasonably intelligent person who has examined the context of the entire integrated agreement." *Cervecería Modelo de México, S. de R.L. de C.V. v. CB Brand Strategies, LLC*, No. 23-810-cv, 2024 WL 1253593, at *1 (2d Cir. Mar. 25, 2024) (summary order) (internal quotation marks omitted). "Generally, a motion for summary judgment may be granted in a contract dispute only when the contractual language on which the moving party's case rests is found to be wholly unambiguous and to convey a definite meaning." *Id.* (internal quotation marks omitted). "[W]here contract language is ambiguous, interpretation of the language's meaning, and hence, determination of the parties' intent, is a question for the jury." *Id.* at *2 (internal quotation marks omitted).

The Barbara 2010 Trust Agreement is governed by Florida law. *See* Barbara 2010 Trust Agreement Art. XI(C). "Under Florida law, '[t]he polestar of trust interpretation is the settlors'

intent.'" *Littell v. Law Firm of Trinkle, Moody, Swanson, Byrd & Colton*, 345 F. App'x 415, 419 (11th Cir. 2009) (quoting *L'Argent v. Barnett Bank, N.A.*, 730 So.2d 395, 397 (Fla. Dist. Ct. App. 1999)). "If the trust language is unambiguous, the settlors' intent as expressed in the trust controls and the court cannot resort to extrinsic evidence." *Id.* "In determining the settlors' intent, the court should not 'resort to isolated words and phrases'; instead, the court should construe 'the instrument as a whole,' taking into account the general dispositional scheme." *Id.* (quoting *Pounds v. Pounds*, 703 So.2d 487, 488 (Fla. Dist. Ct. App. 1997)).

## III. Discussion

Eric maintains that he is entitled to summary judgment on his crossclaim for breach of contract against the Trustees for failing to sell him the shares held by the Barbara 2010 Trust[6] and on Frank's declaratory judgment claim that Frank has the right to purchase the 2010 Trust Shares. Eric SJ Brief at 1. Eric's lead argument is that Barbara was a Shareholder-Beneficiary of the Barbara 2010 Trust at the time of her death, and thus the 2010 Trust Shares were offered upon her death through Paragraph 5(b) of the Shareholder's Agreement by virtue of the operation of Paragraph 4's waterfall. *Id.* at 12-16. Because the Court concludes that the Ancillary Documents were void *ab initio*, the Court agrees that Barbara remained a Shareholder-Beneficiary of the Barbara 2010 Trust at the time of her death, and thus grants Eric's motion for summary judgment as to the 2010 Trust Shares and denies the cross-motion of Frank and Todd.[7]

---

[6] Eric did not "mov[e] for summary judgment on his first counterclaim for declaratory judgment concerning who has the right to purchase the 2010 Trust Shares because it is coextensive with [his] second crossclaim for breach of contract against the Trustees, and a declaration will thus not serve any useful purpose." Dkt. 521 ("Eric SJ Brief") at 1 n.1.

[7] Eric also argues that an "attempted disposition" of the 2010 Trust Shares occurred at Barbara's death by operation of the Death Appointment, which he claims triggered the waterfall pursuant to Paragraph 3(a). Eric SJ Brief at 17-21. Because the Court concludes that the 2010 Trust Shares entered the waterfall by virtue of Paragraph 5(b), it need not pass on whether the 2010

**A.      The Court's Prior Decision Did Not Determine Whether Barbara Was a Shareholder-Beneficiary of the Barbara 2010 Trust**

Frank and Todd offer a few arguments for why Barbara was not a Shareholder-Beneficiary of the Barbara 2010 Trust at the time of her death.[8]  They begin by contending that the Court already determined that Barbara was neither a Shareholder nor a Shareholder-Beneficiary of the Barbara 2010 Trust at the time of her death in its prior summary judgment Opinion and that this determination is the law of the case.  Frank & Todd SJ Brief at 8-9.

That is incorrect.  The Court acknowledged that Barbara was not, at the time of her death, a Shareholder of the ███████ shares at issue as "Frank and Eric agree[d] that Barbara did not hold any shares individually (*i.e.*, not through an associated trust) at the time of her passing." Opinion at 12.  But the Court did not "recognize[] in its summary judgment decision that Barbara was not a Shareholder-Beneficiary of the 2010 Trust when she died, as she had relinquished her beneficial interest in that trust in favor of the ██████████████████ Frank & Todd SJ Brief at 9.

In support of this argument, Frank and Todd cite page 38 of the Court's summary judgment decision.  *See id.*  Although it is not clear what they take to be the Court's determination in this

_____

Trust Shares alternatively would have entered the waterfall upon Barbara's death through Paragraph 3(a).  Frank and Todd's opposition to Eric's argument in this respect also overlap somewhat with the Court's discussion herein insofar as they primarily argue that Paragraph 3(a) did not operate upon Barbara's death because any attempted disposition occurred when the Ancillary Documents took effect on January 1, 2011, and divested Barbara of her beneficial interest in the Barbara 2010 Trust.  *See* Dkt. 542 ("Opp. to Eric SJ Br.") at 12-16.  The Court also need not address whether Eric's notice of acceptance was ineffective because "Eric purported to accept the shares pursuant to Paragraph 5(b), not Paragraph 3(a)," Frank & Todd SJ Brief at 15, in light of its conclusion that the 2010 Trust Shares were offered up through the waterfall by operation of Paragraph 5(b).

[8] Frank and Todd withdrew a portion of their lead supplemental brief in their response to Eric's supplemental brief.  *See* Opp. to Eric SJ Brief at 1 n.3 ("Frank and Todd hereby withdraw and do not assert the arguments in Section I.A of their opening brief.").  The Court accordingly does not address the arguments contained within that section.

respect, presumably they rely on the Court's remark that "Eric also does not make any arguments disputing that the three aforementioned amendments made the ███████████████ the beneficiary of the Barbara 2010 Trust, and the Court can discern no evidence in the record that would show that these amendments were not operative at the time of Barbara's death."  Opinion at 38 (citation omitted).

Reading this statement in isolation to somehow constitute a determination of Barbara's status *vis-à-vis* the Barbara 2010 Trust under the Shareholder's Agreement divorces the Court's comment from its context.  *Cf. United States v. Skoien*, 614 F.3d 638, 640 (7th Cir. 2010) (en banc) (Easterbrook, C.J.) ("The opinion is not a comprehensive code; it is just an explanation for the Court's disposition.  Judicial opinions must not be confused with statutes, and general expressions must be read in light of the subject under consideration.").  As is clear from the Court's Opinion, this statement was made while observing the "contradictory" nature of the parties' representations up to that point about whether Barbara was a beneficiary of the Barbara 2010 Trust at the time of her death, including Frank and Todd's own admissions through their Answers that Barbara *was* the beneficiary of the Barbara 2010 Trust.  *See* Opinion at 37-39.  As the Court explained, "all parties now appear to agree that the ███████████████ became the beneficiary of the Barbara 2010 Trust *at the latest* upon Barbara's death," *id.* at 39 (emphasis added), and similarly the parties appeared to agree on the status of the trust beneficiary "*upon* Barbara's death," *id.* at 40 (emphasis added).

But that did not resolve the issue of whether Barbara remained the beneficiary of the Barbara 2010 Trust until her death.  Instead, the Court concluded that due to the "convoluted course of the parties' briefing and statements at oral argument," summary judgment was "not in order as to the Barbara 2010 Trust shares."  *Id.* at 41.  The Court further explained that it "will not purport

16

to pass on [the appropriate construction of the Shareholder's Agreement as to those shares] without further aid from the parties." *Id.* The Court's prior summary judgment Opinion plainly did not decide this issue one way or another, and thus the law of the case doctrine is inapplicable. *See, e.g.*, *Walsh v. McGee*, 918 F. Supp. 107, 111 (S.D.N.Y. 1996) ("[Q]uestions that have not been decided do not become law of the case merely because they could have been decided." (internal quotation marks omitted)).

**B.      Barbara Was a Shareholder-Beneficiary of the Barbara 2010 Trust at the Time of Her Death; the Shares Accordingly Entered the Waterfall Under Paragraph 5(b)**

With this initial objection aside, Frank and Todd's primary argument is that Barbara was not a Shareholder-Beneficiary of the Barbara 2010 Trust because "Barbara relinquished her beneficial interest in the trust income by assigning it to the ███████████████████" through the Ancillary Documents. Opp. to Eric SJ Brief at 4-12; *see also* Frank & Todd SJ Brief at 9 n.1 ("Barbara ceased to be a beneficiary of the 2010 Trust in early 2011, when the amendments to the 2010 Trust took effect, not upon her death."). The parties disagree on whether the Ancillary Documents, if given full effect, would have divested Barbara of her beneficial interest in the Barbara 2010 Trust as a matter of trust and estates law. *Compare* Eric SJ Brief at 12-17, *and* Opp. to Frank & Todd SJ Brief at 4-7, *with* Opp. to Eric SJ Brief at 4-12. But the Court need not resolve this issue. Assuming, as Frank and Todd maintain, *see* 9/8/25 Oral Arg. Tr. at 5:19-25, that the Ancillary Documents had the power to divest Barbara of her beneficial interest in the Barbara 2010 Trust, then the Ancillary Documents themselves are void *ab initio* under the terms of the Shareholder's Agreement. Thus they had no legal effect, and Barbara remained a beneficiary of the Barbara 2010 Trust until her death. *See* Eric SJ Brief at 21-23. Accordingly, Barbara was a Shareholder-Beneficiary of the Barbara 2010 Trust when she died, so upon her death the 2010

Trust Shares entered the waterfall, making Eric their proper recipient for the reasons expressed in the Court's August 29, 2024 Opinion and Order.

### 1. Any Documents Divesting Barbara of Her Beneficial Interest in the Barbara 2010 Trust Were Void *Ab Initio*

Resolution of the parties' summary judgment motions hinges on the interaction between the Shareholder's Agreement and the documents Barbara executed when establishing the Barbara 2010 Trust. As explained at *supra* I.B, Barbara settled the Barbara 2010 Trust on December 24, 2010, and funded it with ███████ Boar's Head shares. Frank & Todd 56.1 Stmt. ¶ 25; Eric 56.1 Stmt. ¶ 35. The parties agree that, at its inception, the Barbara 2010 Trust was revocable, Barbara was expressly identified as an income beneficiary, and Barbara held a general power of appointment over the trust corpus. *See* Barbara 2010 Trust Agreement Art. I, II(A), II(C), VI(A); Frank & Todd 56.1 Stmt. ¶ 27; Eric 56.1 Stmt. ¶ 36.

In general, the Shareholder's Agreement prohibits shares from being "place[d] in trust . . . except as" provided in the Shareholder's Agreement. Shareholder's Agreement ¶ 3(a). Paragraph 3(b) of the Shareholder's Agreement provides that a Group A Shareholder like Barbara "may at any time sell or otherwise transfer any or all of his Shares to . . . a trust for the benefit of such Group A Shareholder or such permitted transferee." *Id.* ¶ 3(b). Given this language, there does not appear to be any disagreement between the parties that transferring the ███████ shares into the Barbara 2010 Trust was permissible under the Shareholder's Agreement because, at the time of transfer, Barbara (a Group A Shareholder) was the trust beneficiary. Nor do the parties seem to disagree that under the Court's August 29, 2024 Opinion and Order—which is the law of the case—Barbara was, for purposes of the Shareholder's Agreement, a Shareholder-Beneficiary of the Barbara 2010 Trust at the point of the trust's inception. *See* Opinion at 14-36; 9/8/25 Oral Arg. Tr. at 4:9-5:1 (Frank's counsel concurring with the Court that Barbara was a Shareholder-

Beneficiary at the time of the initial transfer of shares to the Barbara 2010 Trust); 19:19-25 (Eric's counsel concurring). Accordingly, if Barbara had died without making any further amendment to the Barbara 2010 Trust documents, the 2010 Trust Shares would have entered the waterfall upon her death for the reasons expressed in the Court's prior summary judgment Opinion.

Shortly after transferring the shares into the Barbara 2010 Trust, however, Barbara executed the Ancillary Documents. *See* Irrevocability Amendment, Death Appointment, Income Assignment. Recall that Paragraph 3(a) of the Shareholder's Agreement broadly prohibits any direct or indirect attempt to "transfer," "encumber" or "place in trust" any shares except as provided by the Shareholder's Agreement. Shareholder's Agreement ¶ 3(a). The terms of the Ancillary Documents had the combined effect of making the Barbara 2010 Trust irrevocable, appointing the entire Trust Fund remaining at Barbara's death to the ███████████████ and further assigning to the ███████████████ the right to receive income from the trust during Barbara's lifetime. *See* Irrevocability Amendment, Death Appointment, Income Assignment. As Frank and Todd argue, *see* 9/8/25 Oral Arg. Tr. at 5:19-25, the Ancillary Documents were designed to divest Barbara's interest in the 2010 Trust Shares in favor of the ███████████████. And the parties agree that the ███████████████ "is an impermissible transferee." Eric 56.1 Stmt. ¶ 49; 9/8/25 Oral Arg. Tr. at 15:12-18 (Frank's counsel acknowledging that transferring shares to the ███████████████ would "trigger the waterfall" because the transfer was improper under the Shareholder Agreement). Put together, Eric argues, the Ancillary Documents themselves were "void *ab initio* and a legal nullity" because "Paragraph 3(a) provides that any 'attempted disposition' that is prohibited by the Shareholder's Agreement 'shall be void.'" Eric SJ Brief at 22 (quoting Shareholder's Agreement ¶ 3(a)). By Eric's view, "[i]t would have been as if Barbara had never executed the Ancillary Documents at all, and the 2010 Trust Agreement would have

persisted in the form it was originally settled"—that is, "a revocable trust for Barbara's benefit." *Id.* The upshot, says Eric, is that Barbara remained a Shareholder-Beneficiary of the 2010 Trust until she died, at which point Paragraph 5(b) of the Shareholder's Agreement, and its applicable notice provision, kicked in. *See supra* I.A.

Eric is correct that—assuming Frank and Todd are right that the Ancillary Documents had the power to divest Barbara from her interest in the 2010 Trust Shares, *see* Opp. to Eric SJ Brief 4-12—Paragraph 3(a) of the Shareholder's Agreement voided *ab initio* that attempt to "encumber" Barbara's shares or "place [them] in trust." *See Genger v. Genger*, 22 N.Y.S.3d 433, 433 (1st Dep't 2016) (holding an agreement which transferred stock "void *ab initio* because it violated the notice provisions of a [separate] stockholders agreement, which provided that any attempt to transfer shares in violation of the notice provision 'shall be void'"); *see also* Eric SJ Brief at 22-23 (collecting similar cases); 9/8/25 Oral Arg. Tr. at 27:7-14 (Frank's counsel stating that if there was any encumbrance, "it happened on January 1st, 2011, when the amendment that made the trust irrevocable and gave the foundation the ability to compel the trustees to distribute to it all of the trust's property became effective"). Accordingly, any document purporting to effect that transfer would be "a legal nullity at its inception," *Faison v. Lewis*, 32 N.E.3d 400, 401 (N.Y. 2015), and powerless to change Barbara's status as a Shareholder-Beneficiary.

Of course, in addition to voiding this "attempted disposition," Paragraph 3(a) of the Shareholder's Agreement also triggered the process by which the 2010 Trust Shares would be available for purchase pursuant to Paragraph 4's waterfall. *See* Eric SJ Brief at 23-25. No party asserts that the shares were purchased during this period, so ultimately the shares returned to the Barbara 2010 Trust under the restrictions of the Shareholder's Agreement by operation of Paragraph 4(i). *See supra* I.A. And, because the void Ancillary Documents were incapable of

changing Barbara's relation to the Barbara 2010 Trust, she remained a Shareholder-Beneficiary of the 2010 Trust Shares until her death. Accordingly, the shares entered the waterfall upon her death through Paragraph 5(b) for the reasons set forth in the Court's prior summary judgment Opinion, with Eric being the only party who timely offered to purchase the shares. *See* Opinion at 14-36.

### 2. The Court's Recognition of the Void Nature of the Ancillary Documents Does Not Violate the Statute of Limitations

Frank and Todd contend that Eric is time-barred from claiming, on voidness grounds, that the Ancillary Documents failed to divest Barbara from her interest in the Barbrara 2010 Trust. Under their theory, Eric's voidness argument "fails because he is barred by the statute of limitations from challenging any 'attempted disposition' of shares in 2010." Opp. to Eric SJ Brief at 16. According to Frank and Todd, "[u]nder New York law" any such claim would be "subject to a six-year statute of limitations from the date of the alleged breach—regardless of when Eric may have discovered the purported attempted disposition." Frank & Todd SJ Brief at 14. In this regard, Frank and Todd appeal to Section 213(2) of New York's Civil Practice Law and Rules ("C.P.L.R."), *see id.*, under which "contract claims are subject to a six-year statute of limitations," *City of New York v. FedEx Ground Package Sys., Inc.*, 351 F. Supp. 3d 456, 487 (S.D.N.Y. 2018).[9]

The Court does not agree that Eric's claim for breach of contract is barred by the statute of limitations. "The theory of the statute of limitations generally followed in New York is that the passing of the applicable period does not wipe out the substantive right; it merely suspends the remedy." Siegel, N.Y. Prac. § 34 (6th ed. 2024); *see also* 75 N.Y. Jur. 2d Limitations & Laches § 23 (2025) ("The statute of limitations acts as a bar to the remedy by action after a certain stated

---

[9] While neither Frank nor Todd pleaded a statute of limitations defense in their Amended Answers, *see* Dkts. 470 (Frank), 473 (Todd), Eric does not object to the Court's consideration of this argument. The Court accordingly proceeds to evaluate the merits. *See Rose v. AmSouth Bank of Fla.*, 391 F.3d 63, 65 & n.3 (2d Cir. 2004).

period, but, ordinarily, it does not extinguish the debt or the underlying obligation, right, or liability. The expiration of the statutory limitations period does not cure the underlying wrong but extinguishes the right to judicial relief."); *Hahn Auto. Warehouse, Inc. v. Am. Zurich Ins. Co.*, 916 N.Y.S.2d 678, 680 (4th Dep't 2011) (applying this principle). From this principle, New York law holds that there exists "a rule of general applicability regarding void documents": "a document void at its inception has no effect and cannot be subject to a statute of limitations." *Faison*, 32 N.E.3d at 405; *accord OneWest Bank v. Schiffman*, 109 N.Y.S.3d 365, 367 (2d Dep't 2019).

The New York Court of Appeals applied this principle when holding that the statute of limitations did not bar a landlord's challenge to settlement terms that were void under rent stabilization laws. In *Riverside Syndicate, Inc. v. Munroe*, 882 N.E.2d 875 (N.Y. 2008), a pair of tenants leased three apartments in Manhattan that were subject to rent stabilization laws. *Id.* at 876. After the tenants subleased one of these apartments, the landlord sued to evict them, claiming the sublease was illegal. *Id.* When the parties settled, they agreed that the tenants could stay in the apartment at a monthly rental rate "far in excess of the maximum rent allowed by the rent stabilization laws." *Id.* In 2004, the landlord brought a declaratory judgment action that the settlement agreement violated public policy and was void. *Id.* at 877.

The tenants argued that "since the agreement was made in 1996, th[e] action, brought in 2004, [wa]s barred by the six year statute of limitations provided by CPLR 213(2) for 'an action upon a contractual obligation or liability.'" *Id.* at 878 (quoting N.Y. C.P.L.R. § 213(2)). The Court of Appeals held that such an argument "misconceives the nature of a statute of limitations; it does not make an agreement that was void at its inception valid by the mere passage of time." *Id.* The statute of limitations did not apply because this was not an action "'upon a contractual obligation or liability,' but one to declare that no valid contractual obligations ever existed." *Id.*

(quoting N.Y. C.P.L.R. § 213(2)).  Accordingly, the Court of Appeals held the agreement "void as to both parties," so neither party could rely on it.  *Id.*

The New York Court of Appeals reiterated this conclusion in *Faison v. Lewis*.  There, the Court of Appeals considered whether a plaintiff was time-barred under C.P.L.R. Section 213(8) "from seeking to set aside and cancel, as null and void, [a defendant's] mortgage interest in real property conveyed on the authority of a forged deed."  *Faison*, 32 N.E.3d at 401.  The Court of Appeals explained that "a forged deed is void *ab initio*, and that it is a document without legal capacity to have any effect on ownership rights," and then considered "whether a claim challenging a conveyance or encumbrance of real property based on such deed is subject to a time bar."  *Id.* at 404.  The Court of Appeals held that "a claim against a forged deed is not subject to a statute of limitations defense," stating that "a forged deed is void, not merely voidable.  That legal status cannot be changed, regardless of how long it may take for the forgery to be uncovered."  *Id.* Relying on *Riverside*, the *Faison* court said that "a statute of limitations does not make an agreement that was void at its inception valid by the mere passage of time."  *Id.* (internal quotation marks omitted).  "[A] legal nullity at its creation is never entitled to legal effect because '[v]oid things are as no things.'"  *Id.* at 403 (quoting *Marden v. Dorthy*, 54 N.E. 726, 731 (N.Y. 1899)). "Consequently, plaintiff may seek to vacate the deed and defendant's encumbrance upon the property."  *Id.* at 404.

In *Faison*, the Court of Appeals rejected the defendant's argument that *Riverside* was merely "a case about illegal contracts, not deeds, and thus should be limited to its subject matter, namely instruments void at inception due to illegality."  *Id.* at 405.  "The fact that *Riverside* involved an illegal agreement is no basis to limit its analysis as regards the statute of limitations. Instead, the language and analysis employed in *Riverside* make clear that the holding was based

on a rule that is generally applicable to claims involving void documents, including, obviously, forged deeds." *Id.* *Faison* noted that *Riverside* "relied on 'the nature of a statute of limitations,'" which "refers to the statute's function as barring stale claims. In contrast, a statute of limitations cannot grant legal significance to a document expressly rejected under the law; it cannot be deployed to validate what the law has never recognized." *Id.* (quoting *Riverside*, 882 N.E.2d at 878).[10]

*Riverside* and *Faison* refute Frank and Todd's argument that Eric's breach-of-contract crossclaim is time-barred because it relies on a void act—the Ancillary Documents' execution— that occurred more than six years ago. Those cases also help explain the two fundamental and related problems with Frank and Todd's position.

First, Frank and Todd's argument conflates the remedy barred by the statute of limitations with the remedy Eric seeks in this action. Eric's breach-of-contract crossclaim alleges that Todd breached the Shareholder's Agreement in 2021 by failing to sell to Eric the 2010 Trust Shares after

---

[10] A contract may be void on grounds other than public policy—for example, because a previous contract denies a party the authority to execute the later one. Reviewing other States' refusals to allow statutes of limitations to revive void agreements, the Court of Appeals in *Faison* favorably cited one case in which a lease was void not due to statute (as in *Riverside*) or common law (as in *Faison*), but because the purported lessors "lack[ed] . . . authority" under a prior contract. 32 N.E.3d at 404 (citing *Thompson v. Ebbert*, 144 Idaho 315, 318 (2007)). In *Thompson*, the owner of a condominium brought an action to quiet title on the ground that a prior lease of a portion of his property was void under the governing Condominium Declaration. *Thompson*, 144 Idaho at 317. The Declaration required that any lease convey the entire "Unit," as defined therein. *Id.* In holding that a lease for only part of the Unit was void because it violated the Declaration, the Idaho Supreme Court rejected the defendants' argument that the statute of limitations barred the plaintiff's claim that the lease was void. *Id.* at 318. Instead, "[b]ecause the lease was void *ab initio*, it could be challenged at any time." *Id.*

A New York court similarly applied the *Riverside*/*Faison* principle beyond the "public policy concerns" relating to illegal contracts and forged deeds, *Faison*, 32 N.E.3d at 405-06, to a void satisfaction of a mortgage. In *Bank of New York Mellon Trust Co., N.A. v. Claypoole*, the statute of limitations did not bar an action to vacate the satisfaction of a mortgage because the filing of the satisfaction was void *ab initio* given that the filer had previously assigned away its interest under the mortgage. 55 N.Y.S.3d 19, 19-20 (1st Dep't 2017).

Barbara's death. *See* Dkt. 150 (Eric's operative Third Amended Counterclaims and Crossclaims) ¶¶ 156-167; *see id.* ¶ 164 (alleging that "[b]y failing to sell" the Barbara Trust Shares to Eric "the Trustees and the Barbara Brunckhorst Trusts are in breach of the [Shareholder's] Agreement"). Eric does not allege a breach based on Barbara's attempted disposition of the 2010 Trust Shares when the Ancillary Documents were executed in late 2010 or ostensibly entered effect in early 2011; rather, he challenges only conduct by the Trustees in 2021 that, he claims, breached the Shareholder's Agreement. Frank and Todd's argument elides the distinction between two breaches: the attempted disposition and the failure to sell Eric the shares. While the statute of limitations bars the Court from remedying the former, it does not prevent the Court from providing a remedy for the more recent breach of the Shareholder's Agreement. *See* Siegel, N.Y. Prac. § 34; 75 N.Y. Jur. 2d Limitations and Laches § 23; *see also Bulova Watch Co., Inc. v. Celotex Corp.*, 389 N.E.2d 130, 132 (N.Y. 1979) (holding that the respective limitations periods for separate breaches of a roofing contract started at the time of each breach).

In order to defeat Eric's breach-of-contract crossclaim, Frank and Todd would need to establish that the passage of time, through the statute of limitations, endowed the Ancillary Documents with legal effect that they otherwise did not have under the Shareholder's Agreement. Only in such a scenario would Eric's right to purchase the shares under the Shareholder's Agreement be affected, because then the ███████████████ would be the beneficiary of the shares, Barbara would not be a Shareholder-Beneficiary of the Barbara 2010 Trust, and thus the 2010 Trust Shares would not enter the waterfall by operation of Paragraph 5(b).

But that reasoning runs into the second problem: it ignores that New York's statutes of limitations do not extinguish the parties' underlying legal rights and liabilities even if they preclude remedies. *See* Opp. to Frank & Todd SJ Brief at 25 ("[T]he expiration of the statute of limitations

cannot turn a legal wrong into a legal right and thus the passage of time cannot turn an improper transferee of Boar's Head shares into a permissible transferee."). *Riverside* and *Faison* teach that the Ancillary Documents, as void *ab initio*, cannot defeat Eric's claim to shares he is otherwise entitled to purchase through the Shareholder's Agreement because "a document void at its inception has no effect and cannot be subject to a statute of limitations." *Faison*, 32 N.E.3d at 405.[11]

For these reasons, this case is distinguishable from those on which Frank and Todd rely. Frank and Todd primarily point to the decision of the United States District Court for the Middle District of Florida in *Martin v. Bischoff*, No. 21 Civ. 1045 (MSS) (AAS), 2023 WL 8247079 (M.D. Fla. Oct. 27, 2023), *appeal pending*, No. 23-13851 (11th Cir.). *See* Frank & Todd SJ Brief at 14-15. There, Eric contested the validity of three transfers of Boar's Head shares made by RSM in 2011, 2013, and 2016 to trusts established for RSM's son. *Martin*, 2023 WL 8247079, at *2. RSM

---

[11] In an unpublished summary order, the Second Circuit noted that *Faison* "stands for the limited proposition that 'a claim against a forged deed is not subject to a statute of limitations defense.'" *Busher v. Barry*, No. 20-3587-cv, 2021 WL 5071871, at *4 n.1 (2d Cir. Nov. 2, 2021) (summary order) (quoting *Faison*, 32 N.E.3d at 404). This limitation, though, is in some tension with the various statements of the New York Court of Appeals in *Faison* that it relied upon "a rule that is generally applicable to claims involving void documents," a general rule that was also relied on in *Riverside*, a case "about illegal contracts" which addressed C.P.L.R. Section 213(2)—the very statute of limitations provision on which Frank and Todd rely. *Faison*, 32 N.E.3d at 405; *Riverside*, 882 N.E.2d at 878. In any event, *Busher* and the Second Department case upon which it relied, *Kassab v. Kassab*, 29 N.Y.S.3d 39, 41-42 (2d Dep't 2016), addressed declaratory judgment claims which sought declarations directly on allegedly void transactions. So did the case that Frank and Todd raised at oral argument, *Cross Sound Cable Co., LLC v. Long Island Lighting Co.*, No. 21 Civ. 2771 (KAM), 2022 WL 247996, at *10-11 (E.D.N.Y. Jan. 27, 2022) (applying *Busher* to bar a declaratory judgment claim). 9/8/25 Oral Arg. Tr. at 9:22-10:9; *see Riverside*, 882 N.E.3d at 878 (holding that a declaratory action "is not one 'upon a contractual obligation or liability,' but one to declare that no valid contractual obligations ever existed"). The Court does not read these cases to stand for the proposition rejected in *Riverside* and *Faison* that Frank and Todd now ask the Court to endorse: that the expiration of the limitations period extinguishes Eric's ability to secure a breach of contract remedy for his crossclaim against Todd because the statute of limitations bars the Court from considering, as a predicate matter, that the Ancillary Documents are void under the terms of the Shareholder's Agreement.

filed a complaint seeking a declaratory judgment that, *inter alia*, the transfers were valid and that Eric's challenge to the 2011 transfer was barred by the statute of limitations. *Id.* Eric asserted a counterclaim alleging that RSM breached the Shareholder's Agreement through the transfers and sought declaratory relief that the transfers were void *ab initio* and that Eric had the right to acquire the shares. *Id.* at *2-3.

The court in *Martin* held that Eric's breach-of-contract counterclaim was time-barred because "[t]o evaluate whether RSM breached the Shareholder's Agreement by making the 2011 Transfer, the Court would need to interpret the Shareholder's Agreement to determine whether RSM made the 2011 Transfer in a way that did not comply with the Shareholder's Agreement and was thus prohibited by the Shareholder's Agreement." *Id.* at *5. On this basis, the court held that Eric's "assertion that the 2011 Transfer breached the Shareholder's Agreement is a contract claim subject to C.P.L.R. § 213(2)'s six-year statute of limitations." *Id.* The *Martin* court similarly held Eric's declaratory judgment claims time-barred. *Id.* at *6-7.

*Martin* is inapposite because Eric here does not assert a claim for relief stemming from Barbara's attempted disposition of the shares in 2010 through the Ancillary Documents. The critical difference is that *Martin* involved claims for breach of contract and declaratory relief *with respect to the allegedly void transfer*, while the instant case does not demand any remedy for the void transfer: the only remedy is with respect to the operation of the Shareholders' Agreement insofar as the Trustees failed to sell Eric the 2010 Trust Shares under its terms. *Martin* therefore does not support Frank and Todd's argument that the Ancillary Documents, which would be analogous to the transfer agreement at issue in *Martin*, are subject to the statute of limitations.[12]

---

[12] In a footnote, the *Martin* court said that Eric's "principal argument is that the 2011 Transfer was void *ab initio* because it violated Paragraph 3(a) of the Shareholder's Agreement,"

Frank and Todd point the Court to three other cases, *see* Opp. to Eric SJ Brief at 17, but none is persuasive. *Berkovits v. Berkovits*, 69 N.Y.S.3d 506, 506 (2d Dep't 2018), simply states "[t]he plaintiff's contention that the statute of limitations does not apply to an action challenging the validity of a separation agreement as void *ab initio* is without merit." *Id.* That decision lacks any supporting reasoning for its conclusion. It is also somewhat difficult to square with the Second Department's prior decision in *Pacchiana v. Pacchiana*, 462 N.Y.S.2d 256, 258 (2d Dep't 1983), on which *Riverside* and *Faison* relied, where the Second Department held that "the Statute of Limitations is not a defense" to a claim that an antenuptial agreement "was void and of no effect at its inception." *Id.* The plaintiffs in *Corporate Universe, Inc. v. Emry Capital Group, Inc.*, No. 21 Civ. 6923 (SN), 2023 WL 5629230, at *3 (S.D.N.Y. Aug. 31, 2023), and *Dean v. VanScoter*, 470 N.Y.S.2d 224, 224 (4th Dep't 1983), sought declaratory judgments that certain transactions were void. As explained above, Eric does not seek a judicial declaration about any breach that may have occurred in 2010 or 2011, and therefore the statute of limitations would not preclude his desired remedy in the same manner as it affected the plaintiffs in *Corporate Universe* and *Dean*.

The *Corporate Universe* court also noted that "[e]quitable principles of repose" strengthened its conclusion. 2023 WL 5629230, at *3 & 4 n.2. But unlike the facts of that case, in which a transfer of shares already had occurred, here the parties agree that the shares remain in the Barbara 2010 Trust and have never been disposed of. Frank & Todd 56.1 Stmt. ¶¶ 34-35; Eric

---

which it characterized as "simply an argument that the transfer should not be permitted because it constitutes a breach of the Shareholder's [A]greement." 2023 WL 8247079, at *7 n.1. But the New York Court of Appeals in *Riverside* held that such a declaratory judgment action "is not one 'upon a contractual obligation or liability,'" which would be subject to the statute of limitations under C.P.L.R. Section 213(2), "but one to declare that no valid contractual obligations ever existed," 882 N.E.3d at 878. So it is not clear *Martin* (much like the Second Circuit's unpublished order in *Busher*) is correct to say that such an action would be time-barred, and in any event, this footnote in *Martin* is *dicta*.

56.1 Stmt. ¶¶ 45, 53.  Moreover, C.P.L.R. Section 213(2) "is a statute of limitations, not a statute of repose," so different equitable considerations inform the Court's understanding of its application.  *See Homeward Residential, Inc. v. Sand Canyon Corp.*, No. 12 Civ. 7319 (JFK), 2018 WL 557913, at *5 (S.D.N.Y. Jan. 24, 2018) (explaining the distinction between these kinds of statutes).  Further, such interests in repose could hardly be said to surpass the interests in determining the ownership of real property, as was at issue in *Faison*.  As the New York Court of Appeals remarked in *Faison* when rejecting a similar argument, "the argument for bringing finality to potentially stale claims fails to make the case for why the desire for repose is any more significant than the need to ferret out forged deeds and purge them from our real property system.  As the law makes clear, a forged deed has no legal significance and cannot convey title, therefore there is no reason to impose barriers to those who seek to vacate such deed as null and void."  32 N.E.3d at 407.

Similarly, while the Court recognizes that there is a general finality interest in determining the ownership of Boar's Head so that it may structure its affairs, there would seem to be a countervailing interest in ensuring that the closed-ended ownership structure set up in the Shareholder's Agreement is respected.  Through that agreement, the parties to it apparently determined that this countervailing interest surpassed any interest in finality by virtue of voiding any attempted disposition of shares outside the Shareholder's Agreement's framework.  Shareholder's Agreement ¶ 3(a).  It is not this Court's place to second-guess the wisdom of that decision.

*     *     *

When Barbara settled the Barbara 2010 Trust, she did so as its beneficiary.  To the extent the Ancillary Documents changed her status as a beneficiary, those documents were void *ab initio*

under the terms of the Shareholder's Agreement. Thus, Barbara was a Shareholder-Beneficiary of the Barbara 2010 Trust at the time of her death. For the reasons set forth in the Court's August 29, 2024 summary judgment Opinion, the 2010 Trust Shares entered the waterfall pursuant to Paragraph 5(b) upon Barbara's death and Eric timely accepted the shares held by the Barbara 2010 Trust.

## IV. Conclusion

For the foregoing reasons, the Court: (1) denies Frank and Todd's motion in its entirety; (2) grants Eric's motion for summary judgment on the second cause of action in the Third Amended Counterclaims and Crossclaims for breach of contract against Todd to the extent it concerns the 2010 Trust Shares; and (3) grants Eric's motion for summary judgment on Frank's declaratory judgment claim asserting that Frank has the right to purchase the 2010 Trust Shares.

This Opinion and Order shall initially be filed under seal. The parties shall have until October 7, 2025, to file any proposed redactions to this Opinion and Order, as well as a joint letter addressing why these redactions are justified under *Lugosch v. Pyramid Company of Onondaga*, 435 F.3d 110 (2d Cir. 2006). The parties shall submit a single set of proposed redactions, but may explain any disagreements in their joint letter.

Given that Todd did not move for summary judgment in his favor on Frank's claim for declaratory judgment with respect to the 2010 Trust Shares, the Court will also provide Frank and Todd an opportunity to show cause why summary judgment should not similarly be granted *sua sponte* on this claim under Rule 56(f) in favor of Todd as to the 2010 Trust Shares. *Cf. Brunckhorst v. Bischoff*, No. 21 Civ. 4362 (JPC), 2024 WL 5443172, at *1-2 (S.D.N.Y. Oct. 7, 2024). Frank and Todd may file a letter of no more than five pages addressing this issue by October 14, 2025.

In the absence of any letter, the Court will grant summary judgment in favor of Todd along these lines.

Finally, the Court will hold a teleconference on October 29, 2025, at 10:00 a.m.  Unless the Court orders otherwise, the Court will conduct the teleconference on Webex.  At the scheduled time, counsel for all parties should call (855) 244-8681, access code 2302 755 2307.  The parties should be prepared to address next steps in this matter.  They should confer beforehand to propose a joint plan for discovery with respect to Eric's damages and the Trustees' affirmative defense as to equitable offset, *see* Opinion at 41-43; Dkt. 574 (Order on the Trustees' Motion to Amend, Dkt. 509), and to advise the Court whether they anticipate the need for an evidentiary hearing.

The Clerk of the Court is respectfully directed to close Docket Numbers 516 and 518.

SO ORDERED.

Dated: September 30, 2025
New York, New York

_____
JOHN P. CRONAN
United States District Judge