UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

FRANK BRUNCKHORST III, individually and in his capacity as trustee of THE FRANK BRUNCKHORST III 2001 TRUST,

Plaintiff,

-v-

ERIC BISCHOFF, *et al.*,

Defendants.

---

ERIC BISCHOFF,

Counterclaim-Plaintiff,

-v-

FRANK BRUNCKHORST III, individually and in his capacity as trustee of THE FRANK BRUNCKHORST III 2001 TRUST,

Counterclaim-Defendant.

---

ERIC BISCHOFF,

Crossclaim-Plaintiff,

-v-

SUSAN STRAVITZ KEMP, in her capacity as co-trustee of THE BARBARA BRUNCKHORST 1994 TRUST and executrix of THE ESTATE OF BARBARA BRUNCKHORST, *et al.*,

Crossclaim-Defendants.

---

21 Civ. 4362 (JPC)

OPINION AND ORDER

JOHN P. CRONAN, United States District Judge:

This Opinion and Order resolves the final remaining issues in a long-running dispute over 1,200 shares of Boar's Head Provisions Company, Inc. ("Boar's Head" or the "Company") that were associated with Barbara Brunckhorst ("Barbara") before her death on November 18, 2020 (the "Barbara Trust Shares"). In two summary judgment rulings, the Court held that Defendant, Counterclaim-Plaintiff, and Crossclaim-Plaintiff Eric Bischoff ("Eric") made a timely demand for those shares under the Boar's Head Shareholder's Agreement (the "Shareholder's Agreement") and that Defendants and Crossclaim-Defendants Susan Stravitz Kemp, in her capacities as co-trustee of the Barbara Brunckhorst 1994 Trust (the "Barbara 1994 Trust") and executrix of Barbara's estate, and Richard Todd Stravitz, in his capacities as co-trustee of the Barbara 1994 Trust, executor of Barbara's estate, and trustee of the Barbara Brunckhorst 2010 Trust (the "Barbara 2010 Trust") (collectively with Kemp, the "Trustees"), breached the Shareholder's Agreement by not selling the Barbara Trust Shares to Eric. *See Brunckhorst v. Bischoff* ("*Brunckhorst I*"), No. 21 Civ. 4362 (JPC), 2024 WL 4277788 (S.D.N.Y. Sept. 24, 2024) (concerning the Barbara 1994 Trust); *Brunckhorst v. Bischoff* ("*Brunckhorst II*"), No. 21 Civ. 4362 (JPC), 2025 WL 3126697 (S.D.N.Y. Nov. 7, 2025) (concerning the Barbara 2010 Trust).[1] Here, the Court addresses the dispute between Eric and the Trustees over the proper remedy for the Trustees' breach and orders specific performance of the Shareholder's Agreement, with Eric entitled to prejudgment interest on the stock distributions owed to him.[2]

[1] The unredacted versions of *Brunckhorst I* and *Brunckhorst II* are located at Docket Numbers 467 and 582, respectively.

[2] Plaintiff and Counterclaim-Defendant Frank Brunckhorst III ("Frank") did not submit any filings with respect to the remedy for the Trustees' breach.

## I. Background

### A. Undisputed Facts[3]

The Court assumes familiarity with the facts as laid out in its prior Opinions, *see Brunckhorst I*, 2024 WL 4277788 at *2, *4-9; *Brunckhorst II*, 2025 WL 3126697, at *1-5, and recites only the facts as relevant here. When Barbara died on November 18, 2020, 1,152 shares of Boar's Head common stock[4] in the Barbara 1994 Trust and 48 shares of Boar's Head common stock[5] in the Barbara 2010 Trust were offered up for sale pursuant to the waterfall provision of a Shareholder's Agreement executed in 1991. Stip. ¶¶ 1-2, 4, 11, 13; *see* Dkt. 520, Exh. 1 ("Shareholder's Agreement"). While the Court has since held that Eric timely accepted those shares, *Brunckhorst I*, 2024 WL 4277788, at *16; *Brunckhorst II*, 2025 WL 3126697, at *14, Frank disputed whether that was the case, so the Trustees declined to turn over the shares until this Court determined who was entitled to them under the Shareholder's Agreement. *See* Stip. ¶ 8. On August 29, 2024, the Court ruled that "Eric is the proper recipient of the shares held by the Barbara 1994 Trust" and granted summary judgment in his favor on his crossclaim for breach of contract against the Trustees in his Third Amended Counterclaims and Crossclaims to the extent it concerned the Barbara 1994 Trust. *Brunckhorst I*, 2024 WL 4277788, at *19, *25. On September 30, 2025, the Court ruled that Eric also timely accepted the shares in the Barbara 2010 Trust and, as to those shares, granted summary judgment in his favor on his breach-of-contract crossclaim to the extent it concerned the Barbara 2010 Trust. *Brunckhorst II*, 2025 WL 3126697, at *14.

[3] The facts throughout this Opinion and Order are mainly drawn from Eric and the Trustees' Stipulation of Undisputed Material Facts, Dkt. 607, Exh. A ("Stip."), and the undisputed facts discussed in the Court's prior Opinions and Orders.

[4] This constitutes twenty-four percent of the Company's outstanding shares. Stip. ¶ 2.

[5] This constitutes one percent of the Company's outstanding shares. Stip. ¶ 4.

Now the Trustees must convey the Barbara Trust Shares to Eric, and Eric must pay for them. The parties agree on many of the terms of the Shareholder's Agreement that govern that exchange. The Shareholder's Agreement obligated the Trustees to transfer the shares to Eric within nine months of Barbara's death, that is, by August 18, 2021. *See* Shareholder's Agreement ¶ 7(a)(i)(A). In exchange, Eric would deliver to the Trustees the "Tax Amount," which was zero dollars, Stip. ¶¶ 19-21, as well as "an installment promissory note . . . in the principal amount of" the shares' book value of $90,929,096.00 (the "Purchase Price"). *Id.* ¶ 22 (quoting Shareholder's Agreement ¶ 7(a)(ii)); *see also id.* ¶¶ 11-17; Shareholder's Agreement ¶ 6 (describing the method for calculating the Purchase Price). The Purchase Price would be paid down in ten "equal annual installments, the first of such installment being payable one (1) year following the Sale Date," which as explained below was extended by agreement to September 30, 2021. Stip. ¶ 22 (quoting Shareholder's Agreement ¶ 7(a)(ii)); *see id.* ¶¶ 6, 18-24. The Shareholder's Agreement established the interest rate on the unpaid balance of the promissory note as "the higher of (i) the minimum rate necessary to avoid the imputation of interest pursuant to the [Internal Revenue] Code or (ii) the prime or base rate of interest of Citibank, N.A., as in effect on the Sale Date, plus one percent (1%)," which the parties refer to as the "Prime Rate Plus." *Id.* ¶¶ 25-26 (quoting Shareholder's Agreement ¶ 7(a)(ii)). The Prime Rate Plus on September 30, 2021, was 4.25 percent. *Id.* ¶ 27. At "any time prior to the maturity of the note," Eric could elect to accelerate his payments and pay the entire Purchase Price "without premium or penalty." *Id.* ¶ 24 (quoting Shareholder's Agreement ¶ 7(a)(ii)). Thus, Eric had two options for paying the Purchase Price: either by lump sum or in installments. Eric maintains that he was ready, willing, and able to purchase the Barbara Trust Shares on the Sale Date. *Id.* ¶ 7.

On August 16, 2021—two days before the Trustees' deadline under the Shareholder's Agreement to transfer the shares—they executed a limited waiver with Eric that effectively postponed that deadline until September 30, 2021 (the "Sale Date").[6] *Id.* ¶ 6; Dkt. 510, Exh. 3 ("Waiver Agreement") ¶ 1(a).[7] In the Waiver Agreement, the Trustees also agreed to transfer Eric, at the same time they convey the Barbara Trust Shares, "any and all distributions or dividends paid by [Boar's Head] with respect to the [s]hares after the Effective Date" of the waiver. Waiver Agreement ¶ 2.[8] Of course, those transactions did not take place because the Trustees refused to transfer the shares to Eric while Frank asserted his entitlement to them.

Boar's Head issued generous distributions to its shareholders over the past five years. From August 18, 2021, through Eric's and the Trustees' filings regarding the appropriate remedy in approximately December 2025, Boar's Head paid $76,320,000 in distributions to the Barbara 1994 Trust and $3,180,000 in distributions to the Barbara 2010 Trust, for a total of $79,500,000 on the Barbara Trust Shares (collectively, the "Distributions"). Stip. ¶ 10.

---

[6] The Court identifies the Sale Date as September 30, 2021, solely for purposes of fashioning an equitable remedy, and not to determine or prejudge the date of the actual transfer of shares for purposes of corporate governance or Delaware law. *See* Dkt. 609 ("Trs. Br.") at 10 (arguing that this date is the Sale Date "[f]or purposes of the Court's specific performance decree"); Dkt. 615 ("Eric Response") at 2 (same).

[7] The relevant portion of the Waiver Agreement states: "Each Party hereby waives any and all allegations or theories of breach and/or violation of the Shareholder's Agreement resulting from the consummation of the Required Sale . . . not taking place prior to September 30, 2021 solely for purposes of the nine (9) month deadline imposed by Paragraph 7(a) of the Shareholder's Agreement." Waiver Agreement ¶ 1(a).

[8] The Waiver Agreement's "Effective Date" is August 16, 2021, *see* Waiver Agreement at 1, but the parties use August *18*, 2021, as the relevant starting point for Eric's entitlement to the Distributions. *See* Stip. ¶ 10. Any difference in the two days does not appear to affect Eric's recovery.

### B. Post-Summary Judgment Procedural History

The same day that the Court issued its summary judgment ruling as to the Barbara 2010 Trust, the Court also granted in part the Trustees' motion for leave to further amend their Amended Answer to Eric's Third Amended Counterclaims and Crossclaims. *Brunckhorst v. Bischoff* ("*MTA Opinion*"), No. 21 Civ. 4362 (JPC), 2025 WL 3124753 (S.D.N.Y. Nov. 7, 2025).[9] On October 7, 2025, the Trustees filed their Second Amended Answer to Eric's Third Amended Counterclaims and Crossclaims, which added an affirmative defense seeking "an equitable offset to account for the benefit [Eric] gained by not paying [the] Trustees the portion of the purchase price for any or all of the [s]ubject [s]hares that would be past-due pursuant to the retroactive sale date." Dkt. 575 ("Second Amended Answer") at 49.

At a conference on October 29, 2025, the Court ordered the parties to file briefs stating their positions as to Eric's relief. *See* Minute Entry, Oct. 29, 2025. On December 19, 2025, the parties jointly filed a Stipulation of Undisputed Material Facts, Dkt. 607, Exh. A, Eric moved "for an order[] pursuant to Rule 56(a) of the Federal Rules of Civil Procedure and the Court's equitable power to fashion remedies," Dkt. 608 ("Motion") at 2,[10] and the parties submitted their respective briefs on the appropriate remedy, Dkts. 609, 610 ("Eric Br."). Each party filed a response on January 9, 2026. Dkts. 614 ("Trs. Response"), 615.

## II. Legal Standard

District courts may grant summary judgment under Rule 56(a) as to equitable relief where there is no disputed issue of material fact. *See AEP Energy Servs. Gas Holding Co. v. Bank of Am., N.A.*, 626 F.3d 699, 740 (2d Cir. 2010); *see also Petrello v. White*, 412 F. Supp. 2d 215, 222,

---

[9] The unredacted version of *MTA Opinion* is located at Docket Number 583.

[10] Eric fashioned his submission as a "Motion to Resolve All Remaining Issues" pursuant to Federal Rule of Civil Procedure 56(a). Motion at 1-2.

230-31 (E.D.N.Y. 2006) (granting summary judgment and ordering specific performance of a contract). The Court will grant summary judgment if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "Summary judgment is appropriate '[w]here the record taken as a whole could not lead a rational trier of fact to find for the non-moving party.'" *Mhany Mgmt., Inc. v. Cnty. of Nassau*, 819 F.3d 581, 620 (2d Cir. 2016) (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986)). "A genuine dispute exists where 'the evidence is such that a reasonable jury could return a verdict for the nonmoving party,' while a fact is material if it 'might affect the outcome of the suit under the governing law.'" *Chen v. 2425 Broadway Chao Rest., LLC*, No. 16 Civ. 5735 (GHW), 2019 WL 1244291, at *4 (S.D.N.Y. Mar. 18, 2019) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). In conducting this review, the Court "resolve[s] all ambiguities and draw[s] all reasonable inferences in favor of the nonmoving party." *Mhany Mgmt.*, 819 F.3d at 620.

"The movant bears the initial burden of demonstrating 'the absence of a genuine issue of material fact,' and, if satisfied, the burden then shifts to the non-movant to present 'evidence sufficient to satisfy every element of the claim.'" *Chen*, 2019 WL 1244291, at *4 (quoting *Holcomb v. Iona Coll.*, 521 F.3d 130, 137 (2d Cir. 2008)). The non-movant "may not rely on conclusory allegations or unsubstantiated speculation," and "must offer some hard evidence showing that its version of the events is not wholly fanciful." *Jeffreys v. City of New York*, 426 F.3d 549, 554 (2d Cir. 2005) (citation modified). The non-movant must present more than a "scintilla of evidence" to survive summary judgment. *Anderson*, 477 U.S. at 252. "Where no rational finder of fact could find in favor of the nonmoving party because the evidence to support

its case is so slight, summary judgment must be granted." *Brown v. Eli Lilly & Co.*, 654 F.3d 347, 358 (2d Cir. 2011) (citation modified).

## III. Discussion

The parties agree that Eric is entitled to specific performance of the Shareholder's Agreement. *See* Trs. Br. at 1-2; Eric Response at 1-2. Indeed, "New York courts routinely award specific performance in cases involving the conveyance of stock in privately held corporations." *Vacold LLC v. Cerami*, 545 F.3d 114, 130 (2d Cir. 2008); *see e.g.*, *Waddle v. Cabana*, 114 N.E. 1054, 1056 (N.Y. 1917). An order of specific performance aims "to effectuate the purposes for which the contract was made and on such terms as justice requires," but "the performance that it requires need not be identical with that due under the contract." Restatement (Second) of Contracts § 358(1) (1981); *cf. Vacold*, 545 F.3d at 131 (citing Restatement (Second) of Contracts for principles of specific performance). A district court has "considerable latitude in fashioning the relief," *NML Cap., Ltd. v. Republic of Argentina*, 699 F.3d 246, 261 (2d Cir. 2012), within the confines of "settled principles of equity . . . and always with reference to the facts of the particular case," *Haffner v. Dobrinski*, 215 U.S. 446, 450 (1910). In light of this wide discretion, the Second Circuit has stated that it "may affirm an order of specific performance so long as it achieves a fair result under the totality of the circumstances." *NML Cap.*, 699 F.3d at 261 (citation modified).

Before resolving the areas of disagreement between Eric and the Trustees, the Court reviews the many details of the transaction that they do not dispute. In light of the Court's prior Opinion, those parties agree that Eric should obtain the Barbara Trust Shares, Trs. Br. at 1; Eric Response at 2, and the Distributions through the date that those shares are conveyed, Trs. Br. at 4-5; Eric Response at 3. And they agree that Eric should give the Trustees the Purchase Price, which he can elect to deliver in one of two ways. Eric Response at 3; Trs. Response at 15. Option A is

full payment upfront; Option B is payment in installments. Eric Br. at 5-8; Trs. Br. at 8 ("[T]he Court's final judgment should account for either scenario whether Eric pays in annual installments or in one lump sum."); *see supra* I.A. Should Eric choose Option A, he would pay the Trustees the Purchase Price upon taking possession of the shares. *See* Eric Response at 3; Trs. Br. at 7-8. If he opts to pay in installments under Option B, upon taking possession of the shares he would deliver the Trustees (i) a payment reflecting the four installments that he would have remitted in the period since the Sale Date, comprising forty percent of the Purchase Price plus interest at a rate of 4.25 percent, which as mentioned was the Prime Rate Plus as of September 30, 2021 (collectively, the "Past-Due Purchase Money"),[11] and (ii) a six-year promissory note for the remaining sixty percent of the Purchase Price, to be paid in six equal annual installments along with interest payments of 4.25 percent multiplied against the balance of the outstanding principal. Eric Br. at 5-7; Trs. Br. at 6-8; *see* Stip. ¶¶ 22-27. The six-year promissory note would be prepayable anytime without premium or penalty. *See* Stip. ¶ 24. In addition, the parties agree that Eric's payment of the Purchase Price "will be netted against the Distributions" that the Trustees owe him, Trs. Response at 6, "to avoid 'the absurdity of making A pay B when B owes A,'" Eric Br. at 21 (quoting *Studley v. Boylston Nat'l Bank of Boston*, 229 U.S. 523, 528 (1913)).

The parties diverge over whether the Court should assess prejudgment interest on the Distributions and the Purchase Price. Eric seeks prejudgment interest on the Distributions at a rate of nine percent per annum, Eric Br. at 9, while the Trustees demand that, if the Court so awards Eric, it should impose the same rate of prejudgment interest on the Purchase Price—a move the

[11] The first installment would have been due on September 30, 2022, and subsequent installments would have been due on September 30 of each following year. The parties agree that the value of the Past-Due Purchase Money is $49,510,892.77. Eric Response at 3; Trs. Br. at 6; Stip., App'x B.

Trustees refer to as an "equitable offset" of the interest Eric would obtain on the Distributions. Trs. Br. at 4-7; *see* Second Amended Answer at 49 (the Trustees' fifth affirmative defense seeking "an equitable offset to account for the benefit [Eric] gained by not paying [the] Trustees the portion of the [P]urchase [P]rice for any or all of the [s]ubject [s]hares that would be past-due pursuant to the retroactive sale date"). The Court considers each demand in turn.

## A. The Court Awards Eric Prejudgment Interest on the Distributions at a Rate of Nine Percent.

### 1. An Award of Prejudgment Interest is in the Court's Discretion.

Section 5001 of New York's Civil Practice Law and Rules ("C.P.L.R.") provides that "[i]nterest shall be recovered upon a sum awarded because of a breach of performance of a contract." N.Y. C.P.L.R. § 5001(a). When interest is mandatory, it "shall be at the rate of nine percent per annum." *Id.* § 5004(a). But "in an action of an equitable nature, interest and the rate and date from which it shall be computed shall be in the court's discretion." *Id.* § 5001(a); *see, e.g.*, *Breskin v. Moronto*, 102 N.Y.S.3d 85, 87 (2d Dep't 2019) ("Since this action for specific performance is an action of an equitable nature, interest . . . and the rate and date from which that interest shall be computed shall be in the court's discretion."); *Salerno Painting & Coating Corp. v. Nat'l Neurolabs, Inc.*, 842 N.Y.S.2d 81, 82 (2d Dep't 2007) (collecting cases).

For purposes of Section 5001(a), "[t]he nature of a claim is determined by 'the nature of *the relief* demanded.'" *Rhodes v. Davis*, 628 F. App'x 787, 792 (2d Cir. 2015) (summary order) (emphasis added) (quoting *Lewis v. S.L. & E. Inc.*, 831 F.2d 37, 39 (2d Cir. 1987)). In *Rhodes*, the defendant breached a settlement agreement in which he had promised to buy the plaintiff's stake in two corporate entities. *Id.* at 789. The plaintiff demanded damages and "such other and further relief as the Court deems just and proper." *Id.* at 792 (quoting the complaint). The district court declined to award damages and instead awarded specific performance of the settlement

agreement's buy-sell provision, ordering the defendant to take the plaintiff's shares in the two entities and pay the plaintiff the purchase price agreed to in the settlement agreement, along with mandatory prejudgment interest on that purchase price. *Id.* at 791. The district court erred by treating prejudgment interest as mandatory in these circumstances. *See id.* at 792. The Second Circuit explained that specific performance is "a form of equitable relief" for which prejudgment interest is in the court's discretion under Section 5001(a). *Id.* The Second Circuit therefore vacated the district court's award and "remand[ed] for the district court to determine, in the exercise of its discretion, whether to award prejudgment interest and if so at what rate." *Id.* at 793.

Eric's demand for prejudgment interest on the Distributions at the statutory rate of nine percent rests on the mistaken premise that the Distributions are a "sum awarded because of a breach of performance of a contract." Eric Br. at 9 (quoting N.Y. C.P.L.R. § 5001(a)). Though he pursues "damages for any distributions made to or on account of the [Barbara Trust] Shares after August 18, 2021," he also seeks "an injunction compelling the Trustees . . . to sell the [Barbara Trust] Shares . . . on the terms and conditions provided under the Shareholder's Agreement" and "any such other and further relief as the Court deems just and proper." Dkt. 150 (Eric's Third Amended Counterclaims and Crossclaims) at 43-44. Despite the mention of "damages," those requests are capacious enough to allow the Court to award specific performance, making this an equitable action for which prejudgment interest and its rate are in the Court's discretion. *Rhodes*, 628 F. App'x at 792; *see* N.Y. C.P.L.R. § 5001(a). *But see U.S. Bank Nat'l Ass'n v. Dexia Real Estate Cap. Mkts.*, No. 12 Civ. 9412 (SAS), 2014 WL 4290642, at *3 (S.D.N.Y. Aug. 28, 2014) (applying, before *Rhodes* was decided, mandatory prejudgment interest to a specific-performance award where "performance . . . can only be discharged by transferring a sum of money" (emphasis omitted)), *rev'd on other grounds by*, 643 F. App'x 48 (2d Cir. 2016) (summary order). Indeed,

the parties agree the Court should order specific performance. *See* Trs. Br. at 1-2; Eric Response at 1-2. That order will require not only the transfer of the Barbara Trust Shares pursuant to the Shareholder's Agreement but also "any and all [D]istributions" that Boar's Head paid on those shares since August 16, 2021, pursuant to the terms of the Waiver Agreement. Waiver Agreement ¶ 2. Therefore, the Trustees will convey the Distributions to Eric as part of his equitable remedy for the Trustees' breach, not as a separate "sum awarded." A court may not award both specific performance and damages where the former restores the plaintiff to the position he would have been in had the contract been fully performed. *See Hadcock Motors, Inc. v. Metzger*, 459 N.Y.S.2d 634, 636 (4th Dep't 1983) ("Specific performance is a discretionary remedy which is an alternative to the award of damages as a means of enforcing a contract."); *see also Slaughter v. La Compagnie Francaises Des Cables Telegraphiques*, 119 F. 588, 588-89 (2d Cir. 1902) (explaining that "[o]ne cannot have damages for the breach of contract[] and a decree also for its specific performance" because "they are alternative" remedies "[b]oth . . . in affirmance of the contract"). As this is an equitable action, whether to award prejudgment interest and at what rate is within the Court's discretion.

The Court thus rejects Eric's argument that his request for the Distributions is "essentially legal in nature, and the court must apply the statutory rate of interest." Eric Br. at 10 (quoting *Action S.A. v. Marc Rich & Co.*, 951 F.2d 504, 508 (2d Cir. 1991)). To be sure, the Second Circuit has "long held . . . that the equity clause of § 5001 should not become a source of sterile controversy over the classification of causes of action," but that is because courts must look at the *relief* requested to determine an action's nature. *Action*, 951 F.2d at 508 (citation modified). Thus "where the *only* relief sought was compensatory damages," prejudgment interest is mandatory "even on a claim with equitable underpinnings, such as one for breach of fiduciary duty." *Lewis*,

831 F.2d at 39 (emphasis added). This case does not have mere underpinnings of equity—Eric principally demands specific performance of the Shareholder's Agreement and he will receive the Distributions as a component of that remedy. After all, Eric would have obtained not just the right to own the Barbara Trust Shares but also the right to receive future distributions had the Trustees conveyed those shares to him by their deadline to do so under the Shareholder's Agreement.

The authorities Eric cites in contending that the Distributions are distinct monetary damages are unavailing. *See* Eric Br. at 8-10. First, *Aristocrat Leisure Ltd. v. Deutsche Bank Trust Company Americas* is inapposite because there the district court awarded damages *instead of* specific performance to the counterclaimants who were seeking to recover publicly-traded stock shares and the dividends that had been distributed on them. No. 04 Civ. 10014 (PKL), 2006 WL 1493132, at *8-12 (S.D.N.Y. May 31, 2006) (awarding damages). Next, *Rich v. Fox News Network, Inc.* concerned damages flowing from a breach caused by tortious interference with contract and the court did not discuss equitable relief at all. 939 F.3d 112 (2d Cir. 2019). The third case cited by Eric merits more explanation. In *Blue Citi, LLC v. 5Barz International Inc.*, the court ordered both specific performance and consequential damages. 338 F. Supp. 3d 326, 338-40 (S.D.N.Y. 2018), *aff'd*, 802 F. App'x 28 (2d Cir. 2020) (summary order). It directed the defendant to convey shares of its publicly-traded stock to the plaintiff who had exercised his rights under a convertible note "pursuant to which [the plaintiff] could convert the [n]ote's outstanding principal and interest into shares of [the defendant's] common stock." *Id.* at 331, 338. But that award alone would not have made the plaintiff whole because the value of the shares had decreased in the open market during the defendant's delay in performing the contract. *Id.* at 338. To compensate the plaintiff for that decline, the court further awarded consequential damages. *Id.* at 338-40.

By contrast, the Distributions on the Barbara Trust Shares are not consequential damages. In *Blue Citi*, the equitable remedy did not make the plaintiff whole because merely transferring the shares to the plaintiff did not account for the shares' lost value during the delay. And while the Trustees promised to give up any Distributions received from the date of the Waiver Agreement, at no point did the *Blue Citi* defendant promise to pay the plaintiff for the delay. So consequential damages were necessary to compensate the *Blue Citi* plaintiff. Here, by contrast, the Court's injunction will place Eric (approximately) in the position he would have been in had the contract been performed (notwithstanding the loss of corporate governance due to the Trustees' delay) after the Court orders the Trustees to perform their promise to convey the Barbara Trust Shares plus the Distributions and any interest awarded in the Court's discretion.

Citing the Court's Opinion and Order granting the Trustees' motion to amend, Eric suggests that the Court has previously concluded that the Distributions are monetary damages independent of the award of specific performance. *See* Eric Response at 3. Not so. In that Opinion and Order, the Court discussed "the application of C.P.L.R. Section 5001(a) to Eric's damages" while rejecting one of the Trustees' theories for their equitable-offset defense and while applying the "liberal standard" involved in considering a motion to amend. *MTA Opinion*, 2025 WL 3124753, at *2-3 (quoting *GGC Int'l Ltd. v. Ver*, No. 24 Civ. 1533 (JPC), 2025 WL 81319, at *2 (S.D.N.Y. Jan. 13, 2025)). At no point did the Court find that the Distributions were a standalone damages award. *See generally id.* It was merely discussing one of the theories the Trustees asserted in their motion.

Nor have the Trustees conceded that the Distributions are monetary damages. *See* Eric Response at 3. The Trustees indicated just the opposite in their demand for an equitable offset by explaining, for example, that it would be warranted "*if* [Eric is] awarded nine percent (9%)

statutory interest on the distributions," Trs. Br. at 4 (emphasis added), and "*should* the Court award Eric nine percent (9%) statutory interest on the distributions," *id.* at 7 (emphasis added). *See also* Dkt. 512 (the Trustees' motion to amend their Amended Answer) at 15 (requesting "leave to assert an equitable offset defense to account for the benefit Eric would gain—*if* the Court were to assess a damages award and statutory interest against [the] Trustees—by not paying [the] Trustees the portion of the purchase price that would be past-due" (emphasis added)). Those statements show that the Trustees were not conceding that prejudgment interest at the statutory rate was mandatory under Section 5001(a). And regardless, even if the Trustees agreed that was the case, they would be mistaken as a matter of law.

The nature of an action is based on the relief sought. *See Rhodes*, 628 F. App'x at 792. Eric asks the Court in equity to award him specific performance and he will receive the Distributions as part of that relief. Accordingly, this is an equitable action and the rate of prejudgment interest lies within the Court's discretion under C.P.L.R. Section 5001(a).

**2. Eric Shall Receive Prejudgment Interest on the Distributions at Rate of Nine Percent.**

"[T]he particular facts" of the case govern "[t]he exercise of the court's discretion in determining the appropriate interest." *U.S. Bank, N.A. v. Peralta* ("*Peralta*"), 142 N.Y.S.3d 568, 571 (2d Dep't 2021). Several principles guide this discretion. First, "[i]nterest is not a penalty. Rather it is simply the cost of having the use of another person's money for a specified period . . . . It is intended to indemnify successful plaintiffs for the nonpayment of what is due to them." *Mfr.'s & Traders Tr. Co. v. Reliance Ins. Co.*, 870 N.E.2d 124, 127 (N.Y. 2007) (quoting *Love v. State of New York*, 583 N.E.2d 1296, 1298 (N.Y. 1991)). In other words, it is intended to "make the aggrieved party whole[,] . . . not to provide a windfall." *Spodek v. Park Prop. Dev. Assocs.*, 719 N.Y.S.2d 109, 110 (2d Dep't 2001). Second, because the defendant "has actually had

the use of the money, has presumably used the money to its benefit, and, consequently, has realized some profit, tangible or otherwise, from having it in hand" since the breach, there is "nothing unfair about requiring the defendant to pay over this 'profit' in the form of interest to the plaintiff." *Love*, 583 N.E.2d at 1298 (discussing post-verdict interest under C.P.L.R. Section 5002). Third, wrongful conduct by the prevailing party may defeat its claim to interest. *See Dayan v. York*, 859 N.Y.S.2d 673, 674-75 (2d Dep't 2008). For instance, a party may be denied interest if it unduly delays prosecuting the action, *see Peralta*, 142 N.Y.S.3d at 571, makes misrepresentations, *see U.S. Bank Nat'l Ass'n v. Williams*, 995 N.Y.S.2d 172, 176-77 (2d Dep't 2014), or otherwise has unclean hands, *see Norwest Bank Minn., NA v. E.M.V. Realty Corp.*, 943 N.Y.S.2d 113, 115 (2d Dep't 2012).

These equitable principles weigh in favor of awarding Eric prejudgment interest on the Distributions. Eric has not engaged in any wrongful conduct. Indeed, he maintains that he was ready, willing, and able to buy the Barbara Trust Shares on the Sale Date. Stip. ¶ 7. Had he done so, he would have received the Distributions as Boar's Head issued them. He is thus entitled to be "indemnif[ied] . . . for the nonpayment of what is due to [him]." *Mfr.'s & Traders Tr.*, 870 N.E.2d at 127 (quoting *Love*, 583 N.E.2d at 1298).

The New York Court of Appeals considers the statutory rate of nine percent "presumptively fair and reasonable." *Denio v. State of New York*, 851 N.E.2d 1153, 1157 (N.Y. 2006) (citation modified) (reviewing an interest award under a statute providing that the rate "shall not exceed" nine percent per annum); *see also Gourary v. Gourary*, 943 N.Y.S.2d 80, 82 (1st Dep't 2012) (explaining that this presumption applies "irrespective of the lower interest rate in the current market"). A court acting in its discretion is free to award interest at the statutory rate, *In re Palermo*, 739 F.3d 99, 108 (2d Cir. 2014) (applying New York law), and "[t]he fact that another

interest computation may also be 'reasonable' does not mandate the selection of that rate in an exercise of discretion," *Rodriguez v. N.Y.C. Hous. Auth.*, 689 N.E.2d 903, 906 (N.Y. 1997). Eric demands a rate of nine percent, albeit based on the incorrect premise that it is mandatory under C.P.L.R. Sections 5001 and 5004. Eric Br. at 9; *see supra* III.A.1. The Trustees do not argue for an alternative rate, rather only for an equitable offset at a "corollary" rate to what Eric receives. Trs. Br. at 6 n.5; *see id.* at 4-7.

The Court thus awards Eric prejudgment interest on the Distributions at a rate of nine percent per annum from the date of each Distribution using the formula found in Appendix B of Eric's response brief. *See* Eric Response, App'x B.

**B. The Trustees are Not Entitled to an Equitable Offset.**

The Court declines to award the Trustees interest on Eric's Purchase Price. The Trustees contend that Eric's award of the Distributions and corresponding interest should be "subject to reduction[] by the doctrine of equitable offset." Second Amended Answer at 49. The Trustees urge the Court to apply this doctrine and award them interest on the Purchase Price to "account for the benefit [Eric] gained by not paying [the] Trustees the portion of the [P]urchase [P]rice for any or all of the [s]ubject [s]hares that would be past-due pursuant to the retroactive sale date." *Id.* So the Trustees seek "a corollary nine percent (9%) interest rate" for the Purchase Price "[t]o place the parties in the positions they would have been [in] had the sale occurred in 2021." Trs. Br. at 6 n.5. Otherwise, they contend, the Court would be permitting "an inherent injustice to [the] Trustees and a windfall for Eric." *Id.* at 9.

But equitable principles do not dictate the application of the equitable-offset doctrine. As the Court discussed in its Opinion and Order granting the Trustees' motion to further amend their Amended Answer, the Trustees have not brought forward, nor is the Court aware of, any "case

ordering an offset as part of specific performance of a buy-sell provision in a shareholder agreement." *MTA Opinion*, 2025 WL 3124753, at *6 (citing *Johnsen v. ACP Distrib., Inc.*, 814 N.Y.S.2d 142, 147 (1st Dep't 2006) (directing the sale of shares "in accordance with the applicable terms of, and at the price provided in, the stockholders agreement"); *Doniger v. Rye Psychiatric Hosp. Ctr., Inc.*, 505 N.Y.S.2d 920, 924 (2d Dep't 1986) (affirming specific performance of a share transfer with a payment price made pursuant to calculations set forth in the shareholders' agreement); *Neville, Rodie & Shaw, Inc. v. LeGard*, No. 3:23 Civ. 266 (VAB), 2024 WL 656517, at *8 (D. Conn. Feb. 16, 2024) (ordering, pursuant to the terms of an agreement governed by New York law, specific performance of a sale of a decedent's shares at book value); *Est. of Collins v. Tabs Motors of Valley Stream Corp.*, 156 N.Y.S.3d 711 (Table) (N.Y. Sup. Ct. Nov. 23, 2021) (ordering specific performance of a shareholder's agreement's buy-sell provision)).[12] In the absence of caselaw supporting this demand,[13] the Trustees argue that the equitable offset is simply a "basic application of equitable and contract principles." Trs. Response at 2. The Court disagrees. The doctrine of equitable offset is principally a creature of property law and reflects equitable considerations unique to property law that are not present in this action.

There is good reason to confine the equitable offset to the law of real property. The equitable offset that the Trustees point to is an outgrowth of property law's common-law doctrine

---

[12] The Court nonetheless granted the Trustees' motion to amend because they had shown that they could present at least a colorable argument why the equitable offset might be suitable outside the real-property context, which was sufficient for satisfying the "liberal standard" of demonstrating that their proposed amendment was not futile. *MTA Opinion*, 2025 WL 3124753, at *2; *see id.* at *6-8. On deeper examination, the Court declines to extend the equitable-offset doctrine to this context.

[13] The Trustees cite various cases for the proposition that courts should avoid awarding a windfall when fashioning equitable remedies, but none addresses whether a court should order an offset as part of specific performance of a buy-sell provision in a shareholder agreement. *See* Trs. Br. at 8-9.

of equitable conversion. Equitable conversion is an "artificial, judicially-created legal device" that alters entitlements to the property subject to a land-sale contract—the seller's land and the buyer's purchase money. *Matter of Bergman*, 585 F.2d 1171, 1177 (2d Cir. 1978) (citation modified); *see In re Maguire's Estate*, 296 N.Y.S. 528, 531 (2d Dep't 1937) ("[I]t is the general rule that an equitable conversion results from the making of a contract for the sale of realty."), *aff'd*, 13 N.E.2d 458 (N.Y. 1938). Under that doctrine, after a land-sale contract is executed and until the land is conveyed, the buyer takes equitable title to the land, *see Bean v. Walker*, 464 N.Y.S.2d 895, 897 (4th Dep't 1983), and the seller holds legal title as security for the buyer's payment of the purchase price, *see Worrall v. Munn*, 38 N.Y. 137, 142 (N.Y. 1868) (describing the seller as "trustee of the land" for the buyer's benefit, and the buyer as "trustee of the purchase-money" for the seller's benefit). *See also* Harlan F. Stone, *Equitable Conversion By Contract*, 13 Columbia L. Rev. 369, 370-73 (1913) (explaining equitable conversion while questioning the characterization of the parties as "trustee[s]"); *accord* 17 Williston on Contracts § 50:42 (4th ed. 2026). While this mechanism shifts the risk of loss to the buyer, it also entitles the buyer "to any benefit or increase in value that may accrue to the land." *Bean*, 464 N.Y.S.2d at 897-98 (citation modified). Consequently, when there is a delay in conveying the land, the seller must account to the buyer for the rents and profits accrued from the land during the delay, and the buyer generally must pay interest on the purchase price. *See Worrall*, 38 N.Y. at 142; *cf.* 17 Williston on Contracts § 50:43 (4th ed. 2026). That serves equity's aim of "so far as possible, plac[ing] the parties in the same situation as they would have been if the contract had been performed according to its terms." *Worrall*, 38 N.Y. at 142. In practice, then, a buyer seeking a conveyance of land by an order of specific performance generally "may elect either to pay the interest on the purchase money retained and recover rents and profits from the seller, or allow the seller to retain the rents and profits and

be exempt from paying interest." *Cobble Hill Nursing Home, Inc. v. Henry & Warren Corp.*, 601 N.Y.S.2d 334, 338 (2d Dep't 1993); *see Perfetto v. Scime*, 583 N.Y.S.2d 95, 96 (4th Dep't 1992). That rule gives rise to the equitable offset: whatever rents and profits the buyer would receive is reduced—or, set off—by the interest the buyer owes on the purchase price (or vice versa). For example, in *Cobble Hill Nursing Home*, the court awarded Cobble Hill more than $2.6 million in rent subtracted by the defendant's "offset for interest on the purchase money held by Cobble Hill." 601 N.Y.S.2d at 338. The Trustees, therefore, ask the Court to reason by analogy: here, the Trustees are the Barbara Trust Shares' seller, Eric is the shares' buyer, and as a consequence of electing to receive the Distributions and corresponding interest—which for purposes of the analogy are the equivalent of rents and profits—Eric must pay interest on his Purchase Price, consistent with *Worrall* and its progeny.

The problem for the Trustees is that the set of factors giving rise to equitable conversion—the root of the equitable offset—are absent from the common law of contracts for sale of personal property, such as the contract at issue here. *See* N.Y. Gen. Constr. L. § 15 (defining "certificates of stock, . . . or other securities" as kinds of "personal property"); Del. Code Ann. tit. 8, § 159 ("The shares of stock in every corporation shall be deemed personal property."). Equitable conversion developed as the default rule in property law to account for the risk of harm to the realty after the execution of a land-sale contract and before the seller conveyed legal title. *See* 17 Williston on Contracts § 50:46 (4th ed. 2026); *see id.* § 50:43 (calling this a "default rule"). Contracts for sales of personal property do not allocate risk in the same manner. *See Lupin v. Marie*, 2 Paige Ch. 169, 171 (N.Y. Ch. 1830) (New York's highest court of equity explaining that a seller of real estate has equitable title in the purchase money and thus "an implied lien on the property sold, for the purchase money," but "there is no such lien on personal property, even as

between vendor and vendee"); *see also* 17 Williston on Contracts § 50:47 (4th ed. 2026) ("The development of the early law in regard to risk of real property under a contract to sell it has been entirely apart from the law governing the sale of goods."). Equitable conversion "creates privity and duties between the purchaser and the seller" of real property, *Kendle v. Town of Amsterdam*, 828 N.Y.S.2d 620, 622 (3rd Dep't 2007), and an equitable offset of the non-breaching party's relief arises out of those mutual obligations. But in the absence of equitable conversion (or a contractual provision to the same effect), the buyer and seller do not have the obligations to each other that give rise to an equitable offset.

The Court accordingly declines to take up the Trustees' call to extend the principles undergirding equitable conversion and equitable offset to the Shareholder's Agreement. To be sure, equitable conversion "rests . . . on the maxim that equity regards as done what ought to be done." *Bergman*, 585 F.2d at 1177. But "what ought to be done" differs based on the parties' expectations. *See id.* (explaining that equitable conversion is "designed to effectuate the [o]bvious intention of the parties and to promote justice" and "rests on the presumed intention of the owner of the property" (citation modified)). Here, no contract indicates that the parties intended to charge the buyer of the Barbara Trust Shares with interest as a result of a delay in transferring them—especially not a delay caused by the seller (here, the Trustees). That silence is particularly notable given that the Shareholder's Agreement contemplates interest in another context. *See* Shareholder's Agreement ¶ 7(a)(ii) (providing for interest on the promissory note). Moreover, the Trustees cannot point to a single decision that awarded an equitable offset in an analogous context, despite the numerous instances in which courts have ordered specific performance of a shareholder agreement's buy-sell provision, *see MTA Opinion*, 2025 WL 3124753, at *6 (collecting cases), so the Court cannot conclude that the parties expected a default rule modeled on equitable conversion

to apply to the Shareholder's Agreement. Accordingly, the Court declines to import the principles underlying the equitable offset to this dispute.[14]

Additional equitable factors weigh against awarding the Trustees prejudgment interest on the Purchase Price. First, the Trustees' breach of the Shareholder's Agreement has prevented Eric from exercising the voting power of the Barbara Trust Shares and corresponding ability to influence Boar's Head for the duration of this litigation.[15] *See* Eric Br. at 14-17. Eric cannot be compensated for that lost value. Second, the Court aims to "achieve[] a fair result under the totality of the circumstances," *NML Cap.*, 699 F.3d at 261 (citation modified), and the Trustees as the breaching party should bear any adverse consequences arising from the delay that they caused, *see Bigelow v. RKO Radio Pictures, Inc.*, 327 U.S. 251, 265 (1946) ("The most elementary conceptions of justice and public policy require that the wrongdoer shall bear the risk of the uncertainty which his own wrong has created."). Though the Trustees maintain that they were stuck in the middle of a dispute between Eric and Frank and that they were ready to sell the Barbara Trust Shares to whomever the Court deemed their rightful owner, *see* Trs. Response at 11-12, the reality is that the Trustees breached the Shareholder's Agreement by not selling the shares to Eric. *See Brunckhorst I*, 2024 WL 4277788, at *25; *Brunckhorst II*, 2025 WL 3126697, at *14. By contrast, Eric claims to have been ready to perform his contractual obligations since the Sale Date.

---

[14] For this reason, the Trustees' reliance on *In re 114 Tenth Avenue Association, Inc.*, 427 B.R. 283 (S.D.N.Y. Bankr. 2010), is unavailing. *See* Trs. Br. at 2-3. Though the Court observed that *114 Tenth Avenue* "support[ed] the viability of the Trustees' equitable offset defense" under the applicable liberal standard for their motion to amend, *see MTA Opinion*, 2025 WL 3124753, at *6, that action concerned a conveyance of real property and thus, for purposes of the present analysis, does not lend support to the Trustees' argument that the Court should extend the equitable offset beyond the real-property context.

[15] The parties dispute whether the Barbara Trust Shares would give Eric the voting power to select unilaterally two of the Company's four directors under the terms of the Shareholder's Agreement. *See* Eric Br. at 14-15; Trs. Response at 7-8; Eric Response at 5-7. The Court does not need to reach this issue.

Stip. ¶ 7. Finally, while the Trustees point to the contract-law principle that "[a]n 'injured party should not recover more from the breach than he would have gained had the contract been fully performed,'" *Aristocrat Leisure Ltd. v. Deutsche Bank Tr. Co. Ams.*, 727 F. Supp. 2d 256, 286-87 (S.D.N.Y. 2010) (quoting *Freund v. Wash. Square Press, Inc.*, 314 N.E.2d 419, 421 (N.Y. 1974)); *see* Trs. Br. at 2, that principle guides courts when calculating a damages award—and in particular consequential damages, *see Freund*, 314 N.E.2d at 420-21—but it provides less guidance for structuring an order directing specific performance of a contract.

The Court thus declines to award the Trustees an equitable offset and denies their request for interest on the Purchase Price.[16]

## IV. Conclusion

In sum, the Trustees shall transfer to Eric: (1) the Barbara Trust Shares, (2) the Distributions paid on those shares from August 18, 2021, through the date that the Barbara Trust Shares are actually conveyed, and (3) prejudgment interest on the Distributions at a rate of nine percent per annum from the date of each Distribution, using the formula found in Appendix B of Eric's response brief, *see* Eric Response, App'x B. Eric shall transfer to the Trustees the Purchase Price either in a lump-sum payment or in installments. If the latter, then Eric shall deliver the Trustees (i) a payment reflecting the Past-Due Purchase Money and (ii) a six-year promissory note for the remaining sixty percent of the Purchase Price, to be paid in six equal annual installments along with interest payments of 4.25 percent multiplied against the balance of the outstanding principal. The parties may net their respective payments.

---

[16] Accordingly, the Court need not consider Eric's alternative arguments against the Trustees' proposed offset. *See* Eric Br. at 20-25.

By July 21, 2026, the parties shall jointly file a proposed judgment setting out the terms of the injunction, updating the amount of Distributions in the event any were made between December 2025 and the date that they file the proposed judgment, and computing interest on the total Distributions.

This Opinion and Order shall initially be filed under seal. The parties shall have until July 28, 2026, to file any proposed redactions to this Opinion and Order, as well as a joint letter addressing why these redactions are justified under *Lugosch v. Pyramid Company of Onondaga*, 435 F.3d 110 (2d Cir. 2006). The parties shall submit a single set of proposed redactions, but may explain any disagreements in their joint letter.

The Clerk of Court is respectfully directed to close Docket Number 608.

SO ORDERED.

Dated: July 7, 2026
New York, New York

JOHN P. CRONAN
United States District Judge